UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

GARY MCCALLA, RINVILLE DORSAINVILLE,  :
DEAN MULZAC, DELVIN HENRY, ASUQUO
UKPONG, RICHARD WHINT, SATISH PATEL,  :
YVON CANTAVE, REGINALD MINAULT and
NIURKA MORILLA,                        :

                                 :                15 Civ. 8002 (LAK) (AJP)
              Plaintiffs,                :

                                       **REPORT & RECOMMENDATION**
              -against-                   :

THE CITY OF NEW YORK, DMITRI DITS,     :
ROBERT D'ALLESSIO, TIMOTHY HOGAN,
THOMAS CONNORS and ELIZABETH           :
SKOWRONEK,
                                 :

              Defendants.                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Lewis A. Kaplan, United States District Judge:**

           Plaintiffs Gary McCalla, Rinville Dorsainville, Dean Mulzac, Delvin Henry, Asuquo

Ukpong, Richard Whint, Satish Patel, Yvon Cantave, Reginald Minault and Niurka Morilla brought

this action against the City of New York ("the City"), Dmitri Dits, Robert D'Allessio, Timothy

Hogan, Thomas Connors and Elizabeth Skowronek for their alleged violations of various anti-

discrimination laws. (See generally Dkt. No. 48: 2d Am. Compl.) On January 3, 2017, the Court

issued an order (Dkt. No. 52) granting plaintiffs' motion to voluntarily dismiss their hostile work

environment and Monell claims (Dkt. No. 51). Presently before the Court is defendants' January

9, 2017 summary judgment motion on plaintiffs' remaining claims brought under 42 U.S.C. §§ 1981

and 1983, the New York State Human Rights Law ("NYSHRL"), the New York City Human Rights

Law ("NYCHRL"), the ADA and the FMLA. (Dkt. No. 56.) For the reasons set forth below,

defendants' summary judgment motion should be <u>GRANTED</u> in part and <u>DENIED</u> in part. Specifically, <u>all</u> claims by Henry, Ukpong, Whint and Cantave should be dismissed. Some claims of the remaining plaintiffs should survive summary judgment.

**FACTS**

**Procedural History**

On October 9, 2015, plaintiffs filed their Complaint alleging, <u>inter alia</u>, claims on behalf of a class "comprised of all past and present Blacks/Non-Hispanic White employees of the [New York City] Department of Buildings [("DOB")] who have been denied promotions, raises and comparable salaries and remunerations in their employment based on their race and ethnic backgrounds." (Dkt. No. 1: Compl. ¶ 81.) During a June 9, 2016 status conference, plaintiffs' counsel indicated his intent to withdraw plaintiffs' class claims. (Dkt. No. 23: 6/9/16 Conf. Tr. at 3.) Plaintiffs formally dismissed their class claims by filing their First Amended Complaint on June 30, 2016. (<u>See generally</u> Dkt. No. 22: 1st Am. Compl.) Plaintiffs filed their Second Amended Complaint on December 8, 2016. (Dkt. No. 48: 2d Am. Compl.) Briefing on the instant motion followed, with plaintiffs requesting and receiving three extensions of time to file their response. (<u>See</u> Dkt. Nos. 62, 64, 66.)

**Gary McCalla & Rinville Dorsainville**

Gary McCalla is black and was born in Jamaica. (Dkt. No. 57: Defs. Rule 56.1 Stmt. ¶¶ 5, 19; Dkt. No. 69-3: McCalla Aff. ¶ 1; Dkt. Nos. 69-1, 69-2: McCalla Dep. at 85.) Prior to joining DOB, McCalla apprenticed for two electrical companies for three years and worked as a crew chief for three years. (Defs. Rule 56.1 Stmt. ¶ 6; Dkt. No. 67: Pls. Rule 56.1(b) Counter-Stmt. ¶ 1.) McCalla began working at DOB in November 1999 as an Electrical Inspector assigned to Manhattan and the Bronx. (Defs. Rule 56.1 Stmt. ¶ 8; Dkt. No. 68: Pls. Resp. To Defs. Rule 56.1

Stmt. ¶ 8.)

Rinville Dorsainville is black and was born in Haiti. (Defs. & Pls. Rule 56.1 Stmts. ¶ 20; Dkt. No. 69-5: Dorsainville Aff. ¶ 1.) He holds a degree in electrical engineering. (Pls. Rule 56.1(b) Counter-Stmt. ¶ 16; Dorsainville Aff. ¶ 3; Dkt. No. 69-4: Dorsainville Dep. at 14.) Prior to joining DOB, Dorsainville worked in the United States for approximately four years as an electrician and supervising electrician. (Defs. Rule 56.1 Stmt. ¶ 21; Pls. Rule 56.1(b) Counter-Stmt. ¶ 16; Dorsainville Aff. ¶ 3; Dkt. No. 59-1, Ex. I: Dorsainville Resume; Dorsainville Dep. at 22-23.) Dorsainville joined DOB in 1989 as an Electrical Inspector assigned to the Manhattan Unit. (Defs. & Pls. Rule 56.1 Stmts. ¶ 22; Dorsainville Dep. at 18.)

In January 2013, the DOB began interviewing applicants for two new Supervising Inspector positions. (Defs. & Pls. Rule 56.1 Stmts. ¶ 13; Dkt. No. 59-1, Ex. D: Connors Aff. ¶ 14; Dkt. No. 59-1, Ex. E: Interview Schedule.) McCalla interviewed to fill one of those positions on January 24, 2013. (Defs. Rule 56.1 Stmt. ¶ 15; Ex. E: Interview Schedule.) Ferron Pinnock, who also is black and from Jamaica, conducted McCalla's interview. (McCalla Dep. at 52, 87; see also Dkt. No. 75-3: Solanto Dep. at 53.) At some point during the application process, McCalla was assessed as "need[ing] leadership mentoring" (Defs. Rule 56.1 Stmt. ¶ 15; Ex. E: Interview Schedule), although it is not clear from the record who made this assessment (see Ex. E: Interview Schedule). At the time of his application, McCalla had been at DOB for more than ten years; a coworker recalled that McCalla "perform[ed] most of the functions that are needed" as an Inspector. (Solanto Dep. at 48; Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 14; Pls. Rule 56.1(b) Counter-Stmt. ¶¶ 6, 12.) McCalla asserts that he had the necessary supervisory experience to become a Supervising Inspector because "probably once a month" he would "fill in for a day" when the supervisor or chief was out. (McCalla Dep. at 51.)

According to McCalla, Chief Inspector "Michael Rogaleski told [McCalla] that [he] was the most qualified inspector for promotion to one of the two openings for supervisors in the electrical department and that [McCalla] would get one of the two open positions." (McCalla Aff. ¶ 7; Pls. Rule 56.1(b) Counter-Stmt. ¶ 13; <u>see also</u> McCalla Dep. at 53-54, 107.) McCalla asserts that because Rogaleski directly supervised McCalla and the two candidates ultimately selected for the Supervising Inspector positions—Philip DiMaggio and Thomas Solanto—he was "in a better position to know their qualifications and abilities tha[n] Thomas Connors." (McCalla Aff. ¶ 7; Pls. Rule 56.1(b) Counter-Stmt. ¶ 13.)[1]

Dorsainville did not apply for the Supervising Inspector positions because Leonid Miller and Rogaleski told him before the positions were posted that he had been selected to fill one of them. (Defs. & Pls. Rule 56.1 Stmts. ¶ 24; Pls. Rule 56.1(b) Counter-Stmt. ¶ 17; Dorsainville Aff. ¶¶ 4-5; Dorsainville Dep. at 52-53, 60.)[2] At that time, Miller was the Director of Operations

---

[1] Defendants argue that Rogaleski's statements to McCalla are hearsay because there is no direct evidence suggesting Rogaleski played a role in the selection of DiMaggio or Solanto for the Supervising Inspector positions. (<u>See</u> Dkt. No. 58: Defs. Br. at 12.) The Court disagrees. "Under Federal Rule of Evidence 801(d)(2)(D), a statement is not hearsay when made 'by the party's agent or servant concerning a matter within the scope of the agency or employment, [and] during the existence of the relationship.'" <u>United States</u> v. <u>Rioux</u>, 97 F.3d 648, 660 (2d Cir. 1996). For this rule to apply, Rogaleski must have "be[en] an advisor or other significant participant in the decision-making process that is the subject matter of the statement." <u>Id.</u> at 661; <u>accord</u>, <u>e.g.</u>, <u>Walsh</u> v. <u>N.Y.C. Hous. Auth.</u>, 828 F.3d 70, 79 (2d Cir. 2016). On summary judgment, the Court must draw all reasonable inferences in favor of the non-moving party. (<u>See</u> cases cited on page 55 below.) Based on Rogaleski's status as McCalla's supervisor and his alleged statements that McCalla "was the most qualified inspector for promotion" and that McCalla "would get one of the two open positions" to which he applied, the Court can (and must) infer that Rogaleski played at least an advisory role in the promotion decision-making process as to McCalla—even if his advice was ultimately ignored by Connors.

[2] Miller's and Rogaleski's statements to Dorsainville are not hearsay because they are being offered to explain Dorsainville's failure to apply for the Supervising Inspector positions; they
(continued...)

(Defs. & Pls. Rule 56.1 Stmts. ¶ 25; Dorsainville Dep. at 53; Dkt. No. 75-7: Miller Dep. at 21) and Rogaleski was the Chief of the Electrical Unit for Manhattan (Pls. Rule 56.1(b) Counter-Stmt. ¶¶ 17, 19; see also Dkt. No. 59-1, Ex. E: Hierarchy Chart). Dorsainville believed Miller's and Rogaleski's statements because "many times Defendants promoted people without their applying for" a promotion. (Dorsainville Aff. ¶ 9.) After his conversations with Miller and Rogaleski, Dorsainville went on a month-long vacation. (Pls. Rule 56.1(b) Counter-Stmt. ¶¶ 17-18; Dorsainville Aff. ¶¶ 6-7.) Upon returning to work, Dorsainville learned that the Supervising Inspector positions had been filled. (Pls. Rule 56.1(b) Counter-Stmt. ¶¶ 17-18; Dorsainville Aff. ¶¶ 7-8.)

Thomas Connors, who was either the Executive Director or Senior Executive Director of Inspection Services at the time (see Defs. & Pls. Rule 56.1 Stmts. ¶ 13; Solanto Dep. at 67; Ex. E: Hierarchy Chart), made the decision to award the Supervising Inspector positions to DiMaggio and Solanto (Defs. & Pls. Rule 56.1 Stmts. ¶ 16; Connors Aff. ¶¶ 16, 18; McCalla Dep. at 84, 88; Solanto Dep. at 65). DiMaggio and Solanto are white (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 16; Pls. Rule 56.1(b) Counter-Stmt. ¶ 8; Ex. E: Interview Schedule; Dkt. No. 75-4: DiMaggio Dep. at 43; Solanto Dep. at 85), and both were trained by McCalla and Dorsainville (Pls. Rule 56.1(b) Counter-Stmt. ¶¶ 5, 17; Pls. Resp. To Defs. Rule 56.1 Stmt. ¶¶ 14, 24; McCalla Aff. ¶ 9; McCalla Dep. 56-57, 109; Dorsainville Aff. ¶¶ 12, 17).

According to Connors, "[a]n employee's length of service at DOB does not

---

2/    (...continued)
are not being offered in support of the truth of the matter asserted—i.e., that Dorsainville was actually given the promotion. See, e.g., In re MetLife Demutualization Litig., 262 F.R.D. 217, 236 (E.D.N.Y. 2009) (a statement "that would otherwise satisfy the definition of hearsay, if not offered for the truth of the matters asserted . . . is not hearsay." (citing Fed. R. Evid. 801(c)). The Court notes, however, that like Rogaleski (see page 4 n.1 above; Dorsainville Dep. at 83-84), Leonid Miller did not participate in the decision to promote DiMaggio and Solanto (Defs. & Pls. Rule 56.1 Stmts. ¶ 26; Connors Aff. ¶ 18).

necessarily make the employee qualified for a supervisor position." (Connors Aff. ¶ 15.)  Connors asserts that he selected DiMaggio and Solanto because they had "demonstrated the ability to supervise themselves and other inspectors" by "tak[ing] the lead in routing out other inspectors." (Connors Aff. ¶¶ 15-16; Defs. Rule 56.1 Stmt. ¶¶ 14, 16.)[3]  Solanto testified, however, that his duties as a Supervising Inspector were to do "quality assurance checks on the inspectors in the field." (Solanto Dep. at 80-81.)  And when McCalla later asked Ferron Pinnock why he was not selected, Pinnock told him that it was partly because McCalla was not "versatile" in computers. (McCalla Dep. at 54-55.)

DiMaggio joined DOB in March 2012.  (Defs. Rule 56.1 Stmt. ¶ 17; Pls. Resp. To Defs. Rule 56.1 Stmt. ¶¶ 14, 16; Pls. Rule 56.1(b) Counter-Stmt. ¶ 11.)  DiMaggio had previously worked as an electrician for eight years, an operating engineer for four years, and as a foreman/journeyman electrician for roughly eleven years.  (Defs. & Pls. Rule 56.1 Stmts. ¶ 17; Dkt. No. 59-1, Ex. F: DiMaggio Resume.)  Connors selected DiMaggio for the Supervising Inspector position approximately two years after DiMaggio joined DOB.  (Defs. & Pls. Rule 56.1 Stmts. ¶ 16; Pls. Rule 56.1(b) Counter-Stmt. ¶ 16; DiMaggio Dep. at 52; Connors Aff. ¶¶ 16, 18.)  Ferron Pinnock, who was present during DiMaggio's interview, told DiMaggio that he interviewed well. (DiMaggio Dep. at 52-53.)  According to McCalla, however, DiMaggio was unqualified for the Supervising Inspector position because McCalla "was being sent to find and correct mistakes in

---

[3]     Plaintiffs conclusorily assert that DiMaggio "ha[d] no experience for the supervisory position that he was promoted to" (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 16; see also Pls. Rule 56.1(b) Counter-Stmt. ¶ 12) and that "Solanto was promoted over . . . McCalla even though he did not have the academic qualification nor managerial skill required" (Pls. Rule 56.1(b) Counter-Stmt. ¶ 6).  But the deposition excerpts cited in support of these assertions do not create any dispute regarding Solanto's or DiMaggio's supervisory experience.  (See McCalla Dep. at 80-81; Solanto Dep. at 48-50.)

Di[M]aggio's work" (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 16; <u>see also</u> Pls. Rule 56.1(b) Counter-Stmt. ¶ 12; McCalla Aff. ¶ 11; McCalla Dep. at 80-84), and because "DiMaggio did not know how to read plans" (McCalla Aff. ¶ 11).[4/]

 Solanto joined DOB in 2012. (Defs. & Pls. Rule 56.1 Stmts. ¶ 18; <u>see also</u> Pls. Rule 56.1(b) Counter-Stmt. ¶ 12.) Solanto had previously worked as an electronics and engineering technician for multiple employers between 1980 and 2000, and operated his own electrical company between 2000 and 2012. (Defs. & Pls. Rule 56.1 Stmts. ¶ 18; Dkt. No. 59-1, Ex. G: Solanto Resume.) Connors selected Solanto for the Supervising Inspector position approximately one year after Solanto joined DOB. (Defs. & Pls. Rule 56.1 Stmts. ¶¶ 16, 18; Pls. Rule 56.1(b) Counter-Stmt. ¶ 12; Solanto Dep. at 74-75; Dkt. No. 59-1, Ex. E: Personnel Action Request.)

 According to Winston McKenzie, one of Connors' subordinates in the DOB Electrical Unit (<u>see</u> Ex. E: Hierarchy Chart), "[f]rom the time [Connors] came into the [DOB in 2011], . . . [he] was very clear that he wanted to make changes and spoke often and openly about the reason he wanted to make changes - too many black supervisors and too many black people" (Dkt. No. 74-7: McKenzie Aff. ¶ 11). Connors "often stated that the Department was too black . . . and that he would change it." (<u>Id.</u> ¶ 12.) Connors made such comments "in the presence of staff, including

---

[4/] McCalla asserts that after DiMaggio's promotion, DiMaggio approached McCalla and acknowledged that McCalla "was more qualified than him and the position he was promoted to belonged to [McCalla] and that [McCalla] should have been the one to be promoted." (McCalla Aff. ¶ 10; <u>see also</u> McCalla Dep. at 67-68, 79.) Unlike Rogaleski's statement to McCalla, however (<u>see</u> page 4 n.1 above), it cannot be said that this alleged statement by DiMaggio was made in his capacity as "an advisor or other significant participant in the decision-making process that is the subject matter of the statement." <u>United States</u> v. <u>Rioux</u>, 97 F.3d at 661. The Court therefore disregards this statement as hearsay. <u>See</u>, <u>e.g.</u>, <u>Burlington Coat Factory Warehouse Corp.</u> v. <u>Esprit De Corp.</u>, 769 F.2d 919, 924 (2d Cir. 1985) (a party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment"); <u>see also</u> Defs. Br. at 13 n.5.

black inspectors." (Id.) McKenzie recalled two occasions on which such statements were made: once at the DOB office at 280 Broadway on a Friday in 2012 (id. ¶ 13), and again in the presence of Frank Koluchi at the DOB office at 1 Centre Street sometime after McKenzie had been demoted (id. ¶ 14). According to McKenzie, Connors once made such comments after "some black supervisors suggested that he sign off in writing any direction he gave them that they felt was contrary to Department of Buildings regulations and directives." (Id. ¶ 15.)

It is undisputed, however, that "Connors has promoted several black employees of Caribbean national origin to supervisor and executive positions." (Defs. & Pls. Rule 56.1 Stmts. ¶ 28; Connors Aff. ¶ 5.) McCalla responds that this fact "misses the whole picture" because when Connors came to DOB, "[t]here were already many African American employees many of them supervisors in place." (McCalla Aff. ¶¶ 2-3.) Thus, according to McCalla, it is likely that Connors promoted black employees "not due to his preference but because they were the only ones in line for the promotional positions." (McCalla Aff. ¶ 3.)[5]

**Dean Mulzac**

Dean Mulzac is black and was born in St. Vincent, West Indies. (Defs. & Pls. Rule 56.1 Stmts. ¶ 29; Dkt. Nos. 70, 70-1: Mulzac Dep. at 9-10.) Prior to joining DOB, Mulzac worked as a construction manager for two years, a construction superintendent for approximately two years,

---

[5]     During his deposition, McCalla asserted that he was improperly denied a raise. (McCalla Dep. at 100-02; see also McCalla Aff. ¶ 12.) Defendants argue that these claims are without merit (Defs. Br. at 13), and Plaintiffs fail to respond (see Dkt. No. 71: Pls. Opp. Br. at 15-18; Pls. Resp. To Defs. Rule 56.1 Stmt. ¶¶ 6-19; Pls. Rule 56.1(b) Counter-Stmt. ¶¶ 1-15). Thus, to the extent McCalla asserts discrimination or retaliation claims based on denial of a raise, the Court deems those claims abandoned and does not discuss their underlying facts herein. See, e.g., Jessamy v. City of New Rochelle, 292 F. Supp. 2d 498, 515 n.21 (S.D.N.Y. 2003) ("'Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.'").

and an assistant superintendent for approximately three years. (Defs. Rule 56.1 Stmt. ¶ 30; Pls. Resp. To Defs. Rule 56.1 Stmt. ¶¶ 30-31, 35, 38; Pls. Rule 56.1(b) Counter-Stmt. ¶ 21; Dkt. No. 59-1, Ex. L: Mulzac Resume.) Mulzac also has a bachelor's degree in construction management and an associates degree in architecture. (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶¶ 31, 35, 38; Pls. Rule 56.1(b) Counter-Stmt. ¶ 22; Mulzac Dep. at 11.) Mulzac joined DOB in 2005 as a Construction Inspector assigned to Manhattan. (Defs. & Pls. Rule 56.1 Stmts. ¶ 31; Mulzac Dep. at 25.) In January 2014, Mulzac was assigned to Queens as a Development Inspector. (Defs. & Pls. Rule 56.1 Stmts. ¶ 31; Mulzac Dep. at 27, 34-35.) During his tenure at DOB, Mulzac acquired supervisory skills by "training new hires from time to time." (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 33; Pls. Rule 56.1(b) Counter-Stmt. ¶ 23; Mulzac Dep. at 82.) He also acted as a "field supervisor," meaning he supervised other inspectors while "still doing inspections," as opposed to doing so while "in the office." (Mulzac Dep. at 82, 84-85.)

On May 23, 2014, Mulzac interviewed for a Supervising Inspector position. (Defs. Rule 56.1 Stmt. ¶ 33; Dkt. No. 59-1, Ex. M: Interview Schedule.) At some point during the application process, Mulzac was assessed as possessing "[i]nadequate [m]anagerial/supervisory skills" (Defs. Rule 56.1 Stmt. ¶ 33; Ex. M: Interview Schedule), although it is not clear who made this assessment (see Ex. M: Interview Schedule). Zafeirios Chatzis, who is white, was selected to fill the Supervising Inspector position, effective August 3, 2014. (Defs. & Pls. Rule 56.1 Stmts. ¶ 34; Pls. Rule 56.1(b) Counter-Stmt. ¶ 24; Dkt. No. 59-1, Ex. M: Personnel Action Request.) Chatzis joined DOB in 2007 as a Construction Inspector. (Defs. & Pls. Rule 56.1 Stmts. ¶ 35.) Prior to joining DOB, Chatzis worked as a carpenter and foreman for roughly nine years. (Defs. Rule 56.1 Stmt. ¶ 35; Dkt. No. 59-1, Ex. N: Chatzis Resume.) Mulzac asserts that Chatzis was less qualified for the position because he lacked Mulzac's seniority, experience and academic

qualifications. (Defs. Rule 56.1 Stmt. ¶ 34; Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 35; Pls. Rule 56.1(b) Counter-Stmt. ¶ 24; Mulzac Dep. at 49-50.)

Mulzac interviewed for an Associate Inspector position in July 2014. (Defs. & Pls. Rule 56.1 Stmts. ¶ 36.) At some point during the application process, Mulzac was assessed as the "Third Choice Candidate" (Defs. Rule 56.1 Stmt. ¶ 36; Dkt. No. 59-1, Ex. O: Interview Schedule), although it is not clear who made this assessment (see Ex. O: Interview Schedule). Joseph Iacopetta, who is white (see Ex. O: Interview Schedule), was selected for the Associate Inspector position, effective September 14, 2014 (Defs. & Pls. Rule 56.1 Stmts. ¶ 37; Pls. Rule 56.1(b) Counter-Stmt. ¶ 25; Dkt. No. 59-1, Ex. O: Personnel Action Request). Iacopetta joined DOB in 2012 as a Multi-Discipline Inspector. (Defs. & Pls. Rule 56.1 Stmts. ¶ 38; Dkt. No. 59-1, Ex. O: Iacopetta Resume.) Prior to joining DOB, Iacopetta worked as a construction supervisor for roughly seven years and an engineering technician for about two years. (Defs. Rule 56.1 Stmt. ¶ 38; Iacopetta Resume.) Mulzac asserts that Iacopetta was less qualified for the position because he lacked Mulzac's education and work experience. (Defs. Rule 56.1 Stmt. ¶ 37; Pls. Resp. To Defs. Rule 56.1 Stmt. ¶¶ 37-38; Pls. Rule 56.1(b) Counter-Stmt. ¶ 25; Mulzac Dep. at 52.)

Mulzac again interviewed for a Supervising Inspector position in June 2015. (Defs. & Pls. Rule 56.1 Stmts. ¶ 39.) At some point during the application process, Mulzac was assessed as the "Second-Choice Candidate" (Defs. & Pls. Rule 56.1 Stmts. ¶ 39; Dkt. No. 59-1, Ex. P: Interview Schedule), although it is not clear who made this assessment (see Ex. P: Interview Schedule). James Glynn, who is white (see Mulzac Dep. 55-56; Dkt. No. 59-2, Ex. S: Interview Schedule), was selected to fill the Supervising Inspector position, effective June 22, 2015. (Defs. Rule 56.1 Stmt. ¶ 40; Dkt. No. 59-1, Ex. P: Personnel Action Request.) Glynn joined DOB in 2012 as a Multi-Discipline Inspector. (Defs. & Pls. Rule 56.1 Stmts. ¶ 41.) Prior to joining DOB, Glynn

worked as a foreman for more than five years, as an electrician for six years, and as a building inspector for about three years. (Defs. Rule 56.1 Stmt. ¶ 41; Dkt. No. 59-1, Ex. P: Glynn Resume.) Mulzac asserts that Glynn was less qualified for the Supervising Inspector position because he lacked Mulzac's experience and educational background. (Defs. & Pls. Rule 56.1 Stmts. ¶ 40; Mulzac Dep. at 58-59.)[6/]

When asked who made the final decision as to who would receive a particular position to which he applied, Mulzac replied that "[a]ll positions, all selections, are made by Thomas Connors." (Mulzac Dep. at 68.)[7/]

**Delvin Henry**

Delvin Henry is black and was born in Barbados, West Indies. (Defs. & Pls. Rule 56.1 Stmts. ¶ 42; Pls. Rule 56.1(b) Counter-Stmt. ¶ 70; Dkt. Nos. 70-2, 70-3, 70-4: Henry Dep. at 8.) Prior to joining DOB, Henry worked as a union carpenter for approximately sixteen years and

---

[6/] Plaintiffs assert that "[s]ome of the new hires that [Mulzac] trained were promoted over him." (Pls. Rule 56.1(b) Counter-Stmt. ¶ 23; see also Pls. Opp. Br. at 21.) Although Mulzac testified at deposition to training new hires (see, e.g., Mulzac Dep. at 82), the portions of his deposition cited by plaintiffs do not contain evidence establishing that Mulzac trained Chatzis, Iacopetta or Glynn (see Mulzac Dep. at 81-82, 84-86).

[7/] The record contains information regarding nine other promotions for which Mulzac applied. (See Dkt. No. 75-2: Mulzac Positions; Mulzac Dep. at 64-81.) However, Mulzac testified that for eight of these positions, his failure to receive the position was not discriminatory or he had no opinion whether it was discriminatory. (Mulzac Dep. at 64-81.) And notably, two of those eight positions were given to black applicants of Caribbean national origin. (Mulzac Dep. at 70-74; see also Defs. Br. at 16 n.8.) For the ninth position—Supervising Inspector, BPP (see Mulzac Positions at 139)—Mulzac believed that his failure to receive the position was discriminatory because he was more qualified than the selected candidate, who was white; but he could not recall the white candidate's name or any specifics about his or her qualifications (Mulzac Dep. at 65-69; see also Pls. Rule 56.1(b) Counter-Stmt. ¶ 23). The Court agrees with defendants (see Dkt. No. 78: Defs. Reply Br. at 10-11 & n.1) that plaintiffs cannot—at this late stage—blame defendants for their own failure to develop such facts (see Pls. Opp. Br. at 21).

also worked for several private construction companies. (Defs. & Pls. Rule 56.1 Stmts. ¶ 43; Pls. Rule 56.1(b) Counter-Stmt. ¶ 71; Henry Dep. at 14-15.) Henry joined DOB in June 1999 as a Construction Inspector. (Defs. & Pls. Rule 56.1 Stmts. ¶ 45; Pls. Rule 56.1(b) Counter-Stmt. ¶ 72; Henry Dep. at 13, 21.) Since joining DOB, Henry has been promoted to the positions of Supervisor and Assistant Chief/Triage Officer; he has been assigned to Brooklyn, Queens, and the Manhattan-based Emergency Response Team ("ERT"). (Defs. & Pls. Rule 56.1 Stmts. ¶ 45; Henry Dep. at 26-27, 48.)

In October 2011, Henry was assigned to Manhattan as a Triage Officer and was told by Dmitri Dits that he would no longer need a City vehicle (Defs. & Pls. Rule 56.1 Stmts. ¶ 48; Henry Dep. at 80, 83); Dits reassigned Henry's vehicle to Tom Mascialino, who is white (Pls. Rule 56.1(b) Counter-Stmt. ¶ 80; Henry Dep. at 83). Henry asserts that "all his fellow Assistant Chiefs in the Manhattan Office had vehicles assigned to them and that he was the only Assistant Chief who was not assigned a city vehicle." (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 48; Pls. Rule 56.1(b) Counter-Stmt. ¶ 81; Henry Dep. at 92.) Dits could not recall any other Triage Officers who had City vehicles (Dkt. No. 74-5: Dits Dep. at 87) and testified that "none of the triage officers were assigned a vehicle" (id. at 90).

As a result of losing his City vehicle, Henry lost his parking permit and gas card. (Defs. & Pls. Rule 56.1 Stmts. ¶¶ 50-52; Pls. Rule 56.1(b) Counter-Stmt. ¶ 82.) Henry requested a parking permit for use with his personal car because he was "recovering from cancer" and "could not stand for long or carry load on himself" (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶¶ 50, 54; see also Defs. Rule 56.1 Stmt. ¶ 50; Henry Dep. at 85-86, 89). "[O]ther employees with health reasons had parking permits for use in their personal cars." (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 51; Henry Dep. at 87.) Dits was not in charge of permit requests (Dits Dep. at 98-99) and Qurem Cukoviq was

responsible for taking away Henry's gas card (Henry Dep. at 139; <u>see also</u> Dits Dep. at 166).

Henry also testified that he did not receive a raise after his transfer to Manhattan in October 2011. (Defs. & Pls. Rule 56.1 Stmts. ¶ 55; Henry Dep. at 96; <u>see also</u> Dits Dep. at 97.) Henry asserts that his coworker—Andie Holder, who is black and from Grenada (Defs. Rule 56.1 Stmt. ¶ 55; Henry Dep. at 33, 97-99; Dits Dep. at 143)—did receive such a raise, but Henry was unsure why (Defs. & Pls. Rule 56.1 Stmts. ¶ 55).

On November 21, 2012, Henry interviewed for a position as the Assistant Chief of the Emergency Operations Center. (Defs. & Pls. Rule 56.1 Stmts. ¶ 56; Pls. Rule 56.1(b) Counter-Stmt. ¶ 84; Ex. S: Interview Schedule.) At some point during the application process, Henry was assessed as "[q]ualified [b]ut [n]ot [s]elected" for the Assistant Chief position (Defs. & Pls. Rule 56.1 Stmts. ¶ 56), but it is not clear from the record who made this assessment (<u>see</u> Ex. S: Interview Schedule). Dits, who conducted Henry's interview along with Daniel Cornwell (Henry Dep. at 106-07; Dits Dep. at 92), asked all interviewees for the Assistant Chief position whether they would be available to respond to emergencies on a twenty-four-hours-a-day basis (Defs. & Pls. Rule 56.1 Stmts. ¶ 57; Dits Dep. at 92). Henry answered "that he could get up at anytime if the job requires." (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 57; Henry Dep. at 108.) Dits recalled that Henry "didn't give [Dits] any straight answer" to the question. (Dits Dep. at 93, 96-97.) He also recalled having concerns that Henry would not be able to respond to emergencies due to "his personal life and ability." (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 60; Dits Dep. at 92-93.) Juan Arias, who is white, was selected for the Assistant Chief position. (Defs. & Pls. Rule 56.1 Stmts. ¶ 59; Pls. Rule 56.1(b) Counter-Stmt. ¶ 84; Henry Dep. at 109.) That selection was made "formal" by a Personnel Action Request Committee that included Dits. (Dits Dep. at 94, 104.)

Arias joined DOB in 2006 as a Community Associate; he became an Inspector in

2007 and a Supervising Inspector in 2008. (Defs. Rule 56.1 Stmt. ¶ 60; Dkt. No. 59-2, Ex. U: Arias Resume.) Prior to joining DOB, Arias worked as a locator for one year and a construction laborer for four years. (Defs. Rule 56.1 Stmt. ¶ 60; Arias Resume.) According to Dits, Arias was selected for the Assistant Chief position because Arias had experience dealing with emergencies and had been in charge of incidents when working with DOB's Building Enforcement Safety Team ("BEST Squad"). (Defs. & Pls. Rule 56.1 Stmts. ¶ 61; Dits Dep. at 90-91, 94-95.) Henry asserts that he was better qualified than Arias for the Assistant Chief position because he had more experience and "on-the-job training." (Defs. & Pls. Rule 56.1 Stmts. ¶ 59; Henry Dep. at 112.)

Henry asserts that during his employment with DOB, "[w]hite employees earned higher salaries than blacks doing similar work." (Pls. Rule 56.1(b) Counter-Stmt. ¶ 86.) Specifically, Henry asserts that "[a]mongst the Triage Command Officers, . . . Zhaneta Sanilevich (who is white) and Shimauth Bisnauth (who is white)" were paid more. (Pls. Rule 56.1(b) Counter-Stmt. ¶ 88; Dits Dep. at 82-83.) Similarly, Henry states that "Maurice Jelencovich was making a higher base salary . . . as a Triage Officer even though he did not pass the civil service test." (Pls. Rule 56.1(b) Counter-Stmt. ¶ 88; Defs. & Pls. Rule 56.1 Stmts. ¶ 62; Henry Dep. at 115.) Records indicate that between 2008 and 2016, Henry's total salary was $782,888 and Jelencovich's total salary during the same time was $767,080. (Defs. Rule 56.1 Stmt. ¶ 63; Dkt. No. 59-3, Ex. V: Summ. of Henry and Jelencovich Salaries.) Plaintiffs' Rule 56.1 statement asserts that "overtime earnings and adjustments for longevity may account for" Henry's higher total salary (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 63), but Henry testified in deposition that he was not sure why his total salary was higher (Henry Dep. at 119-20).

On March 8, 2013, Henry filed a complaint against DOB with the New York State Division of Human Rights ("NYSDHR") raising various claims of discrimination and retaliation

(Defs. & Pls. Rule 56.1 Stmts. ¶ 64; Dkt. No. 59-3, Ex. W: Henry NYSDHR Compl.), which was ultimately denied for lack of probable cause (Defs. & Pls. Rule 56.1 Stmts. ¶ 65; Dkt. No. 59-3, Ex. X: NYSDHR Determ. & Ord. After Investigation).

Henry testified that between 2013 and 2015, he was denied opportunities to work overtime by Dits.[8] (Defs. & Pls. Rule 56.1 Stmts. ¶ 66.) Dits testified that he never denied Henry overtime, and in fact "encouraged [Henry] to do some overtime." (Defs. Rule 56.1 Stmt. ¶ 67; Dits Dep. at 69.) Dits also recalled that Henry "and other two, three triage officer[s] were offered overtime . . . and they really didn't want to take it . . . [w]ith exception to the short time over the holiday season." (Dits. Dep. at 86.) Henry responds that "he was denied overtime and he complained about it." (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 67; see also, e.g., Henry Dep. at 133-34.)

Henry asserts that he was not registered to take a defensive driving course in 2014 for discriminatory reasons (Defs. & Pls. Rule 56.1 Stmts. ¶ 68; Henry Dep. at 140-43), but admits that failing to take that class did not affect his job (Defs. & Pls. Rule 56.1 Stmts. ¶ 69; Henry Dep. at 143). Henry also took an OSHA training course but did not receive a certificate of completion like his coworkers. (Defs. & Pls. Rule 56.1 Stmts. ¶ 70; Pls. Rule 56.1(b) Counter-Stmt. ¶ 89; Henry

---

[8] Henry raises similar denial of overtime claims arising from his work as Assistant Chief of Construction in Queens under Chief Dennis Zambotti. (See Pls. Rule 56.1(b) Counter-Stmt. ¶ 77; Henry Dep. at 60-63.) Henry claims that Zambotti "constantly denied overtime opportunities" to Henry, and that he "gave all the overtime to the white Assistant Chief" and to "William Trainer, an Inspector, who is white." (Id.) Defendants respond that these facts "refer to time-barred actions." (Dkt. No. 79: Defs. Resp. To Pls.' Rule 56.1(b) Counter-Stmt. ¶ 26.) The Court agrees. Henry testified that he worked as an Assistant Chief under Zambotti between January 2010 (see Henry Dep. at 28, 35, 47) and October 2011 (see id. at 62, 66), and that he filed an internal complaint about denial of overtime in "early 2011" (id. at 62), making such claims time-barred. (See page 68 below.) Moreover, Henry's NYSHRL and NYCHRL claims based on denial of overtime by Zambotti are barred under the election of remedies doctrine. (See pages 76-77 below.)

Dep. at 144-47.)  Henry testified that he "was prohibited by Dmitri [Dits] from entering the office . . . before 7 a.m. everyday while other employees were allowed to do so."  (Pls. Rule 56.1(b) Counter-Stmt. ¶ 91; Henry Dep. at 160-64.)

"On April 30, 2014, Henry sent an email to various persons complaining about unfair treatment on many issues including being denied overtime, training classes, gas card, parking permit and salary issues."  (Pls. Rule 56.1(b) Counter-Stmt. ¶ 92.)  In a May 22, 2014 memorandum addressed to Henry, Bernadette Nespole—DOB's EEO Officer at the time (Defs. Rule 56.1 Stmt. ¶ 54)—responded that "[o]vertime is at the discretion of the unit supervisor based on operational need."  (Dkt. No. 59-2, Ex. R: Nespole Mem. at 223.)  Nespole also noted that Henry had taken a driving course in 2011, that the training is valid for three years, that Henry would "be considered for re-training during the next set of course dates in the new fiscal year," and that "several other inspectors . . . are in the same situation."  (Nespole Mem. at 222.)  With regard to Henry's vehicle being reassigned and his parking permit and gas card being withheld, Nespole stated that such accommodations were not necessary because Henry's "current position d[id] not require . . . routine/normal field work."  (Id.; see also Defs. Rule 56.1 Stmt. ¶ 54; Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 51.)  Finally, Nespole stated that "[a]ccording to Human Resources, [Henry's] salary [was] within" the appropriate range.  (Nespole Mem. at 223.)

**Asuquo Ukpong**

Asuquo Ukpong is black and was born in Nigeria.  (Defs. & Pls. Rule 56.1 Stmts. ¶ 72; Dkt. Nos. 72, 72-1: Ukpong Dep. at 11.)  Prior to joining DOB, Ukpong worked as an architect, project designer and as an assistant professor of architecture at the Pratt Institute (Defs. & Pls. Rule 56.1 Stmts. ¶ 73; Dkt. No. 72-2: Ukpong Aff. ¶ 7); he also "owned an architectural studio that he ran for many years before joining the City" (Pls. Rule 56.1(b) Counter-Stmt. ¶ 234;

Ukpong Aff. ¶ 7; Ukpong Dep. at 19-20). Ukpong is a graduate of the Pratt Institute in New York and holds a bachelor's degree in fine arts, industrial design and interior design; a bachelor's degree in architecture; and a master's degree in urban design and regional planning. (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 73; Pls. Rule 56.1(b) Counter-Stmt. ¶ 219; Ukpong Aff. ¶¶ 2, 7; Ukpong Dep. at 13-14.) Ukpong joined DOB in 2000 and has worked as an Inspector for the Special Project Inspection Team ("SPIT Team"), the Facade Inspection Unit, the Construction Unit and the Boiler Unit. (Defs. & Pls. Rule 56.1 Stmts. ¶ 74; Pls. Rule 56.1(b) Counter-Stmt. ¶¶ 230, 235; Ukpong Aff. ¶¶ 3, 8; Ukpong Dep. at 18, 27-29, 31, 36, 38-39, 41.)

Ukpong asserts that he was transferred to Units where "there was difficult work to be done requiring technical experience and knowledge," but that "immediately after solving the problem, he would be transferred to another unit." (Pls. Rule 56.1(b) Counter-Stmt. ¶ 233; Ukpong Aff. ¶ 6; see also Ukpong Dep. at 88.) He was "always transferred out before the promotional opportunities in those units were advertised." (Pls. Rule 56.1(b) Counter-Stmt. ¶ 236; Ukpong Aff. ¶ 9.) For example, Ukpong approached Commissioner Santulli and asked to remain in the Boiler Unit where "he had worked . . . for four years, had cleaned up all the backlogs in the Bronx and Manhattan and knew that promotional opportunities were coming up." (Pls. Rule 56.1(b) Counter-Stmt. ¶ 239; Ukpong Aff. ¶ 12.) Commissioner Santulli stated that the decision was up to Boiler Unit Director Robert Daley, who is white. (Pls. Rule 56.1(b) Counter-Stmt. ¶ 240; Ukpong Aff. ¶ 13.) Ukpong was not retained, but David Warshall, "a white male who just graduated high school" and had been with DOB for less than one year, was retained. (Pls. Rule 56.1(b) Counter-Stmt. ¶ 240; Ukpong Aff. ¶ 13.) Since his transfer out of the Boiler Unit, the Unit has "hired ten or more new white inspectors." (Pls. Rule 56.1(b) Counter-Stmt. ¶ 240; Ukpong Aff. ¶ 14.)

Ukpong asserts that DOB's "SOP [Standard Operating Procedure] is to adjust upward

an employee's salary when" lateral transfers—such as his transfers between departments discussed above—are made. (Pls. Rule 56.1(b) Counter-Stmt. ¶ 231; Ukpong Aff. ¶ 4.) Ukpong further asserts that while this policy was followed as to white employees, he "was never once given a raise for a lateral transfer" (Pls. Rule 56.1(b) Counter-Stmt. ¶ 231), even after 16 years of working with DOB (Pls. Rule 56.1(b) Counter-Stmt. ¶ 235; Ukpong Aff. ¶ 8). When Ukpong asked Dits why he had not been given a raise after his lateral transfers, Dits replied, "'You are going back to your former unit anyway.'" (Pls. Rule 56.1(b) Counter-Stmt. ¶ 231; Ukpong Aff. ¶ 4.)

Ukpong has informally applied for promotions "in person by approaching the different unit heads and hoping that they would recognize the kind of work that [he] do[es]." (Ukpong Dep. at 53; Defs. & Pls. Rule 56.1 Stmts. ¶ 76; see also Ukpong Aff. ¶ 5.) These unit heads included Executive Asset Manager Mark Sanabria and Gina Bitro with the Human Resources Department. (Pls. Rule 56.1(b) Counter-Stmt. ¶¶ 232, 236; Ukpong Aff. ¶ 5; Ukpong Dep. at 53.) Ukpong recalled applying for one position online, but could not recall when or who was selected for the position. (Defs. & Pls. Rule 56.1 Stmts. ¶ 78; Ukpong Dep. at 62.)

**<u>Richard Whint</u>**

Richard Whint is black and was born in St. George's, Grenada. (Defs. & Pls. Rule 56.1 Stmts. ¶ 79; Pls. Rule 56.1(b) Counter-Stmt. ¶ 97; Dkt. Nos. 72-3, 72-4: Whint Dep. at 13.) Prior to joining DOB, Whint worked for several construction companies and as a carpenter journeyman for a union. (Defs. & Pls. Rule 56.1 Stmts. ¶ 80.) Whint holds certificates in areas such as crane inspection, blueprint reading and asbestos safety. (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 80; Whint Dep. at 20-21.) Whint joined DOB in 2007 as an Inspector. (Defs. & Pls. Rule 56.1 Stmts. ¶ 81; Pls. Rule 56.1(b) Counter-Stmt. ¶ 98; Whint Dep. at 24.) In 2016, Whint was promoted to Supervisor in the Build-it-Back Unit; he was selected to be a Supervisor in the Affordable Housing

Unit that same year.  (Defs. & Pls. Rule 56.1 Stmts. ¶ 82; Pls. Rule 56.1(b) Counter-Stmt. ¶ 115.)

Chief Eyal Amos reassigned Whint's City vehicle to Mike Camara, who is white, after Whint returned from sick leave in 2015.[9]  (Defs. Rule 56.1 Stmt. ¶ 84; Pls. Resp. To Defs. Rule 56.1 Stmt. ¶¶ 84-85; Pls. Rule 56.1(b) Counter-Stmt. ¶ 102; Whint Dep. at 57.)  However, Whint

---

[9]  Neither plaintiffs nor defendants note—in any of their voluminous filings—that plaintiffs refer to "Elam Oems" as the person responsible for reassigning Whint's vehicle (see Pls. Rule 56.1(b) Counter-Stmt. ¶ 101), whereas defendants state that "Eyal Amos" did the deed (see Defs. Rule 56.1 Stmt. ¶ 84; see generally Defs. Resp. To Pls. Rule 56.1(b) Counter-Stmt. ¶¶ 32-37; Defs. Br. at 22-24; Pls. Opp. Br. at 36-37; Defs. Reply Br. at 12-13; Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 85; Whint Dep. at 38, 40, 42, 53, 60, 73).  Plaintiffs' sole comment verging on acknowledgment of this discrepancy asserts that Whint "did not state that Eyal Amos was the supervisor that took the car away." (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 85.)  This comment serves as a fitting simulacrum of plaintiffs' filings on the instant motion insofar as it does more to confuse than clarify and even directly contradicts their statements in other filings—namely, ¶ 67 of plaintiffs' Second Amended Complaint, which states "Chief Amos" is the person who reassigned Whint's vehicle.  In the absence of any explanation from the parties, the Court concludes that "Oems" and "Eyal Amos" are the same person, and that Whint's testimony regarding "Elam" likely refers to DOB employee Sirajul Islam.  This conclusion is complicated by the fact that at his deposition, Whint was explicit in his spelling of "Oems," such that confusion between "Oems" and "Amos" cannot be attributed to an error in transcription.  (See Whint Dep. at 40.)  Also, plaintiffs' Rule 56.1(b) Counter-Statement capitalizes "OEMS" (see Pls. Rule 56.1(b) Counter-Stmt. ¶¶ 101-104, 107-09)—making it the only capitalized name in that filing—and "OEM" is the acronym of an office that exists within DOB—the "Office of Emergency Management" (see, e.g., Hogan Dep. at 26).  Complicating matters further still, plaintiffs' Rule 56.1(b) Counter-Statement refers to "Supervisor Elam OEMS" (Pls. Rule 56.1(b) Counter-Stmt. ¶ 101) and "Chief Elam OEMS" (id. ¶ 102) even though Whint's deposition testimony suggests that "Elam" and "Oems" are two different people (see Whint Dep. at 38 (describing "Elam" as "Indian"), 40 (describing "Oems" as "Jewish white"), 73 ("Oems and Elam told me that.")).  The Court could not locate any documents in the record (besides Whint's deposition transcript and plaintiffs' filings) indicating the existence of persons named either "Elam," "Oems," or "Elam Oems" working at DOB.  Documents do exist, however, indicating the existence of "Eyal Amos" (see, e.g., Dkt. No. 59-4, Ex. CC: Advisory Mem. (listing "Eyal Amos" as a recipient); Dkt. No. 59-4, Ex. DD: Personnel Action Request; Dkt. Nos. 73-1, 73-2, 73-3: Cantave Dep. at 54) and "Sirajul Islam" (see, e.g., Dkt. No. 59-4, Ex. FF: Interview Schedule; Dkt. No. 59-4, Ex. GG: Hierarchy Chart).  Although the Court enjoys using deductive reasoning to unravel the occasional (fictional) case of mistaken identity (see, e.g., SIR ARTHUR CONAN DOYLE, A CASE OF IDENTITY (1891)), the Court does not enjoy wasting its time correcting blatant discrepancies in the record that could—and should—have been identified and explained by the parties.

was again assigned a City vehicle later in 2015 (Defs. & Pls. Rule 56.1 Stmts. ¶ 85) after "'two or three months'" of using his private car for DOB business (Defs. & Pls. Rule 56.1 Stmts. ¶ 85; Pls. Rule 56.1(b) Counter-Stmt. ¶ 103; Whint Dep. at 63).   Whint testified that using his private car during that time period did not prevent him from performing his job duties.  (Defs. & Pls. Rule 56.1 Stmts. ¶ 86; Whint Dep. at 63.)

According to Whint, Amos "harassed Whint a lot and tried to get him fired.  [Amos] reported Whint to [DOB's Internal Audit Division ("IAD")] over a hundred times for nothing significant."  (See Pls. Rule 56.1(b) Counter-Stmt. ¶ 104; see also Whint Dep. at 62, 66.)  On March 12, 2015, IAD issued a memorandum stating that Whint had failed to issue an appropriate violation on November 26, 2013, and that he had previously accepted a penalty in 2012 for failing to abide by DOB protocol.  (Dkt. No. 59-4, Ex. CC: Advisory Mem.; Defs. & Pls. Rule 56.1 Stmts. ¶ 87.) The memorandum admonished that "repeated failure to abide by Department protocol can result in disciplinary action."  (Advisory Mem.; Defs. & Pls. Rule 56.1 Stmts. ¶ 87.)  Whint testified that Robert D'Allessio, Amos, and Philip Krikorian relieved Whint of performing site safety duties and assigned him to processing complaints as a result of the IAD memorandum.  (Defs. & Pls. Rule 56.1 Stmts. ¶ 88; Pls. Rule 56.1(b) Counter-Stmt. ¶ 105; Whint Dep. at 72-75.)[10/]   Whint had been processing complaints already, "'but not as much.'"  (Defs. & Pls. Rule 56.1 Stmts. ¶ 89; Whint Dep.

---

[10/]   Plaintiffs' brief cites a non-existent paragraph of Whint's affidavit in support of the "fact" that "[t]he allegation that Whint had an extensive disciplinary history has no merit as he had only lost one day as discipline based on non-work related incident."  (Pls. Opp. Br. at 37 (citing "Whint Aff. ¶ 16"); see also Dkt. No. 73: Whint Aff. ¶ 13; Whint Dep. at 49.)  This "fact," however, is premised on the false notion that suspension is the only relevant type of disciplinary history.  The Court also notes that the assertions in Whint's affidavit regarding the "sham" nature of his recent promotions are supported only by hearsay (see Whint Aff. ¶ 3) or largely ambiguous emails that fail fully to support the affidavit's sweeping and conclusory "facts" (see Whint Aff. ¶¶ 4-11).

at 76.)  His salary did not change as a result of this reassignment.  (Defs. & Pls. Rule 56.1 Stmts. ¶ 90; Whint Dep. at 82.)  Whint asserts that "when similar complaints [to IAD] were made against white employees," those employees "were neither disciplined nor removed from the Safety Unit." (Pls. Rule 56.1(b) Counter-Stmt. ¶ 105; Whint Dep. at 69.)

On July 9, 2014, Whint interviewed for the position of Assistant Chief of the BEST Squad.  (Defs. & Pls. Rule 56.1 Stmts. ¶ 91; Dkt. No. 59-4, Ex. DD: Interview Schedule.)  At some point during the application process, Whint was assessed as possessing "[i]nadequate managerial/supervisory skills" (Defs. Rule 56.1 Stmt. ¶ 91), but it is not clear from the record who made this assessment (see Ex. DD: Interview Schedule).  Philip Krikorian was selected for the Assistant Chief position, effective September 14, 2014.  (Defs. & Pls. Rule 56.1 Stmts. ¶ 92; Dkt. No. 59-4, Ex. DD: Personnel Action Request.)  Prior to his promotion to Assistant Chief, Krikorian had been working as a Supervisor in the BEST Squad.  (Defs. & Pls. Rule 56.1 Stmts. ¶ 92.)

In late 2015, Whint again applied for a position as Assistant Chief of the BEST Squad.  (Defs. & Pls. Rule 56.1 Stmts. ¶¶ 94-95; Pls. Rule 56.1(b) Counter-Stmt. ¶ 111; see also Ex. FF: Interview Schedule.)  At some point during the application process, Whint was marked as "DI" for "Declined Interview" (Defs. & Pls. Rule 56.1 Stmts. ¶ 95; Ex. FF: Interview Schedule), but it is not clear who made that notation (see Ex. FF: Interview Schedule).  Whint recalled being interviewed for the position by Bernard Ross and Krikorian.  (Whint Dep. at 99.)  Glen Rella, who is white (see Ex. FF: Interview Schedule), was selected to fill the Assistant Chief position, effective December 21, 2015 (Defs. & Pls. Rule 56.1 Stmts. ¶ 94; Whint Dep. at 99; Dkt. No. 59-4, Ex. FF: Personnel Action Request).  Whint asserts that he was more qualified for the Assistant Chief position than Rella because he (Whint) "had more experience in the unit than Rella who had been with the department only about three years."  (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 94; Pls. Rule

56.1(b) Counter-Stmt. ¶ 111; Whint Dep. at 102.) Rella joined DOB in 2008 as an Inspector in the Manhattan Construction and Certificate of Occupancy Units. (Dkt. No. 59-4, Ex. FF: Rella Resume.) Prior to his promotion to Assistant Chief, Rella served as an Inspector at DOB in various units for roughly six years, and as a Supervising Inspector for approximately one and a half years. (Id.)

On June 22, 2015, Whint interviewed for a position as a Supervising Inspector in the BEST Squad. (Defs. & Pls. Rule 56.1 Stmts. ¶ 96; Ex. GG: Interview Schedule.) At some point during the application process, Whint was assessed as "[q]ualified [but] [n]ot [s]elected" (Defs. Rule 56.1 Stmt. ¶ 96), but it is not clear from the record who made this assessment (see Ex. GG: Interview Schedule). Michelle Kotsikonas, who is white, was selected to fill the Supervising Inspector position, effective August 10, 2015.[11/] (Defs. Rule 56.1 Stmt. ¶ 97; Pls. Rule 56.1(b) Counter-Stmt. ¶ 113; Dkt. No. 59-4, Ex. GG: Personnel Action Request.) Whint testified that at the time of her promotion, Kotsikonas was already performing the duties of a supervisor. (Defs. Rule 56.1 Stmt. ¶ 97; Whint Dep. at 87-88.) According to Whint, Philip Krikorian "declared that Kotzikonas [sic] was going to get the position" before any interviews had been conducted. (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 97; Pls. Rule 56.1(b) Counter-Stmt. ¶ 113; Whint Dep. at 107-09.) Kotsikonas joined DOB in 2013 as an Inspector. (Defs. Rule 56.1 Stmt. ¶ 98; Dkt. No. 59-4, Ex. GG: Kotsikonas Resume.) Prior to her promotion to Supervising Inspector, Kotsikonas had served with DOB as an

---

[11/] Plaintiffs do not explicitly dispute that this Supervising Inspector position was given to Kotsikonas (see Pls. Resp. To Defs. Rule 56.1 Stmt. ¶¶ 96-97), but "add[] that the position was given to George Zimmerman" (see Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 96). Given the record evidence submitted by defendants (see Dkt. No. 59-4, Ex. GG: Supervising Inspector Position Materials) and the fact that the portions of Whint's deposition cited in support of plaintiffs' assertion do not relate to the Supervising Inspector position (see Whint Dep. at 103-04), the Court disregards plaintiffs' statement as error.

Inspector for roughly two and a half years. (Kotsikonas Resume.) Prior to joining DOB, Kotsikonas worked as a carpenter for approximately three years and as a journeyman carpenter for one year. (Defs. & Pls. Rule 56.1 Stmts. ¶ 98; Kotsikonas Resume.)

On August 26, 2015, Whint interviewed for a position as Assistant Chief of the Excavation Unit. (Defs. & Pls. Rule 56.1 Stmts. ¶ 99; Dkt. No. 59-4, Ex. HH: Interview Schedule.) At some point during the application process, Whint was assessed as possessing "[i]nadequate [m]anagerial/[s]upervisory [s]kills" (Defs. Rule 56.1 Stmt. ¶ 99; Ex. HH: Interview Schedule), but it is not clear from the record who made this assessment (see Ex. HH: Interview Schedule). Richard Brower, who is white (see Ex. HH: Interview Schedule), was selected to fill the Assistant Chief position (Defs. & Pls. Rule 56.1 Stmts. ¶ 100). Brower joined DOB in 2008 as an Inspector in the Excavation Unit. (Defs. & Pls. Rule 56.1 Stmts. ¶ 100; Dkt. No. 59-4, Ex. HH: Bower Resume.) At the time of his promotion to Assistant Chief, Brower had worked as a Supervising Inspector for about four years and as an Inspector for about three years. (Defs. & Pls. Rule 56.1 Stmts. ¶ 100; Brower Resume.) Prior to working at DOB, Brower worked as a general contractor and construction project manager between 1979 and 2008. (Defs. & Pls. Rule 56.1 Stmts. ¶ 100; Brower Resume.)[12]

---

[12]    Whint asserts that he "applied for the position of Assistant Chief of Excavation but was denied the position which was given to a less qualified white employee who was still in training" (Pls. Rule 56.1(b) Counter-Stmt. ¶ 110), but he fails to identify when he applied for this position, whether he was interviewed, the name of the employee selected, the qualifications of the employee selected, or the identity of the ultimate decision maker (see id.; Whint Dep. at 96-97). Whint also asserts that he "interviewed for the position of Supervising Inspector BEST and . . . the position was given to George Zimmerman, a white employee who had been trained . . . by Whint." (Pls. Rule 56.1(b) Counter-Stmt. ¶ 112.) However, in the portions of Whint's deposition cited in support of that assertion, Whint states that he is unsure whether Zimmerman or Surajul Islam got that position (see Whint Dep. at 103, 119; see also Defs. Reply Br. at 13 n.2), and admits that Islam was more qualified than he was (Whint Dep. at 103, 119).

**Satish Patel**

Satish Patel is Asian and was born in Baroda City, India. (Defs. & Pls. Rule 56.1 Stmts. ¶ 101; Pls. Rule 56.1(b) Counter-Stmt. ¶ 117; Dkt. Nos. 72-5, 72-6, 72-7: Patel Dep. at 8-9, 63.) Prior to joining DOB, Patel was employed from 1998 to 2006 as a private construction inspector. (Defs. & Pls. Rule 56.1 Stmts. ¶ 102; Dkt. No. 59-4, Ex. JJ: Patel Resume.) Patel holds a bachelor's degree in civil engineering from India and multiple certifications relating to construction. (Pls. Rule 56.1(b) Counter-Stmt. ¶ 117; Patel Resume; Patel Dep. at 11, 13.) Patel joined DOB in 2006 as a Construction Inspector. (Defs. & Pls. Rule 56.1 Stmts. ¶ 103; Pls. Rule 56.1(b) Counter-Stmt. ¶ 118; Patel Dep. at 30-31.) Since joining DOB, Patel has worked in the Construction Unit, the Lower Manhattan Construction Command Center, and the Construction Enforcement Unit. (Defs. & Pls. Rule 56.1 Stmts. ¶ 103.) In December 2016, Thomas Connors promoted Patel to Supervising Inspector. (Defs. & Pls. Rule 56.1 Stmts. ¶ 104.)

In 2012, Patel interviewed for a Supervisor position in DOB's Development Unit. (Defs. & Pls. Rule 56.1 Stmts. ¶ 106; Pls. Rule 56.1(b) Counter-Stmt. ¶ 123.) Connors conducted the interview. (Patel Dep. at 61.) James Picone, who is white, was selected for the Supervisor position, effective July 28, 2013. (Defs. & Pls. Rule 56.1 Stmts. ¶ 106; Pls. Rule 56.1(b) Counter-Stmt. ¶ 123; Dkt. No. 59-4, Ex. KK: Personnel Action Request; Patel Dep. at 61.) Patel asserts that he was better qualified for the Supervisor position than Picone because at the time of his promotion, Picone had been at DOB for less than one and a half years, Patel had passed the civil service examination, had more experience doing construction and certificate of occupancy inspections, and had worked in the Development Unit. (Defs. & Pls. Rule 56.1 Stmts. ¶ 107; Pls. Rule 56.1(b) Counter-Stmt. ¶ 123; Patel Dep. at 62-63.) Picone joined DOB in May 2012 as a Multi-Discipline Inspector. (Defs. & Pls. Rule 56.1 Stmts. ¶ 108; Dkt. No. 59-4, Ex. KK: Picone Resume; <u>see also</u>

Connors Aff. ¶ 22.) Prior to joining DOB, Picone worked as a project manager and construction inspector between 1998 and 2003; he owned a general contracting business between 2003 and 2011. (Defs. Rule 56.1 Stmt. ¶ 108; Picone Resume.)

In 2013, Patel interviewed for a Supervising Inspector position with the Manhattan Construction Unit. (Pls. Rule 56.1(b) Counter-Stmt. ¶ 125; Patel Dep. at 68.) Donald O'Connors conducted Patel's interview. (Patel Dep. at 68-69.) That position was awarded to James Glynn, who is white. (Pls. Rule 56.1(b) Counter-Stmt. ¶ 125; Patel Dep. at 70.) Patel asserts that he was better qualified than Glynn because Glynn had been with DOB for less than two years and had not passed any civil service exams. (Pls. Rule 56.1(b) Counter-Stmt. ¶ 125; Patel Dep. at 70.) Patel testified that Donald O'Connors told Patel that Patel had a good interview and that O'Connors had proposed Patel's name for the Supervising Inspector position. (Pls. Rule 56.1(b) Counter-Stmt. ¶ 126; Patel Dep. at 71.) When Patel asked O'Connors why he (Patel) did not get the job, O'Connors stated that the ultimate decision was made by Thomas Connors. (Pls. Rule 56.1(b) Counter-Stmt. ¶ 126; Patel Dep. at 71.) Glynn joined DOB in May 2012. (Dkt. No. 59-1, Ex. P: Glynn Resume.) Prior to joining DOB, Glynn worked as a building inspector for three and a half years, a licensed home inspector for one year, an electrician for six years, and as a foreman for five years. (Id.)

On May 23, 2014, Patel interviewed for a position as Supervising Inspector in the Queens Construction Enforcement Unit. (Defs. & Pls. Rule 56.1 Stmts. ¶ 109.) At some point during the application process, Patel was assessed as lacking "[n]ecessary [p]referred [s]kills" for the position (Defs. Rule 56.1 Stmt. ¶ 109; Dkt. No. 59-1, Ex. M: Interview Schedule), but it is not clear from the record who made that assessment (see Ex. M: Interview Schedule). Zafeirios Chatzis was selected for the Supervising Inspector position. (Defs. & Pls. Rule 56.1 Stmts. ¶ 110.) Patel asserts that he was better qualified for the Supervising Inspector position because he had been at

DOB for "'almost nine years'" at that point, and because he had passed the Associate 1 civil service examination.  (Id.)  According to Patel, Chatzis had not passed that examination at the time of his promotion.  (Id.)  Chatzis joined DOB in August 2007 as a Construction Inspector.  (Dkt. No. 59-1, Ex. N: Chatzis Resume.)  Prior to joining DOB, Chatzis worked as a construction foreman for three and a half years and as a carpenter for five and a half years.  (Id.)

On July 1, 2014, Patel interviewed for an Associate Inspector position in the Development Hub.  (Defs. & Pls. Rule 56.1 Stmts. ¶ 111; Patel Dep. at 80-81.)  At some point during the application process, Patel was assessed as lacking "[n]ecessary [p]referred [s]kills" for the position (Defs. Rule 56.1 Stmt. ¶ 111; Dkt. No. 59-1, Ex. O: Interview Schedule), but it is not clear from the record who made this assessment (see Ex. O: Interview Schedule).  Joseph Iacopetta was selected to fill the Associate Inspector position, effective September 14, 2014.  (Defs. & Pls. Rule 56.1 Stmts. ¶ 112; Pls. Rule 56.1(b) Counter-Stmt. ¶ 130; Dkt. No. 59-1, Ex. O: Personnel Action Request; Patel Dep. at 82.)  Patel asserts that he was better qualified than Iacopetta because he (Patel) had more experience at DOB.  (Defs. & Pls. Rule 56.1 Stmts. ¶ 112; Patel Dep. at 82.)  Iacopetta joined DOB in May 2012.  (Dkt. No. 59-1, Ex. O: Iacopetta Resume.)  Prior to joining DOB, Iacopetta worked as an engineering technician for two years and a construction supervisor for seven years.  (Id.)

In December 2014, Patel applied for a Supervisor position in the Construction Enforcement Unit.  (Defs. & Pls. Rule 56.1 Stmts. ¶ 113; Pls. Rule 56.1(b) Counter-Stmt. ¶ 127; Patel Dep. at 72.)  Derek Peeples and another Supervisor interviewed Patel (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 114; Pls. Rule 56.1(b) Counter-Stmt. ¶ 127; Patel Dep. at 72-73), but the posting was

later cancelled by Dmitri Dits (Defs. & Pls. Rule 56.1 Stmts. ¶ 113; Patel Dep. at 73-75, 84, 87).[13/]

Patel states that the Supervisor position was posted a second time, and that Craig Hughes was selected for the position before Patel found out that it had been re-posted. (Defs. & Pls. Rule 56.1 Stmts. ¶¶ 115-16; Pls. Rule 56.1(b) Counter-Stmt. ¶ 128; Patel Dep. at 86-87.) Patel asserts that he was better qualified than Hughes because he (Patel) trained Hughes and had more experience in the Enforcement Unit. (Defs. & Pls. Rule 56.1 Stmts. ¶ 117; Pls. Rule 56.1(b) Counter-Stmt. ¶ 128; Patel Dep. at 89.) Hughes, who is white, joined DOB in 2008. (Defs. & Pls. Rule 56.1 Stmts. ¶ 118; Patel Dep. at 44; Dkt. No. 59-5, Ex. LL: Hughes Resume.) Prior to joining DOB, Hughes worked as a foreman for twelve years and as a department head for five years. (Defs. & Pls. Rule 56.1 Stmts. ¶ 118; Hughes Resume.)

On June 5, 2015, Patel interviewed for a Supervising Inspector position in the Manhattan Construction Unit. (Defs. & Pls. Rule 56.1 Stmts. ¶ 119.) At some point during the application process, Patel was assessed as a "[t]hird [c]hoice [c]andidate" (Defs. & Pls. Rule 56.1 Stmts. ¶ 119; Dkt. No. 59-1, Ex. P: Interview Schedule), but it is not clear from the record who made

---

[13/] Plaintiffs assert that Peeples told Patel that he (Patel) "was the only applicant qualified for the position," and that Dits cancelled the posting because Dits "did not want Patel to occupy the position." (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶¶ 113-14; see also Defs. Rule 56.1 Stmt. ¶¶ 113-14; Pls. Rule 56.1(b) Counter-Stmt. ¶ 127.) However, during his deposition, Patel testified that what Peeples in fact said was that "I [Peeples] recommended your name, but, unfortunately, the interview was cancelled by Dmitri Dits." (Patel Dep. at 74.) Patel admitted that Peeples did not say that Patel was the only qualified person for that position. (Id. at 74-75.) Similarly, plaintiffs assert that "[a]n employee named Val told Patel that he heard Dmitri [Dits] say that the DOB has enough Indians and coloreds and that they did not want any more coloreds." (Pls. Rule 56.1(b) Counter-Stmt. ¶ 124; Patel Dep. at 64-66.) Contrary to plaintiffs' assertion that Val "heard" Dits make that statement, however, Patel's testimony did not clearly establish Val's basis of knowledge. (See Patel Dep. at 65 ("Q: And how did [Val] know that Dmitri Dits made these comments? A: He told me.").) In any event, defendants correctly note that this statement is hearsay. (Defs. Reply Br. at 13-14; see also cases cited on page 4 n.1 above.)

this assessment (see Ex. P: Interview Schedule).  The Supervising Inspector position was awarded to James Glynn, effective June 22, 2015.  (Defs. & Pls. Rule 56.1 Stmts. ¶ 120.)  Patel asserts that he was better qualified than Glynn because, at the time of his promotion, Glynn still was in his probation period and had not passed any civil service examinations.  (Defs. & Pls. Rule 56.1 Stmts. ¶ 120.)

In 2015, Patel applied for a Supervising Inspector position in the Excavation Unit. (Defs. & Pls. Rule 56.1 Stmts. ¶ 121; Pls. Rule 56.1(b) Counter-Stmt. ¶ 129; Patel Dep. at 76.)  At some point during the application process, Patel was assessed as "[q]ualified [b]ut [n]ot [s]elected" (Defs. Rule 56.1 Stmt. ¶ 121; Dkt. No. 59-4, Ex. MM: Interview Schedule), but it is not clear from the record who made this assessment (see Ex. MM: Interview Schedule).  The record contains a list of applicants purportedly interviewed for the Supervising Inspector position (see Ex. MM: Interview Schedule), but Patel "denies that an interview was conducted; an interview was scheduled but no interview was held, rather Patel was asked to fill out a questionnaire and[] submit same" (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 121; Pls. Rule 56.1(b) Counter-Stmt. ¶ 129; Patel Dep. at 76-77).  Patel could not recall the name of the individual selected.  (Defs. & Pls. Rule 56.1 Stmts. ¶ 122; Patel Dep. at 77-78.)

DOB records indicate that Carlos Saavedra, who is white, was selected to fill the Supervising Inspector position, effective August 3, 2015.  (Defs. & Pls. Rule 56.1 Stmts. ¶ 123; Pls. Rule 56.1(b) Counter-Stmt. ¶ 129; Dkt. No. 59-4, Ex. MM: Personnel Action Request.)  Saavedra joined DOB in 2014 as a Building Inspector.  (Defs. & Pls. Rule 56.1 Stmts. ¶ 123; Dkt. No. 59-4, Ex. MM: Saavedra Resume.)  Prior to joining DOB, Saavadra worked as a construction inspector on multiple projects for ten years and as a construction supervisor for roughly four years.  (Defs. & Pls. Rule 56.1 Stmts. ¶ 123; Saavedra Resume.)  Patel asserts that Saavedra "had been placed in

training for the [Supervising Inspector] position and . . . had been in the department only one year" at the time of his selection for promotion.  (Pls. Rule 56.1(b) Counter-Stmt. ¶ 129.)

Patel asserts that "mostly all my positions that I applied, the decision is made either by Thomas Connors or Dmitri Dits."  (Patel Dep. at 111; Pls. Rule 56.1(b) Counter-Stmt. ¶ 133; <u>see also</u> Pls. Opp. Br. at 35-36.)  However, unless otherwise noted above, this conclusory assertion is unsupported by documentary evidence or testimony from Patel specifying whether it was Connors or Dits who was responsible for any particular decision.[14]

**Yvon Cantave**

Yvon Cantave is black and was born in Port-au-Prince, Haiti.  (Defs. & Pls. Rule 56.1 Stmts. ¶ 124; Pls. Rule 56.1(b) Counter-Stmt. ¶ 140; Cantave Dep. at 15.)  Prior to joining DOB, Cantave worked as a project superintendent/inspector for approximately one year, a mechanical superintendent/junior estimator for two years, a construction manager for roughly one year, and an assistant superintendent for three years.  (Defs. & Pls. Rule 56.1 Stmts. ¶ 125; Dkt. No. 59-6, Ex. OO: Cantave Resume; Cantave Dep. at 24-27.)  He holds a Bachelor of Science degree in architecture technology.  (Cantave Resume; Cantave Dep. at 16.)  Cantave joined DOB in 2000 as a Construction Inspector assigned to the SPIT Team.  (Defs. & Pls. Rule 56.1 Stmts. ¶ 126; Pls. Rule 56.1(b) Counter-Stmt. ¶ 141; Cantave Dep. at 24.)  Since joining DOB, Cantave has been promoted to Supervising Inspector in the SPIT Team, Assistant Chief of the ERT, and Assistant Chief of the BEST Squad.  (Defs. & Pls. Rule 56.1 Stmts. ¶ 126; Pls. Rule 56.1(b) Counter-Stmt. ¶ 143; Cantave

---

[14]    Plaintiffs' filings contain facts regarding the 2011 promotion of Zafeirios Chatzis to a Supervisor position in the Construction Enforcement Unit.  (<u>See</u> Pls. Rule 56.1(b) Counter-Stmt. ¶ 122; Patel Dep. at 57-59, 63-64.)  However, no record evidence suggests that promotions to Supervisor were given as a matter of routine at DOB.  Any claims arising from these facts are therefore time-barred (<u>see</u> pages 63-68 below) and are not discussed further herein.

Dep. at 34, 39-40, 46, 49.)

At some point after 2011, Cantave was assigned to DOB's Office of Emergency Management ("OEM"). (Defs. & Pls. Rule 56.1 Stmts. ¶ 128; see also Pls. Rule 56.1(b) Counter-Stmt. ¶ 143.) On September 21, 2012, the Director of OEM's watch command, Mark Clampet, sent an email to Dmitri Dits and Thomas Mascialino discussing "'a problem we have been having with your employee, Yvon Cantave.'" (Defs. Rule 56.1 Stmt. ¶ 129; Dkt. No. 59-6, Ex. PP: Clampet Email.) According to Clampet's email, Cantave had "on numerous occasions . . . 'disappear[ed]' for periods of time" and would "spend[] a great deal of time on his personal cell phone" preventing him from being "aware of . . . breaking incidents going on." (Clampet Email; Defs. Rule 56.1 Stmt. ¶ 130.) Clampet's email also states that on September 20, 2012, Cantave "reported for duty, then left without notifying the on duty Supervisor . . . of where he was going or when he was coming back." (Clampet Email.) Clampet was "informed that [Cantave] did come into Watch Command for a short time in the late afternoon," but other Watch Commanders were forced to answer Cantave's phone in the meantime. (Id.)[15/]

In September 2012, Cantave was reassigned from OEM to the BEST Squad. (Defs. & Pls. Rule 56.1 Stmts. ¶¶ 131-32; Pls. Rule 56.1(b) Counter-Stmt. ¶¶ 144, 146; Cantave Dep. at 45.) Dits testified that Cantave was "reassigned" because he "received a request from OEM to reassign Cantave" (Defs. Rule 56.1 Stmt. ¶ 131; Dits Dep. at 129-30; see also Hogan Dep. at 25-26; Dkt. No. 74-6: Bitro Dep. at 35-36); Cantave recalled being told by Dits, Gina Bitro and Mark

---

[15/] Plaintiffs cite "Cantave Aff. ¶¶ 3-6" in support of the assertion that "employees called [Cantave] . . . on both his private and work assigned phones" and that he "as a matter of necessity had to leave his desk at OEM to do the actual physical inspection and supervision and always notified proper management" (see Pls. Rule 56.1(b) Counter-Stmt. ¶ 194), but no such affidavit was filed on ECF (accord Defs. Resp. To Pls. Rule 56.1(b) Counter-Stmt. ¶ 55; Defs. Reply Br. at 15).

Sanabria that he was being demoted because he "'did not do [his] job properly'" (Defs. Rule 56.1 Stmt. ¶ 132; Cantave Dep. at 45, 117).[16/]  Cantave asserts that the "reassignment" was actually a demotion because his "duties did, in fact, change in that he . . . was performing the duties of an Inspector rather than the duties of an Assistant Chief Inspector."  (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 131; Cantave Dep. at 46-47.)  He admitted, however, that his pay did not change as a result of the "demotion."  (Defs. & Pls. Rule 56.1 Stmts. ¶ 133; Cantave Dep. at 166; see also Pls. Rule 56.1(b) Counter-Stmt. ¶ 144.)  Cantave testified that the reassignment was discriminatory because "after logically looking at the situation, the only thing I kept going over my mind, the only thing I could come back to is because I'm black."  (Cantave Dep. at 102; Defs. & Pls. Rule 56.1 Stmts. ¶ 134.)[17/]

Cantave testified that he was prevented from performing overtime by Dits and that Cantave's subordinates were given overtime.  (Defs. & Pls. Rule 56.1 Stmts. ¶ 136; Pls. Rule 56.1(b)

---

[16/]    Plaintiffs' assertion that "no body [sic] complained of [Cantave's] work performance" at OEM (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 128) and that "he was doing his job satisfactorily" (Pls. Rule 56.1(b) Counter-Stmt. ¶ 163) is directly contradicted by the Clampet email as well as Cantave's own testimony (see Cantave Dep. at 45).  Plaintiffs' assertion that the email "was a plot to demote [Cantave] from the position at OEM" (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 130) is premised on a misrepresentation of the cited deposition testimony (see Bitro Dep. at 33-35) and thus does not call the email's authenticity or content into dispute.  Plaintiffs' similar assertion that "there was no prior written or other complaint about [Cantave's] work before his demotion" (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 134) is likewise belied by the Clampet email and Gina Bitro's testimony that the meeting at which Cantave's reassignment was discussed occurred "because the office of emergency management sent a letter to Dmitri [Dits]."  (Bitro Dep. at 33-34.)

[17/]    Plaintiffs' assertion that Cantave "successfully filed a grievance about the demotion through his union" (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 132; see also Pls. Rule 56.1(b) Counter-Stmt. ¶ 145) is not supported by the cited deposition testimony (see Cantave Dep. at 49-51), although Cantave did testify that he was "restored . . . to assistant chief status" and "went back to being an assistant chief" in the BEST Squad—a separate unit—after working in that unit for five months (id.).

Counter-Stmt. ¶ 168; Cantave Dep. at 108.) He was told that his requests for overtime were denied due to a fiscal crisis, but "other employees had as much overtime as they wanted." (Defs. & Pls. Rule 56.1 Stmts. ¶ 137; Pls. Rule 56.1(b) Counter-Stmt. ¶ 168; Cantave Dep. at 109.) On October 24, 2011, Chief of Staff Vincent Grippo issued a memorandum stating that DOB's overtime budget had been reduced by 45 percent, and that "[e]ffective 11/1/11, all non-inspection related overtime is ceased until further notice." (Dkt. No. 59-6, Ex. QQ: 10/24/11 Grippo Mem.; Defs. & Pls. Rule 56.1 Stmts. ¶ 138.) A similar memorandum was issued by Grippo on January 15, 2013, stating "all non-inspection related overtime that is not approved in advance by the office of the Chief of Staff must cease until further notice." (Dkt. No. 59-6, Ex. RR: 1/15/13 Grippo Mem.; Defs. & Pls. Rule 56.1 Stmts. ¶ 139.)

Cantave testified that he was required to pay about $800 for his own OSHA training courses. (Defs. & Pls. Rule 56.1 Stmts. ¶ 140; Pls. Rule 56.1(b) Counter-Stmt. ¶ 170; Cantave Dep. at 122.) Gina Bitro, the Assistant Commissioner of Human Capital at DOB, testified that although DOB typically pays for such courses, it did not do so for employees who—like Cantave—were out on FMLA leave. (Defs. Rule 56.1 Stmt. ¶¶ 142-43; Bitro Dep. at 68-69; see also Hogan Dep. at 34-35.)[18] Cantave asserts that being required to pay for his OSHA classes was discriminatory because "two other [white] employees" were allowed to structure their FMLA leave such that they "were allowed to take the . . . classes during their FMLA leave" (Pls. Rule 56.1(b) Counter-Stmt. ¶ 182; Cantave Dep. at 122-23, 127, 136-38) and "'the only thing I'm left to decide upon is, was what's

---

[18] Plaintiffs' assertion that Bitro "was not certain if [Cantave] could take the class while on leave" (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶¶ 142-43) is contradicted by her testimony that although she was initially uncertain, she was later informed by "the general counsel's office" that she should "treat [Cantave] the same way you treat anyone else on leave and everyone else who's on leave does not take training until they come back from leave" (Bitro Dep. at 68-69).

sometimes the obvious – white and black'" (Defs. & Pls. Rule 56.1 Stmts. ¶ 141; Cantave Dep. at 127).[19]

In July 2012 (see Defs. Rule 56.1 Stmt. ¶ 135), Cantave "complained to [DOB's] EEO about being denied training and overtime by Dmitri Dits" (Pls. Rule 56.1(b) Counter-Stmt. ¶ 165; Cantave Dep. at 102-03). "[A]fter Cantave complained . . . he was then allowed to take those training" courses. (Pls. Rule 56.1(b) Counter-Stmt. ¶ 166; Cantave Dep. at 106.) On January 15, 2013, Cantave filed a complaint with the NYSDHR alleging race discrimination and retaliation based on his transfer to the BEST Squad, denial of overtime, denial of training and his complaint to the EEO. (Defs. & Pls. Rule 56.1 Stmts. ¶ 144; Dkt. No. 59-6, Ex. TT: Cantave NYSDHR Compl.) On July 11, 2013, the NYSDHR issued a no probable cause finding. (Defs. & Pls. Rule 56.1 Stmts. ¶ 145; Dkt. No. 59-6, Ex. UU: Determ. & Ord. After Investigation.)

In September 2013, a Major Project Director position was posted (see Dkt. No. 59-6, Ex. VV: Job Posting Notice), but Cantave asserts that "it was no longer there" when he attempted to apply for it (Defs. & Pls. Rule 56.1 Stmts. ¶ 146; Pls. Rule 56.1(b) Counter-Stmt. ¶ 152; Cantave Dep. at 77-78). Bernard Ross, who is white, was selected to fill the Major Project Director position, effective September 30, 2013. (Defs. & Pls. Rule 56.1 Stmts. ¶ 147; Pls. Rule 56.1(b) Counter-Stmt. ¶ 152; Dkt. No. 59-6, Ex. VV: Personnel Action Request; Cantave Dep. at 78.) Cantave asserts that he was better qualified for the Director position than Ross because Ross "'doesn't have a Bachelor

---

[19]    Plaintiffs insist that "Defendants confuse the OSHA training with . . . OEM training" but fail to provide any clarification (see Pls. Opp. Br. at 25)—indeed, plaintiffs failed to file the "Cantave Aff." cited in support of this assertion (accord Defs. Resp. To Pls. Rule 56.1(b) Counter-Stmt. ¶ 55; Defs. Reply Br. at 15). Cantave's testimony also wants for clarity. (Compare Cantave Dep. at 122-23, 127, with id. at 136-38.) In any event, because Bitro testified that her concerns regarding Cantave's FMLA leave pertained to payment for his "OSHA" classes (see Bitro Dep. at 68-69), the Court accepts defendants' contention that Cantave's claim concerns payment for OSHA training.

of Science and he is not a licensed site safety manager.'" (Defs. & Pls. Rule 56.1 Stmts. ¶ 147; Pls. Rule 56.1(b) Counter-Stmt. ¶ 152; Cantave Dep. at 79-80.) Ross joined DOB in 2002 as a Construction Inspector. (Defs. & Pls. Rule 56.1 Stmts. ¶ 148; Dkt. No. 59-6, Ex. VV: Ross Resume.) Prior to joining DOB, Ross owned and operated a contracting business for roughly eighteen years. (Defs. & Pls. Rule 56.1 Stmts. ¶ 148; Ross Resume.) In 2006, Ross was promoted to an Assistant Chief Inspector position at DOB. (Defs. & Pls. Rule 56.1 Stmts. ¶ 148; Ross Resume.) Between 2010 and 2013, Ross served as the Chief Inspector for the Excavation and Interior Demolition and Stalled Sites Units. (Defs. & Pls. Rule 56.1 Stmts. ¶ 148; Ross Resume.)

On January 9, 2014, Cantave interviewed for a position as Chief of the Excavation Unit. (Defs. & Pls. Rule 56.1 Stmts. ¶ 149; Cantave Dep. at 84; Dkt. No. 59-6, Ex. WW: Interview Schedule.) He was interviewed by D'Allessio and Ross. (Cantave Dep. at 84.) At some point during the application process, Cantave was assessed as "[q]ualified but not selected" for that position (Defs. Rule 56.1 Stmt. ¶ 149; Ex. WW: Interview Schedule), but it is not clear from the record who made this assessment (see Ex. WW: Interview Schedule). Gary Grandstaff, who is white, was selected for that position, effective January 27, 2014. (Defs. Rule 56.1 Stmt. ¶ 150; Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 149; Pls. Rule 56.1(b) Counter-Stmt. ¶ 156; Dkt. No. 59-6, Ex. WW: Personnel Action Request; Cantave Dep. at 85.) Cantave asserts he was better qualified than Grandstaff because he (Cantave) had a degree in architecture, was an OSHA trainer, and had experience in excavation work. (Defs. Rule 56.1 Stmt. ¶ 150; Pls. Resp. To Defs. Rule 56.1 Stmt. ¶¶ 149-150; Pls. Rule 56.1(b) Counter-Stmt. ¶ 156; Cantave Dep. at 86-87.) Grandstaff joined DOB in 2008 as an Inspector. (Defs. & Pls. Rule 56.1 Stmts. ¶ 151; Dkt. No. 59-6, Ex. WW: Grandstaff Resume.) Prior to joining DOB, Grandstaff owned and operated a construction company for twenty-five years. (Defs. & Pls. Rule 56.1 Stmts. ¶ 151; Grandstaff Resume.) At the time of his promotion,

Grandstaff had been working as a Supervising Inspector for over a year. (Defs. Rule 56.1 Stmt. ¶ 151; Grandstaff Resume.)

On February 27, 2014, Cantave interviewed for a position as Chief of the ERT. (Defs. & Pls. Rule 56.1 Stmts. ¶ 152; Pls. Rule 56.1(b) Counter-Stmt. ¶ 149; Cantave Dep. at 56.) Dits and someone else conducted the interview. (Cantave Dep. at 57.) At some point during the application process, Cantave was assessed as "[q]ualified [but] not selected" for that position (Defs. Rule 56.1 Stmt. ¶ 152; Dkt. No. 59-6, Ex. XX: Interview Schedule), but it is not clear from the record who made this assessment (see Ex. XX: Interview Schedule). The position was awarded to Daniel Cornwell. (Defs. & Pls. Rule 56.1 Stmts. ¶ 153; Pls. Rule 56.1(b) Counter-Stmt. ¶ 149; Dkt. No. 59-6, Ex. XX: Personnel Action Request; Cantave Dep. at 57.) Cantave asserts that he was better qualified than Cornwell because he (Cantave) had "'more education and more certifications'" and had "'dealt with more disasters.'" (Defs. & Pls. Rule 56.1 Stmts. ¶ 153; Pls. Rule 56.1(b) Counter-Stmt. ¶ 149; Cantave Dep. at 62-63.) Cornwell joined DOB in 2008 as a Construction Inspector. (Defs. & Pls. Rule 56.1 Stmts. ¶ 154; Dkt. No. 59-6, Ex. XX: Cornwell Resume.) In 2012, Cornwell was promoted to Supervising Investigative Inspector; he became the Acting Chief of the ERT in June 2012. (Defs. & Pls. Rule 56.1 Stmts. ¶ 154; Cornwell Resume.) Prior to joining DOB, Cornwell owned and operated a construction company for roughly three years and worked as a carpenter for roughly five years. (Defs. & Pls. Rule 56.1 Stmts. ¶ 154; Cornwell Resume.)

"Around 2014 to 2015," Cantave applied for a position as Deputy Borough Commissioner (Cantave Dep. at 66; Defs. & Pls. Rule 56.1 Stmts. ¶ 155; Pls. Rule 56.1(b) Counter-Stmt. ¶ 151), but he could not recall for which borough (Cantave Dep. at 67). Cantave received an email from someone at human resources telling him that he was not qualified for the position because he was not licensed as a Professional Engineer or Registered Architect. (Defs. & Pls. Rule

56.1 Stmts. ¶ 155; Pls. Rule 56.1(b) Counter-Stmt. ¶ 151; Cantave Dep. at 66-67.)  Cantave asserts that his failure to receive the position was discriminatory because there were "two other white individuals [who] were not licensed professionals and they were also serving in deputy borough commissioner positions and assistant commissioner positions." (Cantave Dep. at 67-68, 70-77; Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 155; Pls. Rule 56.1(b) Counter-Stmt. ¶ 151.)  Cantave could not recall who was selected for the Deputy Borough Commissioner Position.  (Cantave Dep. at 67.)

According to DOB records, Cantave applied to the position of Deputy Borough Commissioner of Manhattan (see Dkt. No. 59-7, Ex. YY: Interview Schedule), which was awarded to Joseph Bruno (Defs. & Pls. Rule 56.1 Stmts. ¶ 156; Dkt. No. 59-7, Ex. YY: Personnel Action Request).  Bruno, who is white (see Ex. YY: Interview Schedule), held a Registered Architect license and a Masters of Architecture degree from Harvard University (Defs. & Pls. Rule 56.1 Stmts. ¶ 156; Dkt. No. 59-7, Ex. YY: Bruno Resume).  Prior to joining DOB in 2004, Bruno worked as an architect for approximately five years.  (Bruno Resume.)

On September 24, 2014, Cantave interviewed for a Night Supervisor ERT position.  (Defs. & Pls. Rule 56.1 Stmts. ¶ 157; Pls. Rule 56.1(b) Counter-Stmt. ¶ 148; Cantave Dep. at 59, 93-94.)  At some point during the application process, Cantave was assessed as the "[t]hird [c]hoice [c]andidate" (Defs. & Pls. Rule 56.1 Stmts. ¶ 157; Dkt. No. 59-7, Ex. ZZ: Interview Schedule), but it is not clear from the record who made this assessment (see Ex. ZZ: Interview Schedule).  The Night Supervisor position was awarded to Richard Schwerdt, who is white (see Ex. ZZ: Interview Schedule), effective November 9, 2014 (Defs. & Pls. Rule 56.1 Stmts. ¶ 158; Pls. Rule 56.1(b) Counter-Stmt. ¶ 148; Dkt. No. 59-7, Ex. ZZ: Personnel Action Request; Cantave Dep. at 60, 94).  Cantave asserts that he was better qualified than Schwerdt because he had more or better certifications, job experience and education.  (Defs. & Pls. Rule 56.1 Stmts. ¶ 158; Pls. Rule 56.1(b)

Counter-Stmt. ¶ 148; Cantave Dep. at 61.) Schwerdt joined DOB in 2008 as a Special Operations Inspector. (Defs. & Pls. Rule 56.1 Stmts. ¶ 159; Dkt. No. 59-7, Ex. ZZ: Schwerdt Resume.) Prior to joining DOB, Schwerdt worked as a construction supervisor for a year and as a project manager/carpenter for eleven years. (Defs. Rule 56.1 Stmt. ¶ 159; Schwerdt Resume.)[20]

      Cantave testified that he applied for a position as Chief of the Build-it-Back Unit, but that Michael Maffei, who is white, was selected to fill that position. (Defs. & Pls. Rule 56.1 Stmts. ¶¶ 160-61; Pls. Rule 56.1(b) Counter-Stmt. ¶ 159; Cantave Dep. at 94-95.) DOB records indicate that Maffei was selected for the position of Administrative Chief Inspector of the Build-it-Back unit, effective December 1, 2014. (Defs. & Pls. Rule 56.1 Stmts. ¶ 161; Pls. Rule 56.1(b) Counter-Stmt. ¶ 159; Dkt. No. 59-7, Ex. AAA: Personnel Action Request.) DOB records also indicate that Cantave "did not show" for his interview for that position, which was scheduled for September 5, 2014. (Defs. Rule 56.1 Stmt. ¶ 161; Dkt. No. 59-7, Ex. AAA: Interview Schedule.)[21] Cantave asserts that he was better qualified than Maffei because "Maffei did not have a degree in Architecture whereas Cantave has a degree in Architecture and had experience in blueprints, plans and zoning requirements." (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 161; Pls. Rule 56.1(b) Counter-Stmt. ¶ 159; Cantave Dep. at 95-96.) Maffei joined DOB in 2001 as a Building Inspector for the Queens Quality

---

[20]    Plaintiffs make much of Dits' opinion that "it would be a demotion to assign Plaintiff Cantave to supervisor ERT when he had the title of Assistant Chief." (Pls. Opp. Br. at 26 (citing Dits Dep. at 121-22).) Dits testified, however, that he had no recollection of Cantave applying for the ERT Night Supervisor position. (Dits Dep. at 118-19.) The Court concludes that Dits' testimony on this point does not "lead to an inference of discrimination" as plaintiffs contend. (Pls. Opp. Br. at 26.)

[21]    Plaintiffs "disagree[] that [Cantave] did not show for interview" and further assert that Cantave "was never invited to interview for this position." (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 161.) The record does not support these assertions. At his deposition, Cantave stated only that he was not interviewed for the position as Chief of the Build-it-Back Unit. (See Cantave Dep. at 94-95.)

of Life Unit. (Dkt. No. 59-7, Ex. AAA: Maffei Resume.) Maffei worked at DOB as an Inspector for two years, as a Training Supervisor and Field Supervisor for almost two years, as an Acting Assistant Chief and Assistant Chief for one year, and as the Chief of Brooklyn and Staten Island Construction for approximately eight years. (Maffei Resume.)

In 2015, Cantave interviewed for a position as Chief Inspector of the BEST Squad. (Defs. & Pls. Rule 56.1 Stmts. ¶ 162; Pls. Rule 56.1(b) Counter-Stmt. ¶ 160; Dkt. No. 59-7, Ex. BBB: Interview Schedule; Cantave Dep. at 97.) He was interviewed by D'Allessio and Ross. (Cantave Dep. at 97; Dkt. No. 74-3: D'Allessio Dep. at 80.) At some point during the application process, Cantave was assessed as "[q]ualified but not selected" (Defs. & Pls. Rule 56.1 Stmts. ¶ 162; Ex. BBB: Interview Schedule), but it is not clear from the record who made this assessment (see Ex. BBB: Interview Schedule). Philip Krikorian, who is white, was selected to fill the Chief Inspector position, effective August 30, 2015. (Defs. & Pls. Rule 56.1 Stmts. ¶ 163; Pls. Rule 56.1(b) Counter-Stmt. ¶ 160; Dkt. No. 59-7, Ex. BBB: Personnel Action Request; Cantave Dep. at 97.) Cantave asserts that he was better qualified than Krikorian because he (Cantave) had a degree in architecture and a safety manager license. (Defs. Rule 56.1 Stmt. ¶ 163; Pls. Resp. To Defs. Rule 56.1 Stmt. ¶¶ 163, 165; Pls. Rule 56.1(b) Counter-Stmt. ¶ 160; Cantave Dep. at 97-98.) Cantave also asserts that the decision to hire Krikorian was discriminatory because "'they first started him as acting chief in the position which took away any chances whatsoever.'" (Defs. & Pls. Rule 56.1 Stmts. ¶ 166; Pls. Rule 56.1(b) Counter-Stmt. ¶ 161; Cantave Dep. at 98, 153.) He further asserts that D'Allessio and Timothy Hogan promoted Krikorian to Acting Chief "with complete disregard of the relevant considerations" such as "academic qualifications" and "work experience." (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 165; Cantave Dep. at 98.)

Krikorian joined DOB in 1988 as an Inspector. (Defs. & Pls. Rule 56.1 Stmts. ¶ 164.)

In 2004, Krikorian was assigned to the BEST Squad; he was promoted to Supervisor in that Unit in 2008. (Id.) D'Allessio testified that Krikorian had "twenty years in high-rise construction, concrete construction, and he had twenty years in the BEST Squad from the inception of the unit until the time that I interviewed him, and I felt that those two things combined were what I needed for that position." (D'Allessio Dep. at 76-77; Defs. & Pls. Rule 56.1 Stmts. ¶ 165.)[22] D'Allessio confirmed Cantave's assertion that Krikorian was appointed Acting Chief, but stated that he (D'Allessio) made that appointment "because of the length of time it takes to fill a chief position, and because he needed 'someone responsible that [he] could deal with on a daily basis.'" (Defs. & Pls. Rule 56.1 Stmts. ¶ 167; D'Allessio Dep. at 76.) Cantave asserts that "[w]hen Krikorian was appointed Acting Chief, Cantave had been Assistant Chief for about six years while Krikorian had been Assistant Chief for only a few months." (Pls. Rule 56.1(b) Counter-Stmt. ¶ 162.)[23]

---

[22] Plaintiffs' assertion that D'Allessio "had no understanding of [Cantave's] educational background" and "admitted that college education was highly relevant for positions he supervised in his unit" are again unsupported by the record. (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 165.) D'Allessio testified that he "had heard that [Cantave] had some architectural training or knowledge or schooling, and . . . a site safety manager license" (D'Allessio Dep. at 73-74), that the importance of education depended on the title at issue (see id. at 75), and that "for positions as assistant chiefs in construction, in excavation, in BEST Squad, [and] in ERT . . . [e]ducation is not one of the primary qualifications for those title[s]" (id.; see also Defs. Reply Br. at 15).

[23] Plaintiffs' filings (see Pls. Rule 56.1(b) Counter-Stmt. ¶¶ 153-55; Pls. Opp. Br. at 24-25; see also Cantave Dep. at 80-81) discuss Thomas Mascialino's promotion from Assistant Chief of Construction (see Dits Dep. at 114) to Chief of ERT. Defendants respond that these facts concern time-barred claims. (See Defs. Resp. To Pls. Rule 56.1(b) Counter-Stmt. ¶ 47; Defs. Reply Br. at 15 n.3.) To begin, Cantave's NYSHRL and NYCHRL claims arising from Mascialino's promotion to chief are barred under the election of remedies doctrine. (See pages 77-78 below.) Furthermore, according to Dits, the Chief of ERT position was advertised and filled "[a]round 2011." (Dits Dep. at 99-102; see also Cantave Dep. at 80-81.) No record evidence suggests that promotions from Assistant Chief to Chief were given as a matter of routine at DOB. Dits testified, moreover, that Mascialino's promotion to Chief constituted a "chang[e] from inspectorial to managerial title" accompanied by "a loss in

(continued...)

Cantave claims that he decided to resign from DOB because he "felt humiliated" after he "realized that he may never be allowed to advance further in his career because of discrimination." (Pls. Rule 56.1(b) Counter-Stmt. ¶ 183; Defs. & Pls. Rule 56.1 Stmts. ¶ 168; Cantave Dep. at 139-40.)

**Reginald Minault**

Reginald Minault is black and was born in Port-au-Prince, Haiti. (Defs. & Pls. Rule 56.1 Stmts. ¶ 169; Pls. Rule 56.1(b) Counter-Stmt. ¶ 195; Dkt. Nos. 73-4, 73-5: Minault Dep. at 9.) He holds a bachelor's degree in physics from Delaware State University. (Pls. Rule 56.1(b) Counter-Stmt. ¶ 196; Minault Dep. at 12; Dkt. No. 59-7, Ex. EEE: Minault Resume.) Prior to joining DOB, Minault worked as a Professor of Mathematics at Medgar Evers College and Long Island University, as a Professor of Geology and Geophysics research at Stony Brook University, and as a project engineer for two construction companies. (Defs. & Pls. Rule 56.1 Stmts. ¶ 170; Pls. Rule 56.1(b) Counter-Stmt. ¶ 197; Minault Resume.) Minault joined DOB in February 2006 as a Construction Inspector. (Defs. & Pls. Rule 56.1 Stmts. ¶ 171; Pls. Rule 56.1(b) Counter-Stmt. ¶ 198.) Since joining DOB, Minault has been assigned to the Brooklyn and Queens Construction Units, the Quality of Life Unit, the ERT, and the Special Audit Unit. (Defs. & Pls. Rule 56.1 Stmts. ¶ 171.) In 2016, Minault was promoted to Assistant Plan Examiner. (Defs. & Pls. Rule 56.1 Stmts. ¶ 172.)

In November 2013, DOB interviewed applicants for the position of Executive Officer for Borough Enforcement Inspections. (Dkt. No. 59-7, Ex. FFF: Interview Schedule.) Minault testified that Joseph Ventour recommended him for the Executive Director position (Minault Dep.

---

23/     (...continued)
salary, because people will lose their overtime." (Dits Dep. at 113-14.) Such evidence establishes that these facts pertain to time-barred claims. (See pages 63-68 below.)

at 113-14), but that Dmitri Dits discouraged him from applying (Defs. & Pls. Rule 56.1 Stmts. ¶ 174; Pls. Rule 56.1(b) Counter-Stmt. ¶ 218; Minault Dep. at 112-15). Specifically, Minault claims that Dits told him "that there was no point for him applying for the position . . . and that the position was not going to be available. As a result Minault did not apply . . . and it was given to a white employee." (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 174; Minault Dep. at 112-14.) Dits could not recall this conversation. (Dits Dep. at 150.) DOB records indicate that Ronald Mener was selected for the position of Executive Officer for Bureau Enforcement, effective January 27, 2014. (Defs. & Pls. Rule 56.1 Stmts. ¶ 175; Dkt. No. 59-7, Ex. FFF: Personnel Action Request.)

Mener joined DOB in 2001 as an Inspector with the BEST Squad. (Defs. & Pls. Rule 56.1 Stmts. ¶ 176; Dkt. No. 59-7, Ex. FFF: Mener Resume.) Prior to joining DOB, Mener worked as a carpenter for roughly twelve years. (Defs. & Pls. Rule 56.1 Stmts. ¶ 176; Mener Resume.) Since joining DOB, Mener had worked in the Special Operations Unit for roughly three years, the Cranes and Derricks Unit for almost a year, and as a Supervising Investigating Inspector with the IAD for roughly three years. (Defs. & Pls. Rule 56.1 Stmts. ¶ 176; Mener Resume.) At the time of his selection for the Executive Officer position, Mener had been working as a Supervisor in the Cranes and Derricks Unit for almost two years. (Defs. & Pls. Rule 56.1 Stmts. ¶ 176; Mener Resume.)[24]

---

[24] Minault asserts that he "interviewed for the position as Chief of Scaffolding Unit but was denied the position which was given to a white employee" and that he "was very qualified for the position." (Pls. Rule 56.1(b) Counter-Stmt. ¶ 201.) However, Minault testified at his November 2016 deposition that he applied for this position "more than five years ago" (Minault Dep. at 50), putting any claims arising from these facts outside the statute of limitations (see pages 63-72 below). In ¶¶ 202-05 of their Rule 56.1(b) Counter-Statement, Plaintiffs assert that Michael Maffei constantly harassed Minault, and that Minault subsequently complained to the EEO about the harassment. However, Minault testified that his report to EEO occurred around 2008 or 2009 (Minault Dep. at 54), again putting any
(continued...)

In "[m]aybe 2011/2012," Minault applied for a position as Supervisor of the Quality of Life Unit. (Minault Dep. at 59; Pls. Rule 56.1(b) Counter-Stmt. ¶ 206.) Chief Dennis Zambotti and Assistant Chief Phil Materra conducted Minault's interview. (Pls. Rule 56.1(b) Counter-Stmt. ¶ 207; Minault Dep. at 59, 62.) According to Minault, Zambotti "ha[d] a history of not promoting individuals that are brown skinned" (Minault Dep. at 67; Pls. Rule 56.1(b) Counter-Stmt. ¶ 207) and "made it crystal clear [Minault] would not be promoted under his supervision" (Minault Dep. at 68; see also Pls. Rule 56.1(b) Counter-Stmt. ¶ 208). The Supervisor position was awarded to a Mr. Powell, who is white. (Pls. Rule 56.1(b) Counter-Stmt. ¶ 206; Minault Dep. at 62.) Minault asserts that he was better qualified than Powell because he (Minault) "had seniority and more experience than Powell." (Pls. Rule 56.1(b) Counter-Stmt. ¶ 206; Minault Dep. at 61, 64-65.) Also, whereas Minault had "passed the Construction Associate exam which was emphasized as a requirement for the position" (Pls. Rule 56.1(b) Counter-Stmt. ¶ 206; Minault Dep. at 63-64), "Powell . . . had not passed the Associate exam" (Pls. Rule 56.1(b) Counter-Stmt. ¶ 206; Minault Dep. at 64). Minault testified that before the Supervisor position was open, Powell "was put there for a very long time to learn the position." (Minault Dep. at 63.)

In what "may have been . . . 2012" (see Minault Dep. at 71), Minault interviewed for a position as Supervisor of the ERT (Pls. Rule 56.1(b) Counter-Stmt. ¶ 211; Minault Dep. at 70-71). Michael Maffei conducted the interview. (Minault Dep. at 71.) The position was awarded to a Mr. Rodriguez, who is "a white Hispanic." (Pls. Rule 56.1(b) Counter-Stmt. ¶ 211; Minault Dep. at 71.) Minault testified that he was more qualified than Rodriguez because "[b]ased on [Rodriguez's] badge number, [Minault] had the seniority," and because Minault had a background in engineering,

24/ (...continued)
claims arising from these facts outside the statute of limitations. (See pages 63-72 below.)

whereas Rodriguez's background was in construction. (Minault Dep. at 72-73; <u>see also</u> Pls. Rule 56.1(b) Counter-Stmt. ¶ 211.) Minault recalled that a background in engineering and construction was a requirement for the Supervisor position. (Pls. Rule 56.1(b) Counter-Stmt. ¶ 211; Minault Dep. at 73-74.)

Around that same time, Minault applied for a position as Assistant Chief of the ERT. (Pls. Rule 56.1(b) Counter-Stmt. ¶ 212; Minault Dep. at 74.) Juan Arias was selected for the position. (Pls. Rule 56.1(b) Counter-Stmt. ¶ 212; Minault Dep. at 74-75.) Minault asserts that he was better qualified for the position than Arias because Arias "did not have any background in engineering and construction" and he did not have any field experience. (Pls. Rule 56.1(b) Counter-Stmt. ¶ 212; Minault Dep. at 76.)[25]

**Niurka Morilla**

Niurka Morilla was born in La Vega, Dominican Republic. (Defs. & Pls. Rule 56.1 Stmts. ¶ 177; Pls. Rule 56.1(b) Counter-Stmt. ¶ 27; Dkt. Nos. 74, 74-1, 74-2: Morilla Dep. at 10.) She holds a Bachelor's of Science Degree in architecture and an associate's degree in construction. (Pls. Rule 56.1(b) Counter-Stmt. ¶ 28; Morilla Dep. at 13; Dkt. No. 59-8, Ex. HHH: Morilla Resume.) Prior to joining DOB, Morilla worked for two architectural firms and a construction company. (Defs. & Pls. Rule 56.1 Stmts. ¶ 178; Morilla Resume.) Morilla joined DOB in December 2000 as a Construction Inspector for the SPIT Team. (Defs. & Pls. Rule 56.1 Stmts.

---

[25] Minault testified that he applied to and was selected for the position of Supervisor in the Lower Manhattan Construction Unit, but that he turned down the position because "[t]he pay raise was not what was initially offered." (Minault Dep. at 44; Pls. Rule 56.1(b) Counter-Stmt. ¶ 200.) Plaintiffs assert that defendants "offered more than the advertised raise to white employees on promoting them." (Pls. Opp. Br. at 32-33.) This assertion, however, is not supported by the record, let alone any citations thereto. (<u>See</u> <u>id.</u>; <u>see also</u>, <u>e.g.</u>, Minault Dep. at 44; Pls. Rule 56.1(b) Counter-Stmt. ¶ 200.)

¶ 179; Pls. Rule 56.1(b) Counter-Stmt. ¶ 29; Morilla Resume; Morilla Dep. at 19, 25.) Since joining DOB, Morilla has worked as a Plan Examiner in the Bronx Division, an Associate Inspector 1 for the SPIT Team, a Supervising Inspector for the SEP Excavation Interior Demolition Unit, a Supervising Inspector for the Forensic Facade and Concrete Unit, and for the ERT. (Defs. & Pls. Rule 56.1 Stmts. ¶ 179; Morilla Resume.)

In 2012, Robert D'Allessio transferred Morilla out of the Excavation Unit and into the Forensic Engineering Unit. (Defs. & Pls. Rule 56.1 Stmts. ¶ 181; Morilla Dep. at 50; see also Pls. Rule 56.1(b) Counter-Stmt. ¶ 37.) D'Allessio recalled working with Morilla on transferring her out of the Excavation Unit on multiple occasions, but that she would "back off and say no" after he had worked out the details of the transfer with HR. (D'Allessio Dep. at 116-18.) According to D'Allessio, this happened with Morilla's transfer to Forensic Engineering Unit: she requested the transfer, but "it was too late" when she attempted to back out. (D'Allessio Dep. at 117-19; see also Defs. Rule 56.1 Stmt. ¶ 181.)

Morilla testified that she did not apply for or want the transfer to the Forensics Unit. (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 181; Pls. Rule 56.1(b) Counter-Stmt. ¶ 37; Morilla Dep. at 50.) Rather, Morilla recalled that in 2012, she "was practically performing the duties of the Assistant Chief of Excavation." (Pls. Rule 56.1(b) Counter-Stmt. ¶ 30; see also Morilla Dep. at 48-50.) She "spoke with Bernard Ross about being promoted" to that position after Eyal Amos, the current Assistant Chief, left the Unit in 2012, "but she was told that the position was closed." (Pls. Rule 56.1(b) Counter-Stmt. ¶ 31; Morilla Dep. at 63.) When Morilla asked D'Allessio about the Assistant Chief position, she was "also told by D'Alessio [sic] that the position [was] closed" (Pls. Rule 56.1(b) Counter-Stmt. ¶ 33; Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 181) and that "the promotion line [was] being closed" (Pls. Rule 56.1(b) Counter-Stmt. ¶ 35; Morilla Dep. at 48-49, 78-79).

Morilla alleges that during this meeting with D'Allessio, he told her "that, being a woman, she should be happy to be working as a supervisor and breaking ground for a generation of women. He also told Morilla that she should be happy she is being paid very well." (Pls. Rule 56.1(b) Counter-Stmt. ¶ 34; Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 181; Morilla Dep. at 66-67.) Morilla testified that she conveyed to D'Allessio her belief that she did not receive the Assistant Chief position because of her race and gender. (Pls. Rule 56.1(b) Counter-Stmt. ¶ 35; Morilla Dep. at 81-82.) Although D'Allessio did not recall this specific conversation (D'Allessio Dep. at 95-96, 109), he could recall many "arduous and painful" conversations with Morilla in which she used the term "white male chauvinist" when discussing her conflicts with coworkers (see D'Allessio Dep. at 109-11; see also Pls. Rule 56.1(b) Counter-Stmt. ¶ 35). D'Allessio conceded that Morilla may, at some point, have called him a "white male chauvinist." (D'Allessio Dep. at 110.)

Morilla asserts that she was transferred out of the Excavation Unit against her will "[s]hortly after" this conversation with D'Allessio. (Pls. Rule 56.1(b) Counter-Stmt. ¶ 37; see also Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 181.) Morilla also claims that, at an unspecified time, she "complained to Director Santulli about being denied promotion to the position of assistant chief of excavation," but that "[h]e told Morilla that the position was closed and that Morilla was making a lot of money and should stop complaining." (Pls. Rule 56.1(b) Counter-Stmt. ¶ 46; Morilla Dep. at 82-83.) Morilla also testified that after Eyal Amos left the Excavation Unit, Ross and D'Allessio "stopped copying [her] on important work details and work related emails." (Pls. Rule 56.1(b) Counter-Stmt. ¶ 47; Morilla Dep. at 84-85, 88-91; see also D'Allessio Dep. at 111-12.)[26]

---

[26] Morilla's testimony regarding when Ross and D'Allessio began leaving her "out of the loop" is somewhat inconsistent. Whereas plaintiffs' Rule 56.1(b) Counter-Statement asserts that Ross and D'Allessio "stopped copying Morilla on important work details and work related (continued...)

Morilla states that "[a]fter [she] was transferred to the Forensic Unit, the position of Assistant Chief of Excavation Unit which defendants had claimed was closed was offered to Gary Grandstaff." (Pls. Rule 56.1(b) Counter-Stmt. ¶ 38; see also id. ¶ 40; Defs. & Pls. Rule 56.1 Stmts. ¶ 182; Morilla Dep. at 139-41.)[27] Morilla testified regarding an April 25, 2013 letter that she sent to HR expressing concern over the fact that the Assistant Chief position was posted "for a couple days only," and that someone in HR "refused to talk to [her]" about it. (See Morilla Dep. at 139-40.) She recalled that "Gary Grandstaff . . . got the position as an assistant chief. . . . Then they make him chief. That's how it went." (Morilla Dep. at 141.)[28] D'Allessio similarly recalled that Grandstaff was working as an Assistant Chief of the Excavation Unit when Morilla was transferred. (D'Allessio Dep. at 118.) Morilla asserts that she was better qualified for the Assistant Chief position because Grandstaff "was a roofer and was trained on excavation by Morilla when he was under her supervision in the Excavation Unit." (Pls. Rule 56.1(b) Counter-Stmt. ¶ 39; Defs. & Pls. Rule 56.1 Stmts. ¶ 183; Morilla Dep. at 77-78.)

---

[26]     (...continued)
emails" because of (and therefore after) her complaints about not being promoted (see Pls. Rule 56.1(b) Counter-Stmt. ¶ 47), Morilla testified that such actions against her "began actually after Eyal [Amos] left" his position as Assistant Chief of the Excavation Unit in 2012 (Morilla Dep. at 84-85).

[27]     Plaintiffs' Rule 56.1 statement contains the "fact" that Morilla "was transferred by D'Allessio [sic] so that she would not be elevated to the open position of Assistant Chief of Excavation Unit" (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 181), but the portions of Morilla's deposition cited do not support this conclusory assertion (see Morilla Dep. at 48-50, 66). Similarly, plaintiffs' assertion that Morilla "was informed by other inspectors . . . that defendants transferred her to get rid of her so that they can offer the position to Gary Grandstaff" (Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 182) is hearsay (see cases cited on page 4 n.1 above), and the Court therefore does not consider it.

[28]     DOB records, on the other hand, show that Grandstaff was working as a "Supervisor" in the Excavation Unit at the time he was promoted to Chief. (See Ex. WW: Personnel Action Request; see also Grandstaff Resume.)

On February 26, 2013, Morilla filed a complaint with the NYSDHR alleging retaliation and discrimination on the basis of gender, race, national origin and marital status. (Defs. & Pls. Rule 56.1 Stmts. ¶ 185; Dkt. No. 59-8, Ex. III: Morilla NYSDHR Compl.) On August 23, 2013, the NYSDHR issued a finding of no probable cause. (Defs. & Pls. Rule 56.1 Stmts. ¶ 186; Dkt. No. 59-8, Ex. JJJ: Determ. & Ord. After Investigation.)

In January 2014—more than a year after Morilla was transferred out of the Excavation Unit (see Defs. & Pls. Rule 56.1 Stmts. ¶ 181; Pls. Rule 56.1(b) Counter-Stmt. ¶ 30)—DOB conducted interviews for the position of Chief of that Unit (Dkt. No. 59-6, Ex. WW: Interview Schedule). DOB records indicate that Morilla was not interviewed for this position. (Defs. & Pls. Rule 56.1 Stmts. ¶ 184; Ex. WW: Interview Schedule.) Gary Grandstaff was selected for the Chief position, effective January 27, 2014. (Defs. & Pls. Rule 56.1 Stmts. ¶¶ 182, 184; Pls. Rule 56.1(b) Counter-Stmt. ¶ 38; Dkt. No. 59-6, Ex. WW: Personnel Action Request; Morilla Dep. at 72-73, 78.) D'Allessio made the decision to select Grandstaff for the Chief position. (D'Allessio Dep. at 69.)

In May 2015, Morilla applied for a position as Assistant Chief Plan Examiner. (Defs. & Pls. Rule 56.1 Stmts. ¶¶ 190, 194; Pls. Rule 56.1(b) Counter-Stmt. ¶ 53; Morilla Dep. at 120, 122-23, 127.)[29] She was not interviewed for that position. (Defs. & Pls. Rule 56.1 Stmts. ¶ 190; Pls. Rule 56.1(b) Counter-Stmt. ¶ 53; Morilla Dep. at 120-21, 123.) Morilla testified that when she

---

[29] During Morilla's deposition, there was some confusion as to whether Morilla's claim that she was not promoted to Assistant Chief Plan Examiner for discriminatory/retaliatory reasons emanated from her May 2015 or April 2016 application to that position. (See Morilla Dep. at 120, 122-23.) After reviewing the deposition transcript, the Court concludes that—contrary to defendants' belief (see Defs. Rule 56.1 Stmt. ¶¶ 190, 194)—Morilla's claim refers to her May 2015 application (see Morilla Dep. at 122-23; see also Pls. Rule 56.1(b) Counter-Stmt. ¶ 53).

asked Elizabeth Skowronek, the Director of the Hub, about applying for the Assistant Chief position, Skowronek stated, "'I think you should take care of your health first.'" (Defs. & Pls. Rule 56.1 Stmts. ¶ 191; Pls. Rule 56.1(b) Counter-Stmt. ¶ 54; Morilla Dep. at 121, 126.) Morilla asserts that this comment was discriminatory because Skowronek "knew that [Morilla was] a cancer survivor and we spoke about it." (Defs. & Pls. Rule 56.1 Stmts. ¶ 192; Morilla Dep. at 126.) Skowronek recalled speaking to Morilla about the Assistant Chief position at the team meeting at which the position was announced, and that Skowronek "'encourage[d] everybody to apply for it.'" (Defs. & Pls. Rule 56.1 Stmts. ¶ 193; Dkt. No. 75-6: Skowronek Dep. at 27-28.) Morilla testified that she was not disabled, and that she was "'coming to work even when [she] had surgery.'" (Defs. & Pls. Rule 56.1 Stmts. ¶ 195; Morilla Dep. at 55, 126.)

On August 26, 2015, Morilla interviewed for a position as Assistant Chief of the Excavation Unit—the same position she was allegedly denied after being transferred out of the Excavation Unit roughly three years earlier. (Defs. & Pls. Rule 56.1 Stmts. ¶ 188; Pls. Rule 56.1(b) Counter-Stmt. ¶ 44; Morilla Dep. at 78-79; Dkt. No. 59-4, Ex. HH: Personnel Action Request.) At some point during the application process, Morilla was assessed as "[q]ualified but not selected" (Defs. & Pls. Rule 56.1 Stmts. ¶ 188; Dkt. No. 59-4, Ex. HH: Interview Schedule), but it is not clear who made this assessment (see Ex. HH: Interview Schedule). Richard Brower was selected to fill the Assistant Chief position, effective October 25, 2015. (Defs. & Pls. Rule 56.1 Stmts. ¶ 189; Pls. Rule 56.1(b) Counter-Stmt. ¶ 44; Ex. HH: Personnel Action Request; Morilla Dep. at 75.) Morilla asserts that she was better qualified than Brower because she trained him and because he had not passed the necessary civil service exam. (Defs. & Pls. Rule 56.1 Stmts. ¶ 189; Pls. Rule 56.1(b)

Counter-Stmt. ¶¶ 44-45; Morilla Dep. at 75, 79.)[30/]

Morilla resigned from DOB in 2016 "[b]ecause [of] the humiliation and . . . all the discrimination because I was a woman . . . and because of my race." (Defs. & Pls. Rule 56.1 Stmts. ¶ 197; Pls. Rule 56.1(b) Counter-Stmt. ¶ 59; Morilla Dep. at 132-33.) She testified:

> I was in the Hub, I was sitting by myself. All these years, sitting by myself, nobody even talk to me. People that came after me, they have – they were called to train new hires. They never approach me to have that and then at the end I said, you know what, I'm going to look for another agency . . . .

(Morilla Dep. at 133.)[31/]

## Civil Service Rules

Plaintiffs' Rule 56.1 statements and affidavits, as well as the numerous deposition transcripts filed on ECF, are replete with statements concerning New York's civil service rules, plaintiffs' civil service titles/qualifications, and DOB's promotion of comparators who allegedly lacked the appropriate civil service titles/qualifications for the positions to which they were promoted, or who were still provisional/probationary[32/] employees at the time of promotion.[33/]

---

[30/] Morilla claims that Gary Grandstaff, Jeff Rodriguez, and another DOB employee named Christian "apologized to Morilla for the discriminatory conduct of the defendants" or otherwise acknowledged allegedly unfair treatment. (Pls. Rule 56.1(b) Counter-Stmt. ¶ 60; Morilla Dep. at 144-46.) In the same vein, Morilla asserts that Grandstaff and Brower, "who were promoted instead of Morilla[,] told her that they knew they were not qualified for the positions the[y] were promoted to." (Pls. Rule 56.1(b) Counter-Stmt. ¶ 61; Morilla Dep. at 144-45, 147.) The Court agrees with defendants (see Defs. Resp. To Pls. Rule 56.1(b) Counter-Stmt. ¶ 24) that these statements are hearsay (see cases cited on page 4 n.1 above).

[31/] Plaintiffs' Rule 56.1(b) Counter-Statement discusses facts pertaining to Morilla's application to the position of "Construction Chief for the [ERT]." (See Pls. Rule 56.1(b) Counter-Stmt. ¶ 51.) Morilla, however, applied to this position in June 2012 (see Morilla Dep. at 111), placing any claims arising from these facts outside the statute of limitations (see pages 63-72 below).

[32/] Provisional employees are those who have been hired into a position but have not yet passed
(continued...)

It appears to be undisputed that at least some civil service rules were ignored when making promotion decisions at DOB. By way of background:

> Following the New York Court of Appeals decision in <u>City of Long Beach</u> v. <u>Civil Service Employees Association, Inc.</u>, 8 N.Y. 3d 465 (2007), New York amended Civil Service Law Section 65 ("CSL § 65") to require the City to hire from a list of civil service candidates—generated by a merit examination—if such a list exists for a given position. . . . Put differently, following the change in law, the City can only fill a position with a provisional appointment if there is no civil service list for that position. In addition, CSL § 65 limits the duration of all provisional appointments, mandates that a civil service exam be given for competitive positions held by provisional employees, and requires that all provisional appointments be terminated within four months following the establishment of a civil service list for a given position. N.Y. Civ. Serv. Law § 65(2)-(4). The changes to the law had the effect of prohibiting the permanent hire of a provisional employee in a given position.

<u>Pena-Barrero</u> v. <u>City of N.Y.</u>, 14 Civ. 9550, 2017 WL 1194477 at *2 (S.D.N.Y. Mar. 30, 2017).[34/]

---

[32/] (...continued)
the appropriate civil service exam for that position; such employees can be fired or laid off at any time. (Henry Dep. at 23, 25-26; Cantave Dep. at 36, 148-49; D'Allessio Dep. at 48.) Once an employee passes the appropriate civil service exam, they are considered "probationary" employees for a period of time. (Henry Dep. at 181-82; Cantave Dep. at 148-49.)

[33/] <u>See</u>, <u>e.g.</u>, Pls. Resp. To Defs. Rule 56.1 Stmt. ¶¶ 16, 19, 34-35, 40-41, 107; Pls. Rule 56.1(b) Counter-Stmt. ¶¶ 11-12, 24, 26, 45, 58, 62-63, 69, 88, 119-120, 122, 125, 131, 134-36, 138, 142, 184, 206, 236, 242, 243, 246, 249, 258; Dorsainville Aff. ¶¶ 2, 11, 13; Ukpong Aff. ¶¶ 7, 9, 16, 18; McKenzie Aff. ¶¶ 3, 10; McCalla Dep. at 72, 109-114; Dorsainville Dep. at 25-26; Mulzac Dep. at 44-45, 59-61, 96; Henry Dep. at 21-26, 123-24, 180-83; Ukpong Dep. at 81; Whint Dep. at 128-29; Patel Dep. at 48-50, 59, 63, 70, 72, 79, 113-18, 126, 130-32; Cantave Dep. at 36-37, 41-42, 47-50, 71, 147-49, 156-57; Minault Dep. at 63-64, 104-05; Morilla Dep. at 147-48, 152, 156; D'Allessio Dep. at 11-14, 16-17, 43-50, 71, 75, 122; Hogan Dep. at 11-16; Dits Dep. at 72, 81, 123-24, 147-48, 165-66; Bitro Dep. at 52-66; Solanto Dep. at 75-76; DiMaggio Dep. at 72-74; Miller Dep. at 28, 50-52.

[34/] <u>See also</u>, <u>e.g.</u>, <u>Lee</u> v. <u>Albany-Schoharie-Schenectady-Saratoga Bd. of Co-op. Educ. Servs.</u>, 69 A.D.3d 1289, 1291, 893 N.Y.S.2d 383, 386 (3d Dep't 2010) ("The constitutional requirement that civil service appointments 'shall be made according to merit and fitness' (N.Y. Const., art. V, § 6) mandates that provisional positions may be succeeded by permanent appointments only as a result of a civil service examination and eligibility; such positions do not ripen into permanency as the result of statutory violations or the passage of (continued...)

When questioned at her deposition about the City of Long Beach decision, Gina Bitro testified that normally, "if there is a promotional exam that is given, people can be appointed from the promotional exam if they pass the exam and they're on th[e] list" of persons who have passed (Bitro Dep. at 52); "[w]hen there is a promotional list, the promotional list is given to the agency, and then the agency uses that list to appoint people" (id. at 56). She also testified that "provisionals were really supposed to be in city service for nine months." (Id. at 53.) Timothy Hogan similarly testified that under the civil service rules, "[w]hen jobs came open and there were lists available we made selections off the li[st]. . . . [W]hen you had an opening for a position you had to go to the list and take the top three candidates, interview those top three candidates and make a decision which one would be put in to the position." (Hogan Dep. at 12-14.)

But when asked, "As hiring manager, did you ever consider the civil services exams in making decisions as to who took what," Robert D'Allessio responded "[n]o," explaining that he did not "think it's necessarily relevant." (D'Allessio Dep. at 45; see also Morilla Dep. at 147-48 ("Robert D'Allessio, because when I came to him and I said, why I'm not getting the position as a plan examiner – I mean as assistant chief because I've been a supervisor and I have my civil service title, why? He said, I don't care about civil service title.").) When D'Allessio was asked how he "c[a]me to the understanding that in selecting candidates for promotion[] [he] did not have to consider the civil service promotional exam list," he responded that "provisional employees were being hired routinely throughout the department." (D'Allessio Dep. at 48.) Bitro similarly testified that although provisional appointments were supposed to be temporary, "nobody paid attention to that. . . . [T]hat's not what has been – what any city agency has done in years and years and years."

---

34/        (...continued)

        time.").

(Bitro Dep. at 53-55; <u>see also</u> Patel Dep. at 49 ("Q: . . . are you required to pass [the civil service] examination, to apply for certain jobs? A: As per the DECAS rules, it's required for promotion; but never the rules are followed.").)

The extent to which defendants violated the civil service rules, however, is disputed. (<u>Compare</u>, <u>e.g.</u>, Patel Dep. at 49 ("Once you pass Inspector exam, then and then, you take the promotion exam . . . you have to pass first exam."), Cantave Dep. at 36-37 ("Q: Are you required to be a civil servant to be eligible for certain positions? A: I believe so."), <u>id.</u> at 149 ("Q: Do you have to pass that civil service examination to be promoted? A: That used to be the law of the City of New York."), <u>with</u> Bitro Dep. at 62 ("The probationary period refers to the civil service title and the permanency of that title. A promotion to another position is possible."); Henry Dep. at 26 ("[H]ow it goes if you are provisional, yes, you could be a supervisor but if you sit for a test for that position . . . then you will be a civil service supervisor . . . ."); <u>see also</u> Defs. Reply Br. at 6.)[35] As defendants note (<u>see</u> Defs. Br. at 17), Bitro testified that DOB was, pursuant to the <u>City of Long Beach</u> decision, in the process of executing "a plan for the reduction of provisionals in city government," which "was originally a five-year plan which had been extended because . . . [i]t's been taking much longer." (Bitro Dep. at 62-63.)

Notably, the record contains no evidence showing that defendants ignored the civil service rules in a manner indicative of discriminatory animus—<u>i.e.</u>, that the rules were followed or ignored specifically to disadvantage members of a protected class. (<u>See</u> Defs. Br. at 17; Defs. Reply Br. at 6.) To the contrary, D'Allessio testified that he never considered civil service exams when

---

[35] Indeed, plaintiff Henry testified that taking the civil service exam was optional (Henry Dep. at 21-23), and plaintiff Whint did not think that passing the civil service exam was necessary for becoming an Inspector (Whint Dep. at 129).

making hiring decisions (D'Allessio Dep. at 45) because DOB "routinely" hired provisional employees (id. at 48); plaintiff Patel similarly recalled that the civil service rules were "never" followed during his ten years at DOB (Patel Dep. at 49). Such facts weaken any inference of discriminatory motive drawn from DOB's failure to follow the civil service rules. See, e.g., Nurse v. Lutheran Med. Ctr., 854 F. Supp. 2d 300, 320 (E.D.N.Y. 2012) ("[E]ven if the court were to find that [defendant] departed from its Policies, plaintiff's failure to present any evidence that any such departure was due to unlawful discrimination is fatal to her claim.").[36/]

Nevertheless, the civil service rules were instituted in part to prevent hiring or promoting on any basis other than merit. See, e.g., Montero v. Lum, 68 N.Y.2d 253, 258, 508 N.Y.S.2d 397, 400 (1986) ("The purpose of [the civil service rules] was to replace the spoils system with a system of merit selection and to protect the public as well as the individual employee."). Moreover, "'[d]epartures from procedural regularity . . . can raise a question as to the good faith of the process where the departure may reasonably affect the decision.'" Tolbert v. Smith, 790 F.3d 427, 438 (2d Cir. 2015). Plaintiffs have proffered evidence suggesting that for at least some of the positions at issue, plaintiffs had passed the necessary exams while those selected for promotion had not. (See, e.g., Pls. Rule 56.1(b) Counter-Stmt. ¶¶ 44-45, 122, 125, 206.) Thus, defendants' departure from the civil service rules may have reasonably affected their promotion decisions insofar as they were required—but failed—to hire from the list of those who had passed the necessary

---

[36/] Accord, e.g., Davis v. Peake, 08 Civ. 3570, 2011 WL 4407551 at *9 (S.D.N.Y. Sept. 20, 2011) ("While Plaintiff seems to argue that Defendant's alleged departure from procedures is indicative of pretext, a plaintiff must still produce evidence that defendant's reason, 'even if pretextual' was a pretext for discrimination."), aff'd, 505 F. App'x 67 (2d Cir. 2012); Albury v. J.P. Morgan Chase, 03 Civ. 2007, 2005 WL 746440 at *9 (S.D.N.Y. Mar. 31, 2005) ("A violation of an employer's internal personnel practices is not, by itself, an act of discrimination.").

exams.  (See pages 49-51 above.)

The Court agrees with plaintiffs that DOB's failure to follow the civil service rules contributes to an inference that defendants' proffered reasons for some of their hiring decisions were pretextual.  See, e.g., Zahorik v. Cornell Univ., 729 F.2d 85, 93 (2d Cir. 1984); Tucker v. New York City, 05 Civ. 2804, 2008 WL 4450271 at *5 (S.D.N.Y. Sept. 30, 2008) ("[A] departure from established procedures may provide support for an inference of discrimination in some contexts."), aff'd, 376 F. App'x 100 (2d Cir. 2010).

## ANALYSIS

## I. LEGAL PRINCIPLES

### A. General Summary Judgment Standards

Rule 56 of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); Humphreys v. Cablevision Sys. Corp., 553 F. App'x 13, 14 (2d Cir. 2014); Connolly v. Calvanese, 515 F. App'x 62, 62 (2d Cir. 2013); Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 580 (2d Cir. 1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment.  See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Alzawahra v. Albany Med. Ctr., 546 F. App'x 53, 54 (2d Cir. 2013); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue

on which the non-movant has the burden of proof. See, e.g., Celotex Corp. v. Catrett, 477 U.S. at 323, 106 S. Ct. at 2552-53; Dolan v. Cassella, 543 F. App'x 90, 90 (2d Cir. 2013).

To defeat a summary judgment motion, the non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts.'" Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986)). Instead, the non-moving party must "cit[e] to particular parts of materials in the record" to show that "a fact . . . is genuinely disputed." Fed. R. Civ. P. 56(c)(1); see, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587, 106 S. Ct. at 1356; Alzawahra v. Albany Med. Ctr., 2013 WL 6284286 at *1; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (at summary judgment, "[t]he time has come . . . 'to put up or shut up'"), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003).

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. at 255, 106 S. Ct. at 2513.[37/] The Court draws all inferences in favor of the non-moving party only after determining that such inferences are reasonable, considering all the evidence presented. See, e.g., Apex Oil Co. v. DiMauro, 822 F.2d 246, 252 (2d Cir.), cert. denied, 484 U.S. 977, 108 S. Ct. 489 (1987). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 37.

---

[37/] See also, e.g., Crown Castle NG E. Inc. v. Town of Greenburgh, 552 F. App'x 47, 49 (2d Cir. 2014); Alzawahra v. Albany Med. Ctr., 2013 WL 6284286 at *1; Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 36; Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d at 1223.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact. See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), cert. denied, 480 U.S. 932, 107 S. Ct. 1570 (1987). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 106 S. Ct. at 2510. While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted." Id. at 248, 106 S. Ct. at 2510 (citations omitted); see also, e.g., Knight v. U.S. Fire Ins. Co., 804 F.2d at 11-12.

### B.    Additional Summary Judgment Standards in Employment Discrimination Cases

When a case turns on the intent of one party, as employment discrimination and retaliation claims often do, a "trial court must be cautious about granting summary judgment." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).[38] Because the employer rarely leaves direct evidence of its discriminatory or retaliatory intent, the Court must carefully comb the available evidence in search of circumstantial proof to undercut the employer's explanations for its actions. E.g., Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d at 1224. "[S]ummary judgment may not be granted simply because the court believes that the plaintiff

---

[38]    Accord, e.g., Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004); Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998) ("[I]n an employment discrimination case when, as here, the employer's intent is at issue, the trial court must be especially cautious about granting summary judgment."); McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997) ("[C]aution must be exercised in granting summary judgment where motive is genuinely in issue."); Cardozo v. Healthfirst, Inc., 210 F. Supp. 2d 224, 227 (S.D.N.Y. 1999); see also, e.g., Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 40 (2d Cir. 1994).

will be unable to meet his or her burden of persuasion at trial. There must either be a lack of evidence in support of the plaintiff's position, or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir. 1998) (citations omitted). Nonetheless, when an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination or retaliation, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer. E.g., Budde v. H&K Distrib. Co., No. 99-9449, 216 F.3d 1071 (table), 2000 WL 900204 at *1 (2d Cir. June 29, 2000); Stern v. Trs. of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997); Meloff v. N.Y. Life Ins. Co., 51 F.3d 372, 375 (2d Cir. 1995).

In other words, to defeat summary judgment, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Stern v. Trs. of Columbia Univ., 131 F.3d at 312; see, e.g., Schnabel v. Abramson, 232 F.3d 83, 90-91 (2d Cir. 2000); Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) ("[T]he question [on summary judgment is] . . . whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination. To get to the jury, it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination." (quotations & alterations omitted)), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003); Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996) (plaintiff must "produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not

[discrimination] was the real reason for the discharge'").[39/]  Indeed, the Second Circuit "went out of [its] way to remind district courts that the 'impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable.'"  Weinstock v. Columbia Univ., 224 F.3d at 41.

### C. The Burden-Shifting Framework Applicable to Retaliation and Discrimination Claims Under 42 U.S.C. §§ 1981 and 1983, NYSHRL and NYCHRL

In connection with § 1981 discrimination and retaliation claims brought under § 1983, the Second Circuit applies the burden-shifting analysis established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973).  See, e.g., Littlejohn v. City of N.Y., 795 F.3d 297, 312, 315 (2d Cir. 2015) (discrimination & retaliation); Fincher v. Depository Tr. & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010) (discrimination & retaliation).[40/]  The same burden-shifting analysis applies to discrimination and retaliation claims brought pursuant to the NYSHRL and the NYCHRL.  See, e.g., Tolbert v. Smith, 790 F.3d at 434 (discrimination under NYSHRL); Fincher v. Depository Tr. & Clearing Corp., 604 F.3d at 723 (retaliation under NYSHRL & NYCHRL); Spiegel v. Schulmann, 604 F.3d 72, 80 (2d Cir. 2010)

---

[39/]  See also, e.g., Budde v. H&K Distrib. Co., 2000 WL 900204 at *1; Scaria v. Rubin, 94 Civ. 3333, 1996 WL 389250 at *5 (S.D.N.Y. July 11, 1996) (Peck, M.J.), aff'd, 117 F.3d 652 (2d Cir. 1997).

[40/]  Accord, e.g., Tolbert v. Smith, 790 F.3d 427, 434 (2d Cir. 2015) (discrimination); Garcia v. Hartford Police Dep't, 706 F.3d 120, 127 (2d Cir. 2013) (discrimination); Benn v. City of N.Y., 482 F. App'x 637, 638 (2d Cir. 2012) (retaliation); Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012) (discrimination); Ruiz v. Cty. of Rockland, 609 F.3d 486, 491 (2d Cir. 2010) (discrimination); Toussaint v. NY Dialysis Servs., Inc., 14 Civ. 5069, 2017 WL 456471 at *9 (S.D.N.Y. Feb. 2, 2017) ("At the summary judgment phase, . . . the Second Circuit has held that 'claims for race . . . discrimination under [§] 1981 . . . are analyzed under the burden-shifting framework set forth in McDonnell Douglas."); Barella v. Vill. of Freeport, 16 F. Supp. 3d 144, 158 (E.D.N.Y. 2014) ("[C]laims under . . . Section 1981 . . . are 'all evaluated according to the three-step burden-shifting framework set forth in McDonnell.'").

(discrimination under NYSHRL & NYCHRL); <u>Leibowitz</u> v. <u>Cornell Univ.</u>, 584 F.3d 487, 498 n.1 (2d Cir. 2009) (discrimination under NYSHRL & NYCHRL).

Under the familiar <u>McDonnell Douglas</u> burden-shifting analysis, the plaintiff has the burden at the outset of "proving by the preponderance of the evidence a prima facie case of discrimination." <u>Tex. Dep't of Cmty. Affairs</u> v. <u>Burdine</u>, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 1093 (1981); <u>see</u>, <u>e.g.</u>, <u>Reeves</u> v. <u>Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142, 120 S. Ct. 2097, 2106 (2000); <u>McDonnell Douglas Corp.</u> v. <u>Green</u>, 411 U.S. at 802, 93 S. Ct. at 1824.[41/] Establishment of a prima facie case "'in effect creates a presumption that the employer unlawfully discriminated against the employee.'" <u>St. Mary's Honor Ctr.</u> v. <u>Hicks</u>, 509 U.S. at 506, 113 S. Ct. at 2747 (quoting <u>Tex. Dep't of Cmty. Affairs</u> v. <u>Burdine</u>, 450 U.S. at 254, 101 S. Ct. at 1094).[42/]

Once a plaintiff claiming employment discrimination or retaliation establishes a prima facie case, the burden shifts to the defendant to rebut the presumption of discrimination or

---

[41/] See also, e.g., <u>Raytheon Co.</u> v. <u>Hernandez</u>, 540 U.S. 44, 50 n.3, 124 S. Ct. 513, 517 n.3 (2003); <u>O'Connor</u> v. <u>Consol. Coin Caterers Corp.</u>, 517 U.S. 308, 310, 116 S. Ct. 1307, 1309 (1996); <u>St. Mary's Honor Ctr.</u> v. <u>Hicks</u>, 509 U.S. 502, 507, 113 S. Ct. 2742, 2746-47 (1993); <u>Vega</u> v. <u>Hempstead Union Free Sch. Dist.</u>, 801 F.3d 72, 83 (2d Cir. 2015); <u>Ruszkowski</u> v. <u>Kaleida Health Sys.</u>, 422 F. App'x 58, 60 (2d Cir. 2011); <u>United States</u> v. <u>Brennan</u>, 650 F.3d 65, 93 (2d Cir. 2011); <u>Leibowitz</u> v. <u>Cornell Univ.</u>, 584 F.3d at 498; <u>Dorfman</u> v. <u>Doar Commc'ns, Inc.</u>, 314 F. App'x 389, 390 (2d Cir. 2009); <u>DeSalvo</u> v. <u>Volhard</u>, 312 F. App'x 394, 396 (2d Cir.), <u>cert. denied</u>, 558 U.S. 932, 130 S. Ct. 70 (2009); <u>Fall</u> v. <u>N.Y.S. United Teachers</u>, 289 F. App'x 419, 420-21 (2d Cir. 2008); <u>Nader</u> v. <u>ABC Television, Inc.</u>, 150 F. App'x 54, 55 (2d Cir. 2005); <u>Mandell</u> v. <u>Cty. of Suffolk</u>, 316 F.3d 368, 377-78 (2d Cir. 2003); <u>Mario</u> v. <u>P&C Food Mkts., Inc.</u>, 313 F.3d 758, 767 (2d Cir. 2002); <u>Collins</u> v. <u>N.Y.C. Transit Auth.</u>, 305 F.3d 113, 118 (2d Cir. 2002); <u>Schnabel</u> v. <u>Abramson</u>, 232 F.3d 83, 87 (2d Cir. 2000); <u>Chambers</u> v. <u>TRM Copy Ctrs. Corp.</u>, 43 F.3d 29, 37 (2d Cir. 1994).

[42/] See also, e.g., <u>Vega</u> v. <u>Hempstead Union Free Sch. Dist.</u>, 801 F.3d at 83; <u>Crawford</u> v. <u>Dep't of Investigation</u>, 324 F. App'x 139, 141 (2d Cir. 2009); <u>Smith</u> v. <u>New Venture Gear, Inc.</u>, 319 F. App'x 52, 54 (2d Cir. 2009); <u>Joseph</u> v. <u>Leavitt</u>, 465 F.3d 87, 90 (2d Cir. 2006), <u>cert. denied</u>, 549 U.S. 1282, 127 S. Ct. 1855 (2007); <u>Mandell</u> v. <u>Cty. of Suffolk</u>, 316 F.3d at 380; <u>Mario</u> v. <u>P&C Food Mkts., Inc.</u>, 313 F.3d at 767; <u>Scaria</u> v. <u>Rubin</u>, 117 F.3d 652, 654 (2d Cir. 1997).

retaliation by articulating a legitimate, non-discriminatory reason for its employment decision. E.g.,

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 142-43, 120 S. Ct. at 2106; McDonnell

Douglas Corp. v. Green, 411 U.S. at 802, 93 S. Ct. at 1824.[43/]  The burden on the defendant at this

phase is one of production rather than persuasion. E.g., Reeves v. Sanderson Plumbing Prods., Inc.,

530 U.S. at 142, 120 S. Ct. at 2106.[44/]

"Although intermediate evidentiary burdens shift back and forth under [the

McDonnell Douglas] framework, '[t]he ultimate burden of persuading the trier of fact that the

defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 143, 120 S. Ct. at 2106.

If the defendant articulates a non-discriminatory reason, the McDonnell Douglas

burden-shifting framework drops out of the picture, and the plaintiff must show that the adverse

employment decision more likely than not was motivated in whole or part by discriminatory reasons.

---

[43/]    See also, e.g., Raytheon Co. v. Hernandez, 540 U.S. at 50 n.3, 124 S. Ct. at 517 n.3; O'Connor v. Consol. Coin Caterers Corp., 517 U.S. at 310, 116 S. Ct. at 1309; St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 506-07, 113 S. Ct. at 2747; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 253-54, 101 S. Ct. at 1093-94; Vega v. Hempstead Union Free Sch. Dist., 801 F.3d at 83; Desir v. City of N.Y., 453 F. App'x 30, 33-34 (2d Cir. 2011); United States v. Brennan, 650 F.3d at 93; Leibowitz v. Cornell Univ., 584 F.3d at 498-99; Dorfman v. Doar Commc'ns, Inc., 314 F. App'x at 390; DeSalvo v. Volhard, 312 F. App'x at 396; Fall v. N.Y.S. United Teachers, 289 F. App'x at 421; Nader v. ABC Television, Inc., 150 F. App'x at 55; Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004); Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003); Mandell v. Cty. of Suffolk, 316 F.3d at 380; Mario v. P&C Food Mkts., Inc., 313 F.3d at 767; Schnabel v. Abramson, 232 F.3d at 88; Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003); Stern v. Trs. of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997); Scaria v. Rubin, 117 F.3d at 654; Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 38.

[44/]    See also, e.g., St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 507, 113 S. Ct. at 2747; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 257, 101 S. Ct. at 1096; Chiang v. Donahoe, 579 F. App'x 39, 42 (2d Cir. 2014); Terry v. Ashcroft, 336 F.3d at 144 n.17; Scaria v. Rubin, 117 F.3d at 654.

E.g., <u>Reeves</u> v. <u>Sanderson Plumbing Prods., Inc.</u>, 530 U.S. at 142-43, 120 S. Ct. at 2106.[45/]

"Moreover, although the presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production, . . . the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" <u>Reeves</u> v. <u>Sanderson Plumbing Prods., Inc.</u>, 530 U.S. at 143, 120 S. Ct. at 2106 (quoting <u>Tex. Dep't of Cmty. Affairs</u> v. <u>Burdine</u>, 450 U.S. at 255 n.10, 101 S. Ct. at 1095 n.10).

The Supreme Court in 2000 clarified the standard at this stage of the <u>McDonnell Douglas</u> analysis:

> [I]n <u>St. Mary's Honor Center</u>. . . . we held that the factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not <u>compel</u> judgment for the plaintiff. The ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct." In other words, "[i]t is not enough . . . to <u>dis</u> believe the employer; the factfinder must <u>believe</u> the plaintiff's explanation of intentional discrimination."
>
> In reaching this conclusion, however, we reasoned that it is <u>permissible</u> for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. . . .
>
> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. In appropriate circumstances, the trier of fact can

---

[45/] See also, <u>e.g.</u>, <u>Raytheon Co.</u> v. <u>Hernandez</u>, 124 S. Ct. at 517 n.3; <u>St. Mary's Honor Ctr.</u> v. <u>Hicks</u>, 509 U.S. at 510, 113 S. Ct. at 2749; <u>Tex. Dep't of Cmty. Affairs</u> v. <u>Burdine</u>, 450 U.S. at 253, 101 S. Ct. at 1093-94; <u>Vega</u> v. <u>Hempstead Union Free Sch. Dist.</u>, 801 F.3d at 83; <u>Allen</u> v. <u>Murray-Lazarus</u>, 463 F. App'x 14, 16 (2d Cir. 2012); <u>Desir</u> v. <u>City of N.Y.</u>, 453 F. App'x at 34; <u>United States</u> v. <u>Brennan</u>, 650 F.3d at 93; <u>Leibowitz</u> v. <u>Cornell Univ.</u>, 584 F.3d at 499; <u>DeSalvo</u> v. <u>Volhard</u>, 312 F. App'x at 396; <u>Fall</u> v. <u>N.Y.S. United Teachers</u>, 289 F. App'x at 421; <u>Feingold</u> v. <u>New York</u>, 366 F.3d at 152; <u>Mandell</u> v. <u>Cty. of Suffolk</u>, 316 F.3d at 380-81; <u>Mario</u> v. <u>P&C Food Mkts., Inc.</u>, 313 F.3d at 767; <u>Weinstock</u> v. <u>Columbia Univ.</u>, 224 F.3d at 42; <u>Scaria</u> v. <u>Rubin</u>, 117 F.3d at 654.

reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. To hold otherwise would be effectively to insulate an entire category of employment discrimination cases from review under Rule 50 [or Rule 56], and we have reiterated that trial courts should not "'treat discrimination differently from other ultimate questions of fact.'"

Whether judgment as a matter of law [or summary judgment] is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 146-49, 120 S. Ct. at 2108-09 (emphasis added & citations omitted).

After Reeves, the Second Circuit has made clear that merely proving a prima facie case and disproving the employer's explanation for its conduct at the third step of the McDonnell Douglas analysis will not preclude summary judgment in all cases; rather, a case-by-case analysis is necessary:

In examining the impact of Reeves on our precedents, we conclude that Reeves prevents courts from imposing a per se rule requiring in all instances that [a

Title VII] claimant offer more than a prima facie case and evidence of pretext. . . . But the converse is not true; following <u>Reeves</u>, <u>we decline to hold that no [Title VII] defendant may succeed on a summary judgment motion so long as the plaintiff has established a prima facie case and presented evidence of pretext. Rather, we hold that the Supreme Court's decision in Reeves clearly mandates a case-by-case approach</u>, with a court examining the entire record to determine whether the plaintiff could satisfy his "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff."

<u>Schnabel</u> v. <u>Abramson</u>, 232 F.3d at 90 (emphasis added).[46/]

Although the above principles were developed in the context of employment discrimination claims, those principles apply with equal force to the burden-shifting analysis of retaliation claims. <u>See</u>, <u>e.g.</u>, <u>Kirkland</u> v. <u>Cablevision Sys.</u>, 760 F.3d 223, 225 (2d Cir. 2014); <u>Kaytor</u> v. <u>Elec. Boat Corp.</u>, 609 F.3d 537, 552-54 (2d Cir. 2010); <u>Hicks</u> v. <u>Baines</u>, 593 F.3d 159, 164-65 (2d Cir. 2010); <u>Jute</u> v. <u>Hamilton Sundstrand Corp.</u>, 420 F.3d 166, 173 (2d Cir. 2005).

## II.    THE STATUTE OF LIMITATIONS BARS SOME OF PLAINTIFFS' CLAIMS

Defendants argue that some of plaintiffs' claims are barred by the relevant statutes

---

[46/]    See also, e.g., Braun v. Securitas Sec. Servs. USA, Inc., 372 F. App'x 113, 114 (2d Cir. 2010); Butts v. N.Y.C. Dep't of Hous. Pres. & Dev., 307 F. App'x 596, 599 (2d Cir. 2009); Cross v. N.Y.C. Transit Auth., 417 F.3d 241, 248 (2d Cir. 2005); Feingold v. New York, 366 F.3d at 152; Roge v. NYP Holdings, Inc., 257 F.3d 164, 167-68 (2d Cir. 2001); Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 469-70 (2d Cir.), cert. denied, 534 U.S. 993, 122 S. Ct. 460 (2001); James v. N.Y. Racing Ass'n, 233 F.3d 149, 156-57 (2d Cir. 2000); Weinstock v. Columbia Univ., 224 F.3d at 42 ("In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination."); Aksamit v. 772 Park Ave. Corp., 00 Civ. 5520, 2003 WL 22283813 at *6 (S.D.N.Y. Oct. 2, 2003) ("[A] plaintiff's establishment of a prima facie case and rebuttal of a nondiscriminatory reason for the adverse action do not save the plaintiff from summary judgment when there is insufficient evidence of discrimination."), aff'd, 128 F. App'x 204 (2d Cir. 2005); Weiser v. Forest Pharm., Inc., 99 Civ. 1809, 2001 WL 293951 at *7-8 (S.D.N.Y. Mar. 26, 2001); Tanay v. St. Barnabas Hosp., 99 Civ. 9215, 2001 WL 262695 at *4 (S.D.N.Y. Mar. 15, 2001); Connell v. Consol. Edison Co., 109 F. Supp. 2d 202, 207-08 (S.D.N.Y. 2000) (Chin, D.J.) ("The key is whether there is sufficient evidence in the record – whether it consists of just the prima facie case and proof of pretext alone or those items together with additional evidence – to support an inference of discrimination.").

of limitation. (Dkt. No. 58: Defs. Br. at 3-5; Dkt. No. 78: Defs. Reply Br. at 2-3.)

The statute of limitations for employment discrimination and retaliation actions brought under NYSHRL and NYCHRL is three years. Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 238 (2d Cir. 2007).[47/] Defendants argue—and plaintiffs appear to concede (see Dkt. No. 71: Pls. Opp. Br. at 2-3)—that the statute of limitations applicable to plaintiffs' § 1981 claims varies depending upon the bases for those claims (Defs. Br. at 4-5). Such variations in the applicable statute of limitations are due to § 1981's history and the interplay between §§ 1981 and 1983.

Section 1981 provides, "All persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a). Section 1983, in turn, provides a federal cause of action against any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. "Section 1983 'is not itself a source of substantive rights.' It merely provides 'a method for vindicating federal rights elsewhere conferred,' such as those conferred by § 1981." Patterson v. Cty. of Oneida, 375 F.3d 206, 225 (2d Cir. 2004) (citations omitted) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3, 99 S. Ct. 2689, 2694 n.3 (1979)); accord, e.g., Vill. of Freeport v. Barrella, 814 F.3d 594, 600 n.8 (2d Cir. 2016). Indeed, the Supreme Court has held that § 1983 "provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 735, 109 S. Ct. 2702, 2723

---

[47/]   Accord, e.g., Taylor v. City of N.Y., 15 Civ. 7454, 2016 WL 4768829 at *5 (S.D.N.Y. Sept. 13, 2016); DeNigris v. N.Y.C. Health & Hosps. Corp., 861 F. Supp. 2d 185, 192 (S.D.N.Y. 2012); Bermudez v. City of N.Y., 783 F. Supp. 2d 560, 607-08 (S.D.N.Y. 2011).

(1989).

Claims brought under § 1983 are subject to "the state statute of limitations 'most analogous' and 'most appropriate' to the particular § 1983 action." Owens v. Okure, 488 U.S. 235, 239, 109 S. Ct. 573, 576 (1989) (citations omitted).[48/]  In New York, "Section 1983 actions . . . are subject to a three-year statute of limitations running from the time a 'plaintiff knows or has reason to know of the injury' giving rise to the claim." Milan v. Wertheimer, 808 F.3d 961, 963 (2d Cir. 2015) (citation omitted).[49/]  Previously, all § 1981 claims brought against state actors under § 1983 were subject to § 1983's three-year statute of limitations. See, e.g., Patterson v. Cty. of Oneida, 375 F.3d at 225 ("The statute of limitations applicable to claims brought under §§ 1981 and 1983 in New York is three years."); Tadros v. Coleman, 898 F.2d 10, 12 (2d Cir.) ("A section 1981 action is not subject to the Title VII statute of limitations, but rather is subject to the state statute applicable to personal injury claims. . . .  In this case, therefore, New York's three-year limitations period for personal injury actions applies."), cert. denied, 498 U.S. 869 , 111 S. Ct. 186 (1990); Ortiz v. City of N.Y., 755 F. Supp. 2d 399, 404 (E.D.N.Y. 2010) ("In New York, § 1983 and § 1981 actions have traditionally carried a three-year statute of limitations.").

On December 1, 1990, Congress enacted the provision now codified in 28 U.S.C. § 1658(a), which states: "a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues." See, e.g., Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 372, 124 S. Ct. 1836, 1839

---

[48/]    Accord, e.g., Smith v. Campbell, 782 F.3d 93, 100 (2d Cir. 2015); Hogan v. Fischer, 738 F.3d 509, 517 (2d Cir. 2013).

[49/]    Accord, e.g., Smith v. Campbell, 782 F.3d at 100; Hogan v. Fischer, 738 F.3d at 517; Fahs Constr. Grp., Inc. v. Gray, 725 F.3d 289, 292 (2d Cir.), cert. denied, 134 S. Ct. 831 (2013); Patterson v. Cty. of Oneida, 375 F.3d 206, 225 (2d Cir. 2004).

(2004); <u>Ortiz</u> v. <u>City of N.Y.</u>, 755 F. Supp. 2d at 404 ("Title 28 U.S.C. § 1658(a) . . . provides a catch-all four-year statute of limitations for civil actions that arise under Acts that were passed after December 1, 1990.").  Congress thereafter passed the Civil Rights Act of 1991, which

> added two subsections to § 1981.  Section 1981(b) now defines contractual formation and enforcement, protected by subsection (a), to include 'the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'  Congress passed this provision to invalidate <u>Patterson</u> v. <u>McLean Credit Union</u>, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), which held that § 1981 did not protect against discriminatory conduct that occurred after a contract is formed.

<u>Ortiz</u> v. <u>City of N.Y.</u>, 755 F. Supp. 2d at 404.  Explaining how 28 U.S.C. §§ 1981(b) and 1658 interact, the Supreme Court in <u>Jones</u> v. <u>R.R. Donnelley & Sons Co.</u>, 541 U.S. at 382, 124 S. Ct. At 1845, held "that a cause of action . . . is governed by § 1658's 4-year statute of limitations . . . if the plaintiff's claim against the defendant was made possible by a post-1990 enactment."

Courts in this District therefore have held that any claims "made possible" by the 1991 amendment to § 1981 are subject to § 1658's four-year statute of limitations—even where § 1983 serves as the vehicle for bringing those claims against state actors.  <u>See</u>, <u>e.g.</u>, <u>Villar</u> v. <u>City of N.Y.</u>, 135 F. Supp. 3d 105, 141-42 (S.D.N.Y. 2015) ("The critical question here—one that has not been answered clearly by the Second Circuit—is therefore whether to apply § 1981's four-year limitations period or § 1983's three-year limitations period to Plaintiff's claims. . . .  Here, . . . Plaintiff's claims are . . . 'made possible by' § [1981(b)].  Accordingly, the Court applies a four-year limitations period to Plaintiff's claims under § 1981 via § 1983."); <u>DeNigris</u> v. <u>N.Y.C. Health & Hosps. Corp.</u>, 861 F. Supp. 2d at 191 ("Claims brought under causes of action created by the 1991 amendments to § 1981 are subject to the federal 'catch-all' four-year statute of limitations prescribed by 28 U.S.C. § 1658.  The same is true when claims authorized by the 1991 amendments to § 1981 are brought against state actors under § 1983."); <u>Harper</u> v. <u>City of N.Y.</u>, 10 Civ. 7856, 2011 WL

3463156 at *5 (S.D.N.Y. Aug. 5, 2011) ("[I]n section 1981 cases that involve discriminatory conduct after a contract is formed, a four-year statute of limitations governs, provided that the claim was made possible by the post-1990 enactment."); <u>Ortiz</u> v. <u>City of N.Y.</u>, 755 F. Supp. 2d at 404-05.

"[T]he critical question following <u>Jones</u> for determining the applicability of" § 1658(a)'s four-year statute of limitations, therefore, "is whether a § 1981 claim for discrimination was viable" before the 1991 amendment to § 1981. <u>Ortiz</u> v. <u>City of N.Y.</u>, 755 F. Supp. 2d at 405; <u>accord</u>, <u>e.g.</u>, <u>Harper</u> v. <u>City of N.Y.</u>, 2011 WL 3463156 at *5 & n.64 (citing <u>Ortiz</u>).  Pre-amendment, § 1981 only covered discriminatory conduct "at the initial formation of the contract . . . ."  <u>Patterson</u> v. <u>McLean Credit Union</u>, 491 U.S. 164, 179, 109 S. Ct. 2363, 2374 (1989); <u>see also</u>, <u>e.g.</u>, <u>Butts</u> v. <u>City of N.Y. Dep't of Hous. Pres. & Dev.</u>, 990 F.2d 1397, 1411-12 (2d Cir. 1993) (Section "1981 only provides a cause of action for discrimination in making and entering contracts, and not for discrimination in the performance of contracts.").  Where a plaintiff's § 1981 discrimination claims are based on a failure-to-promote theory, "the inquiry is whether [the] promotion [would have] effectively create[d] a new contract between employer and employee."  <u>Butts</u> v. <u>City of N.Y. Dep't of Hous. Pres. & Dev.</u>, 990 F.2d at 1411; <u>see also</u>, <u>e.g.</u>, <u>Patterson</u> v. <u>McLean Credit Union</u>, 491 U.S. at 185, 109 S. Ct. at 2377 (analyzing whether "the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer").  If the promotion would have created a new contract, the three-year statute of limitations applies.  <u>DeNigris</u> v. <u>N.Y.C. Health & Hosps. Corp.</u>, 861 F. Supp. 2d at 191-92.

Where, on the other hand, the promotion for which the plaintiff was passed up is "given routinely upon satisfactory job performance," such that it "is simply the fulfillment of a stated promise or an implicit expectation in the original contract," <u>Butts</u> v. <u>City of N.Y. Dep't of Hous. Pres. & Dev.</u>, 990 F.2d at 1411-12, the claim falls under the 1991 amendment to § 1981 and

§ 1658(a)'s four-year statute of limitations applies.  Ortiz v. City of N.Y., 755 F. Supp. 2d at 405;

accord, e.g., Villar v. City of N.Y., 135 F. Supp. 3d at 141-42; DeNigris v. N.Y.C. Health & Hosps.

Corp., 861 F. Supp. 2d at 191-92; Harper v. City of N.Y., 2011 WL 3463156 at *5.

### A.     Complaint Filed on October 9, 2015

Plaintiffs McCalla, Dorsainville, Mulzac, Henry, Ukpong, Whint, Patel and Cantave

filed their Complaint on October 9, 2015.  (Dkt. No. 1: Compl.)  Any NYSHRL or NYCHRL claims

arising from adverse employment actions against these plaintiffs occurring before October 9, 2012

are untimely.  (See page 64 above.)  Similarly, any § 1981 failure-to-promote claims where the

promotion would have "effectively create[d] a new contract between employer and employee," Butts

v. City of N.Y. Dep't of Hous. Pres. & Dev., 990 F.2d at 1411, and accruing before October 9, 2012

are untimely.  (See pages 64-68 above.)  Any § 1981 claims accruing before October 9, 2011, and

based on promotions "given routinely upon satisfactory job performance," Butts v. City of N.Y.

Dep't of Hous. Pres. & Dev., 990 F.2d at 1411, or on other "discriminatory acts occurring in the

course of [plaintiffs'] contractual relationship with Defendants," DeNigris v. N.Y.C. Health &

Hosps. Corp., 861 F. Supp. 2d at 191, are untimely.  (See pages 64-68 above.)

### B.     First Amended Complaint Filed on June 30, 2016

Plaintiffs Morilla and Minault were added to the case by the First Amended

Complaint filed on June 30, 2016.  (Compare Dkt. No. 1: Compl., with Dkt. No. 22: 1st Am.

Compl.)  Defendants argue that Morilla's and Minault's claims therefore must have accrued within

the applicable statute of limitations running backwards from June 30, 2016.  (Dkt. No. 58: Defs. Br.

at 3-4.) Morilla and Minault respond that the limitations period should run backwards from the date

of the original complaint—October 9, 2015—under Federal Rule of Civil Procedure 15(c) (i.e., the

"relation back" doctrine) and/or because their limitations period should be tolled under American

Pipe & Construction Co. v. Utah, 414 U.S. 538, 94 S. Ct. 756 (1974).  (Dkt. No. 71: Pls. Opp. Br. at 6-7.)

In American Pipe, the Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action."  414 U.S. at 554, 94 S. Ct. at 766.[50/]  This rule

> is based on the idea that under Rule 23 of the Federal Rules of Civil Procedure, potential class members are protected by the commencement of a putative class action, even if they are unaware of the action.  Because individual class members, and even unaware class members, may "rely on the existence of the [putative class action] suit to protect their rights," they need not file an action or move to intervene during the pendency of class certification.  To hold otherwise, the Court has indicated, would result in a "multiplicity of [filings]" by potential class members seeking to preserve their rights even while the class certification proceeds, "precisely the situation that Federal Rule of Civil Procedure 23 and the tolling rule of American Pipe were designed to avoid."

Giovanniello v. ALM Media, LLC, 726 F.3d at 117 (citations omitted).

American Pipe tolling ends, however, when the "objectively reasonable reliance rationale breaks down."  Id.[51/]  The Second Circuit has held, therefore, that putative class members

---

[50/]     Accord, e.g., Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 349, 103 S. Ct. 2392, 2395 (1983); SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Cos., 829 F.3d 173, 176 (2d Cir. 2016), cert. denied, 2017 WL 2742913 (2017); Dekalb Cty. Pension Fund v. Transocean Ltd., 817 F.3d 393, 414 (2d Cir. 2016), cert. denied, 2017 WL 2742912 (2017); Giovanniello v. ALM Media, LLC, 726 F.3d 106, 115 (2d Cir. 2013); Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc., 721 F.3d 95, 100 (2d Cir. 2013), cert. dismissed, 134 S. Ct. 1515 (2014).

[51/]     Accord, e.g., Shak v. JPMorgan Chase & Co., 156 F. Supp. 3d 462, 478 (S.D.N.Y. 2016) ("Under these circumstances, . . . plaintiffs' 'reliance on the class action to advance their claims' would have been unreasonable."); Scott v. Dist. of Columbia, 87 F. Supp. 3d 291, 296 (D.D.C. 2015) ("Once all class claims are dismissed from a case, proposed class members are no longer justified in relying on the case to protect their interests, and therefore the rationales underlying class action tolling are no longer applicable."); In re Initial Pub.
(continued...)

can no longer reasonably rely on the class action—and tolling ends—once "the issue of class certification has been decided" against them. In re Agent Orange Prod. Liab. Litig., 818 F.2d 210, 214 (2d Cir. 1987), cert. denied, 484 U.S. 1004, 108 S. Ct. 695 (1988).[52/] Nor can putative class members reasonably rely on a class action if they voluntarily opt out of that action. See In re WorldCom Sec. Litig., 496 F.3d 245, 255 (2d Cir. 2007) ("Because members of the asserted class are treated for limitations purposes as having instituted their own actions, at least so long as they continue to be members of the class, the limitations period does not run against them during that time. Once they cease to be members of the class—for instance, when they opt out . . .—the limitation period begins to run again on their claims.").[53/]

      At least one court in this District has held that American Pipe tolling continues until voluntary withdrawal or dismissal of the putative class action's class claims. Monroe Cty. Emps.'

---

[51/]    (...continued)
Offering Sec. Litig., 544 F. Supp. 2d 277, 301 (S.D.N.Y. 2008) ("When I certified the Sycamore class, those plaintiffs who were not members of that class could no longer rely on the action to protect their interests. As a result, the tolling extended to them under American Pipe ceased." (fn. omitted)); In re Initial Pub. Offering Sec. Litig., 617 F. Supp. 2d 195, 200 (S.D.N.Y. 2007).

[52/]    See also, e.g., Crown, Cork & Seal Co. v. Parker, 462 U.S. at 354, 103 S. Ct. at 2397-98 ("Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied. At that point, class members may choose to file their own suits or to intervene as plaintiffs in the pending action."); Giovanniello v. ALM Media, LLC, 726 F.3d at 115-17 (holding that upon denial of class status, "[i]ndividual class members were required . . . to take action to preserve their rights or face the possibility that their action could become time barred.").

[53/]    Accord, e.g., Choquette v. City of N.Y., 839 F. Supp. 2d 692, 699 (S.D.N.Y. 2012) ("American Pipe tolling ends when a plaintiff opts out of the class or a class certification decision of the court definitively excludes that plaintiff."); Musa v. SuperShuttle Int'l, Inc., No. 12-CV-2418, 2013 WL 5507143 at *3 (E.D.N.Y. Sept. 30, 2013); Josephson v. United Healthcare Corp., No. 11-CV-3665, 2013 WL 3863921 at *5 (E.D.N.Y. July 24, 2013); Marlow v. Gold, 89 Civ. 8589, 1991 WL 107268 at *10 (S.D.N.Y. June 13, 1991).

Ret. Sys. v. YPF Sociedad Anonima, 980 F. Supp. 2d 487, 488, 491 (S.D.N.Y. 2013) (noting "the Second Circuit has not decided whether American Pipe tolling applies . . . where claims are dismissed voluntarily.").[54/] In support of its holding, the Court in Monroe cited "the reality that putative class members have no control over the lead plaintiff's decision to drop or settle a claim." Monroe Cty. Emps.' Ret. Sys. v. YPF Sociedad Anonima, 980 F. Supp. 2d at 491; see also, e.g., Sawyer v. Atlas Heating & Sheet Metal Works, Inc., 642 F.3d 560, 562 (7th Cir. 2011) ("The [Supreme] Court's goal [in American Pipe] of enabling members of a putative class to rely on a pending action to protect their interests can be achieved only if the way in which the first suit ends—denial of class certification by the judge, abandonment by the plaintiff, or any other fashion—is irrelevant.").

Defendants argue that allowing American Pipe tolling in cases where the plaintiffs voluntary withdraw the class action allegations "would invite significant abuse," but they cite no authority directly supporting that argument. (Defs. Reply Br. at 3.) Nor do defendants' cited authorities contradict or undermine the reasoning or holdings in Monroe and Sawyer. (See id.)[55/]

---

[54/] Cf. Famular v. Whirlpool Corp., 16 Civ. 0944, 2017 WL 2470844 at *10 (S.D.N.Y. June 7, 2017) (declining to adopt a holding that could "cause class members to file protective class actions before certification is decided or withdrawn" (emphasis added)); 1 McLAUGHLIN ON CLASS ACTIONS § 3:15 & n.49 (13th ed.) (collecting out-of-Circuit cases and opining, "if a class certification motion is withdrawn by the plaintiff, it also becomes unreasonable for any class member to continue to rely on the case and tolling ends.").

[55/] Defendants fail to note that, in order to prevent unfair surprise and prejudice, American Pipe tolling applies only to "asserted members of the class who would have been parties had the [first] suit been permitted to continue as a class action." Am. Pipe & Constr. Co. v. Utah, 414 U.S. at 554, 94 S. Ct. at 766. Borrowing from Justice Blackmun's concurrence in American Pipe and Justice Powell's concurrence in Crown, Cork & Seal Co., courts have held that preventing unfair surprise requires that claims receiving the benefit of American Pipe tolling "challenge the same conduct as the class action, such that the class action is 'sufficient to alert the defendants sued there to preserve the evidence regarding that conduct' (continued...)

The Court finds <u>Monroe</u>'s holding persuasive and concludes that the statute of limitations for Morilla's and Minault's claims was tolled upon filing of plaintiffs' original October 9, 2015 complaint.[56/]  Although plaintiffs' counsel indicated intent to withdraw the class claims during a June 9, 2016 status conference, tolling continued until plaintiffs formally dismissed their class claims by filing their First Amended Complaint on June 30, 2016.  <u>See</u> <u>Choquette</u> v. <u>City of N.Y.</u>, 839 F. Supp. 2d at 701-02 (rejecting "defendants' argument that conduct by class counsel unequivocally indicating an intention to abandon certain plaintiffs' claims can trigger an end to tolling [as] . . . inconsistent with the underlying rationale of <u>American Pipe</u>"; holding instead that

---

[55/]     (...continued)
and 'the relevant evidence, memories, and witnesses . . . are the same for both actions.'" <u>Shak</u> v. <u>JPMorgan Chase & Co.</u>, 156 F. Supp. 3d at 475; <u>accord</u>, <u>e.g.</u>, <u>Dumont</u> v. <u>Litton Loan Servicing, LP</u>, 12 Civ. 2677, 2014 WL 815244 at *17 n.27 (S.D.N.Y. Mar. 3, 2014); <u>Josephson</u> v. <u>United Healthcare Corp.</u>, 2013 WL 3863921 at *4; <u>see also</u>, <u>e.g.</u>, <u>Sharpe</u> v. <u>Am. Exp. Co.</u>, 689 F. Supp. 294, 301 (S.D.N.Y. 1988) (considering "(1) whether the claims made by plaintiff in this action are substantially similar to or encompassed by those alleged in the class complaint, and (2) whether plaintiff's claims arise in the same general time frame as those alleged in the class action" (citations omitted)).  Plaintiffs' original complaint defined the putative class as "all past and present Blacks/Non-Hispanic White employees of the Department of Buildings who have been denied promotions, raises and comparable salaries and remunerations in their employment based on their race and ethnic backgrounds." (Dkt. No. 1: Compl. ¶ 81.)  In the absence of any contrary facts in the record or arguments from defendants (<u>see</u> Defs. Br. at 3-4; Defs. Reply Br. at 3), the Court finds that Morilla's and Minault's discrimination claims fit that bill.  Morilla's sex discrimination claims, however, are not entitled to <u>American Pipe</u> tolling.

[56/]     <u>American Pipe</u> tolling principles apply to Morilla and Minault's §§ 1981 and 1983 claims, as well as their New York state and city claims.  <u>See</u>, <u>e.g.</u>, <u>Choquette</u> v. <u>City of N.Y.</u>, 839 F. Supp. 2d at 697 n.3 ("When analyzing the statute of limitations for a § 1983 action, federal courts apply state, rather than federal, tolling provisions.  While <u>American Pipe</u> tolling is a federal doctrine, the Court of Appeals for the Second Circuit has held that <u>American Pipe</u> tolling is part of New York common law and has applied <u>American Pipe</u> tolling to § 1983 actions brought in New York."); <u>Matana</u> v. <u>Merkin</u>, 957 F. Supp. 2d 473, 488 (S.D.N.Y. 2013) ("'New York courts have . . . long embraced the principles of <u>American Pipe</u>.'  Thus, '[i]t is also appropriate to apply federal case law interpreting the scope and application of <u>American Pipe</u> tolling.'" (citations omitted)); <u>Wahad</u> v. <u>City of N.Y.</u>, 75 Civ. 6203, 1999 WL 608772 at *5 n.5 (S.D.N.Y. Aug. 12, 1999).

"a plaintiff who was part of the original class should not have been required to bring her own action until there was a definitive decision that her interests were not being pursued."). Thus, the same limitation periods as apply to the original plaintiffs' claims also apply for Morilla and Minault.

## III. THE ELECTION OF REMEDIES DOCTRINE BARS SOME OF PLAINTIFFS' NYSHRL AND NYCHRL CLAIMS

Defendants claim that certain NYSHRL/NYCHRL claims brought by plaintiffs Henry, Cantave and Morilla are barred because of their NYSDHR complaints. (Dkt. No. 58: Defs. Br. at 7.) Plaintiffs have not substantively responded to this argument.[57]

With exceptions not relevant here, a plaintiff asserting claims under the NYSHRL and/or NYCHRL who files a complaint with the NYSDHR/ New York City Commission on Human Rights cannot thereafter bring those claims in court. N.Y. Exec. Law § 297(9); N.Y.C. Admin. Code § 8-502(a); accord, e.g., Carris v. First Student, Inc., No. 15-3350, 2017 WL 946741 at *2 (2d Cir. Mar. 8, 2017); DuBois v. Macy's Retail Holdings, Inc., 533 F. App'x 40, 41 (2d Cir. 2013); Waller v. Muchnik, Golieb & Golieb, P.C., 523 F. App'x 55, 56 n.1 (2d Cir. 2013); Moodie v. Fed. Reserve Bank of N.Y., 58 F.3d 879, 882-83 (2d Cir. 1995); Marine Midland Bank v. N.Y.S. Div. of Human Rights, 551 N.Y.2d 240, 244-45, 552 N.Y.S.2d 65, 66 (1989).[58]

---

[57] In two sentences at the end of their brief, plaintiffs assert that the election of remedies doctrine should not apply in this case because "[t]here was no hearing regarding the claims" they filed with the NYSDHR and "Defendants supplied inaccurate information." (Dkt. No. 71: Pls.' Opp Br. at 39-40.) Defendants correctly note, however, that "Plaintiffs fail to demonstrate that defendants presented 'inaccurate information'"—let alone specify what information was inaccurate or the relevance of such inaccuracies to the election of remedies analysis—"nor do plaintiffs cite any authority holding that the election of remedies doctrine applies only if the SDHR conducts a hearing." (Dkt. No. 78: Defs. Reply Br. at 4.)

[58] See also, e.g., Black v. Anheuser-Busch in Bev, 14 Civ. 2693, 2016 WL 3866583 at *4 (S.D.N.Y. July 13, 2016); Gomez v. N.Y.C. Police Dep't, 191 F. Supp. 3d 293, 298-99 (S.D.N.Y. 2016); Levi v. RSM McGladrey, Inc., 12 Civ. 8787, 2014 WL 4809942 at *3 (continued...)

"'[B]oth the NYSHRL and the NYCHRL require dismissal of a suit in court if the complainant lodges a complaint with <u>either</u> the SDHR or the Commission. This bar applies in federal as well as state court.'" <u>Williams</u> v. <u>City of N.Y.</u>, 916 F. Supp. 2d at 521; <u>accord</u>, <u>e.g.</u>, <u>Carris</u> v. <u>First Student, Inc.</u>, 2017 WL 946741 at *2 ("Here, the district court properly dismissed [plaintiff's NYSHRL] claim: she filed a complaint with the NYSDHR, which that body dismissed for lack of probable cause."); <u>DuBois</u> v. <u>Macy's Retail Holdings, Inc.</u>, 533 F. App'x at 41 ("The record reflects that [plaintiff] filed a complaint with the New York City Commission on Human Rights . . . asserting identical claims, which the NYCCHR dismissed for lack of probable cause. Accordingly, the district court correctly determined that [plaintiff's] claims under the SHRL and the CHRL are precluded by the election of remedies doctrine."); <u>Black</u> v. <u>Anheuser-Busch in Bev</u>, 2016 WL 3866583 at *4 ("In short, the election of remedies provision erects a jurisdictional bar to relitigation of claims that have been brought before the NYCCHR and found to be without probable cause.").[59]

---

[58]    (...continued)
(S.D.N.Y. Sept. 24, 2014) ("[A] plaintiff seeking to bring a discrimination claim under the NYSHRL is given a choice: he can either proceed in court or pursue an administrative complaint before a local human rights commission, but he cannot do both."); <u>Fitzgerald</u> v. <u>Signature Flight Support Corp.</u>, 13 Civ. 4026, 2014 WL 3887217 at *5 (S.D.N.Y. Aug. 5, 2014); <u>Williams</u> v. <u>City of N.Y.</u>, 916 F. Supp. 2d 517, 521 (S.D.N.Y. 2013) ("Generally, the remedies of administrative review through the Human Rights Division or judicial review are <u>mutually exclusive</u>. . . . [O]nce a complainant elects the administrative forum by filing a complaint with the Division of Human Rights, a subsequent judicial action on the same complaint is <u>generally barred</u>." (quotations omitted)); <u>Goldson</u> v. <u>Kral, Clerkin, Redmond, Ryan, Perry & Van Etten, LLP</u>, 13 Civ. 2747, 2014 WL 4061157 at *7 (S.D.N.Y. July 11, 2014) (quoting <u>York</u> v. <u>Ass'n of Bar of City of N.Y.</u>, 286 F.3d 122, 127 (2d Cir. 2002)), <u>R. & R. adopted</u>, 13 Civ. 2747, 2014 WL 3974584 (S.D.N.Y. Aug. 13, 2014); <u>Sicular</u> v. <u>N.Y.C. Dep't Of Homeless Servs.</u>, 09 Civ. 0981, 2010 WL 423013 at *28 (S.D.N.Y. Feb. 4, 2010) (Peck, M.J.) (& cases cited therein), <u>R. & R. adopted</u>, 09 Civ. 0981, 2010 WL 2179962 (S.D.N.Y. May 28, 2010).

[59]    Accord, <u>e.g.</u>, <u>Higgins</u> v. <u>NYP Holdings, Inc.</u>, 836 F. Supp. 2d 182, 189 (S.D.N.Y. 2011) ("[A] claimant's SDHR complaint addressing the same incident, and that results in a finding
(continued...)

This bar, known as election of remedies, "'is not limited to the precise claims brought in the administrative proceeding, but extends to all claims arising out of the same events.'" Coppedge v. N.Y.C. Sales Inc., 10 Civ. 6349, 2011 WL 4343268 at *2 (S.D.N.Y. Sept. 8, 2011); accord, e.g., Carroll v. U.P.S., 225 F.3d 645 at *3 (2d Cir. 2000) (table) ("'The question is whether a sufficient identity of issue exists between the complaint before the division and the instant claim.'"); Black v. Anheuser-Busch in Bev, 2016 WL 3866583 at *5 ("A different pled form of relief arising out of the same incident forming the basis of the claims before the Agency is likewise barred by the election of remedies provision."); Wray v. Health & Hosp. Corp., 15 Civ. 6845, 2016 WL 3542460 at *3 (S.D.N.Y. June 23, 2016) ("'Once an individual pursues administrative relief for her NYSHRL . . . claims, she has elected her remedy and any subsequent judicial action based upon the same events is jurisdictionally barred.'"); Williams v. City of N.Y., 916 F. Supp. 2d at 522 ("[C]laims need not be identical in order to be barred by the state or city election of remedies provisions. . . . A [c]laimant cannot avoid the jurisdictional bar by merely adding additional elements of damage arising out of the same underlying conduct [or] by changing his legal theory." (quotations omitted)).

"[I]mportantly, the [election of remedies] issue . . . is jurisdictional. Accordingly, the Court must consider the argument." Goldson v. Kral, Clerkin, Redmond, Ryan, Perry & Van Etten, LLP, 2014 WL 4061157 at *7 (citation omitted); accord, e.g., Carroll v. U.P.S., 225 F.3d 645

---

59/ (...continued)
of no probable cause, procedurally bars the claimant from relief under the NYCHRL."); Sicular v. N.Y.C. Dep't Of Homeless Servs., 2010 WL 423013 at *28; Lopes v. Caffe Cent. LLC, 06 Civ. 9927, 2009 WL 102212 at *1-2 (S.D.N.Y. Jan. 14, 2009); Illie-Stout v. Barrier Free Living, Inc., 08 Civ. 6388, 2009 WL 81151 at *1-2 (S.D.N.Y. Jan. 12, 2009) (Lynch, D.J.); Mendez v. City of N.Y. Human Res. Admin., 04 Civ. 0559, 2005 WL 2739276 at *2 (S.D.N.Y. Oct. 24, 2005); Thomas v. N.Y.C. Health & Hosps. Corp., 02 Civ. 5159, 2004 WL 1962074 at *1 n.1 (S.D.N.Y. Sept. 2, 2004).

at *3 (table); <u>Moodie</u> v. <u>Fed. Reserve Bank of N.Y.</u>, 58 F.3d at 884 ("Both the language of the statute and its consistent judicial interpretation establish that § 297(9) poses an insuperable jurisdictional bar."); <u>Rasmy</u> v. <u>Marriott Int'l, Inc.</u>, 16 Civ. 4865, 2017 WL 773604 at *4 (S.D.N.Y. Feb. 24, 2017) ("[T]he election of remedies bar operates to divest a federal court of subject matter jurisdiction over the relevant state law claims."); <u>McCray</u> v. <u>Project Renewal, Inc.</u>, 15 Civ. 8494, 2017 WL 715010 at *5 (S.D.N.Y. Feb. 22, 2017); <u>Black</u> v. <u>Anheuser-Busch in Bev</u>, 2016 WL 3866583 at *4.

## A.   **Delvin Henry**

On March 8, 2013, Delvin Henry filed a complaint with the New York State Division of Human Rights ("NYSDHR") alleging that DOB employees Dennis Zambotti and Dmitri Dits discriminated against him on the basis of his race and national origin, and that they retaliated against him "because [he] retain[ed] a private attorney to deal with . . . harassment within the work place." (Dkt. No. 59-3, Ex. W: Henry NYSDHR Compl. at 19-21;[60/] <u>see also</u> pages 14-15 above.)  Henry also asserted that he was paid a lower salary than other workers with his title.  (Henry Compl. at 21.) Henry's NYSDHR complaint alleged, <u>inter alia</u>, that DOB "hire[d] a less qualified inspector to be the assistant chief in the Emergency Response Unit . . . Name: Juan Arias"; that Dits "denied [Henry] a raise in salary . . . meanwhile other inspectors were given a raise"; and that "[he] was denied overtime pay by Dennis Zambotti while assigned to Queens Construction Unit."  (<u>Id.</u> at 22.)

Some of the facts supporting Henry's claims in this case mirror those raised in his complaint to the NYSDHR.  Plaintiffs' filings assert that "[w]hite employees earned higher salaries than blacks doing similar work" (Dkt. No. 67: Pls. Rule 56.1(b) Counter-Stmt. ¶ 86); that "Henry

---

[60/]   Citations to this document use ECF's pagination.

applied for the position of Assistant Chief of his unit but the position was given to Juan Arias . . ." (id. ¶ 84); that "[w]hile working as Assistant Chief of Construction in Queens, Henry was constantly denied overtime opportunities by Chief Dennis Zambotti" (id. ¶ 77); and that "Dmitri [Dits] denied Henry a pay raise" (id. ¶ 83).  Because these facts formed the bases of Henry's claims before the NYSDHR—claims which the NYSDHR subsequently denied for lack of probable cause (see Dkt. No. 59-3, Ex. X: NYSDHR Determ. & Ord. After Investigation; see also pages 14-15 above)—the Court should DISMISS any NYSHRL and NYCHRL claims asserted by Henry arising from these facts.  See, e.g., Carroll v. U.P.S., 225 F.3d 645 at *3 (table) ("The jurisdictional bar posed by § 297(9) required the district court to dismiss [the plaintiff's] claims for lack of jurisdiction, rather than granting summary judgment against her.").

### B.     Yvon Cantave

On January 15, 2013, Yvon Cantave filed a complaint with the NYSDHR alleging that DOB employees Dmitri Dits and Tom Mascialino discriminated against him on the basis of his race, and that they retaliated against him because he "had reported both of [his] supervisors to [his] agency EEO office [and] union – for denying [him] training [and overtime] – [and] constantly sending [him] threatening emails."  (Dkt. No. 59-6, Ex. TT: Cantave NYSDHR Compl. at 18-19;[61/] see also page 33 above.)   Cantave's complaint alleged, inter alia: Cantave "was initially discriminated against when [he] was not given the opportunity to apply for the job of chief" of the Emergency Response Team when that position opened up while he was on vacation; the position went to Tom Mascialino, who "ha[d] no experience in emergency response" (id. at 21); Gina Bitro and Dmitri Dits "had various meetings with staff" that Cantave supervised, but Cantave "was never

---

[61/]     Citations to this document use ECF's pagination.

invited to these meetings" (id.); Cantave was repeatedly denied overtime, which was offered to his subordinates (id.); on July 16, 2012, Cantave reported Mascialino and Dits to DOB's EEO office, and on September 24, 2012, Cantave was verbally told that he was being demoted (id. at 22).

Some of the facts supporting Cantave's claims in this case mirror those raised in his NYSDHR complaint. Plaintiffs' filings assert: in "September 2012, Cantave was demoted from his position as Supervisor to an Inspector" (Dkt. No. 67: Pls. Rule 56.1(b) Counter-Stmt. ¶ 144); "Tom Masalina [sic], who is white, was appointed Chief of Emergency Response Team even though Cantave was more qualified than him" (id. ¶ 153); Cantave was retaliated against in various ways "for his complaints of discrimination . . . and his filing of internal complaint with the . . . EEO" (id. ¶¶ 164, 167, 169, 192); and "Cantave was . . . denied training and overtime by Dmitri Dits" (id. ¶¶ 166-68). Because these facts formed the bases of Cantave's claims before the NYSDHR—claims which the NYSDHR subsequently denied for lack of probable cause (see Dkt. No. 59-6, Ex. UU: NYSDHR Determ. & Ord. After Investigation; see also page 33 above)—the Court should DISMISS any NYSHRL and NYCHRL claims asserted by Cantave arising from these facts. (See case cited on page 77 above.)

###     C.     Niurka Morilla

On February 26, 2013, Niurka Morilla filed a complaint with the NYSDHR alleging that DOB Assistant Commissioner Christopher Santulli and DOB Executive Director Robert D'Allessio discriminated against her on the basis of her national origin, race and sex, and retaliated against her because she filed EEO complaints. (Dkt. No. 59-8, Ex. III: Morilla NYSDHR Compl. at 37-38;[62] see also page 47 above.) Morilla indicated that the specific acts of discrimination

---

[62]     Citations to this document use ECF's pagination.

included denial of a promotion or pay raise and that she was given a "disciplinary notice or negative performance evaluation." (Morilla NYSDHR Compl. at 39.) Morilla's NYSDHR complaint alleged, <u>inter alia</u>, that when an Assistant Chief position opened up in 2011, Bernard Ross told her that the position was closed (<u>id.</u>); in September 2012, Robert D'Allessio told her that she should be glad to be a supervisor and that she was "breaking grounds for [other] females" (<u>id.</u>); she was not copied on "emails that were sent with situations (job) and special projects" (<u>id.</u> at 41); a coworker "verbally attacked" her and made fun of her Spanish accent, but her immediate supervisor "did not do anything" and she was transferred to another unit (<u>id.</u>).

Some of the facts supporting Morilla's claims in this case mirror those raised in her NYSDHR complaint. Plaintiffs' Rule 56.1(b) Counter-Statement asserts that "Morilla spoke with Bernard Ross about being promoted . . . but she was told that the position was closed" (Dkt. No. 67: Pls. Rule 56.1(b) Counter-Stmt. ¶ 31); "[w]hen Morilla met with D'Allessio to ask for promotion . . . D'Alessio [sic] told Morilla that, being a woman, she should be happy to be working as a supervisor and breaking ground for a generation of women" (<u>id.</u> ¶ 34); Morilla's coworker "constantly mocked [her] accent," and that Ross told her "not to pay attention" (<u>id.</u> ¶¶ 41, 43); Ross and D'Allessio "stopped copying Morilla on important . . . worked related emails" (<u>id.</u> ¶¶ 47-48). Because these facts formed the bases of Morilla's claims before the NYSDHR—claims which the NYSDHR subsequently denied for lack of probable cause (<u>see</u> Dkt. No. 59-8, Ex. JJJ: NYSDHR Determ. & Ord. After Investigation; <u>see also</u> page 47 above)—the Court should <u>DISMISS</u> any NYSHRL and NYCHRL claims asserted by Morilla arising from these facts. (<u>See</u> case cited on page 77 above.)

## IV. SUMMARY JUDGMENT IS GRANTED ON SOME OF PLAINTIFFS' DISCRIMINATION CLAIMS

As noted above, 42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction

of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a). "This section thus outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." Patterson v. Cty. of Oneida, 375 F.3d 206, 224 (2d Cir. 2004).[63] The Second Circuit has held that "[m]ost of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981." Patterson v. Cty. of Oneida, 375 F.3d at 225.[64]

To make out a prima facie case of employment discrimination under § 1981, each plaintiff must establish that (1) he or she is within a protected class; (2) he or she was qualified for the job at issue; (3) he or she was subjected to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. E.g., Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012).[65] Except where noted below, defendants do not dispute that plaintiffs satisfy the first two elements for all of their claims. (See generally Dkt. No. 58: Defs. Br.; Dkt. No. 78: Defs. Reply. Br.)

With regard to the third element, "'[a] plaintiff sustains an adverse employment action

---

[63] Accord, e.g., Wiercinski v. Mangia 57, Inc., 787 F.3d 106, 113 (2d Cir. 2015); Jalal v. Lucille Roberts Health Clubs Inc., 15 Civ. 7802, 2017 WL 2242967 at *4 n.2 (S.D.N.Y. May 22, 2017); Yan v. Ziba Mode Inc., 15 Civ. 0047, 2016 WL 1276456 at *3 (S.D.N.Y. Mar. 29, 2016).

[64] Accord, e.g., Wiercinski v. Mangia 57, Inc., 787 F.3d at 113; Yan v. Ziba Mode Inc., 2016 WL 1276456 at *3.

[65] Accord, e.g., Johnson v. Andy Frain Servs., Inc., 638 F. App'x 68, 70 (2d Cir. 2016); White v. Andy Frain Servs., Inc., 629 F. App'x 131, 133 (2d Cir. 2015); Mills v. S. Conn. State Univ., 519 F. App'x 73, 75 (2d Cir. 2013); Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008); Villar v. City of N.Y., 135 F. Supp. 3d 105, 120 (S.D.N.Y. 2015); Bowen-Hooks v. City of N.Y., 13 F. Supp. 3d 179, 210-11 (E.D.N.Y. 2014).

if he or she endures a materially adverse change in the terms and conditions of employment. . . .   An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities.'"  Brown v. City of Syracuse, 673 F.3d at 150.[66/]  "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation."  Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006) (quotations omitted).[67/]  The Second Circuit has held that a "claim of discriminatory failure to promote falls within the core activities encompassed by the term 'adverse actions.'"  Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002) (discussing the meaning of "adverse actions" in the context of retaliation claims); accord, e.g., Mills v. S. Conn. State Univ., 519 F. App'x at 75 (failure to promote constitutes an adverse action for the purposes of establishing a prima facie case of discrimination).[68/]

The fourth element "is a flexible one that can be satisfied differently in differing factual scenarios."  Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996).  It can be

---

[66/]   Accord, e.g., Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003); Galabya v. N.Y.C. Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000).

[67/]   Accord, e.g., Terry v. Ashcroft, 336 F.3d at 138; Galabya v. N.Y.C. Bd. of Educ., 202 F.3d at 640; see also, e.g., Henry v. N.Y.C. Health & Hosp. Corp., 18 F. Supp. 3d 396, 406 (S.D.N.Y. 2014) ("The receipt of undesirable assignments, without more, amounts to nothing more than a 'mere inconvenience,' not a 'materially adverse change in the terms and conditions of employment.'" (quoting Sanders v. N.Y.C. Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004))); Smalls v. Allstate Ins. Co., 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) ("'[R]eceiving unfavorable schedules or work assignments . . . do not rise to the level of adverse employment actions . . . because they [do] not have a material impact on the terms and conditions of Plaintiff's employment.'").

[68/]   See also, e.g., Schibli v. Port Auth. of N.Y. & N.J., 12 Civ. 3057, 2014 WL 1329148 at *8 (S.D.N.Y. Apr. 2, 2014); Farzan v. Wells Fargo Bank, N.A., 12 Civ. 1217, 2013 WL 6231615 at *21 (S.D.N.Y. Dec. 2, 2013), aff'd, 619 F. App'x 15 (2d Cir. 2015).

satisfied, for example, by "'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" Littlejohn v. City of N.Y., 795 F.3d 297, 312 (2d Cir. 2015). Under any scenario, the Second Circuit has "characterized the evidence necessary to satisfy this initial [prima facie] burden as 'minimal' and 'de minimis.'" Zimmermann v. Assoc. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001).

Plaintiffs here generally rely on two methods of establishing the fourth element of the prima facie test: disparate treatment and failure to promote. As to the first,

> A showing of disparate treatment—that is, a showing that an employer treated plaintiff less favorably than a similarly situated employee outside his protected group—is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case. . . . The standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical. In other words, the comparator must be similarly situated to the plaintiff in all material respects.

Villar v. City of N.Y., 135 F. Supp. 3d at 121 (citations & quotations omitted). "Although '[t]he question of whether two employees are similarly situated is generally a triable issue for the fact-finder[,] . . . a plaintiff must offer sufficient evidence from which a jury could reasonably conclude that there was indeed disparate treatment of similarly situated employees.'" Id.

To establish a prima facie case under a failure to promote theory,

> the plaintiff must show that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of discrimination. An inference of discrimination may arise if the position remains open and the employer continues to seek applicants of the plaintiff's qualifications, or if the position was filled by someone not a member of plaintiff's protected class.

Morris v. Ales Grp. USA, Inc., 04 Civ. 8239, 2007 WL 1893729 at *9 (S.D.N.Y. June 29, 2007)

(citations & quotations omitted).[69]  Evidence of a specific application is necessary to meet this standard; the requirement that a plaintiff show that he or she applied for an available position "cannot be established merely with evidence that a plaintiff generally requested promotion consideration."  Petrosino v. Bell Atl., 385 F.3d 210, 227 (2d Cir. 2004).[70]  An exception to the specific application requirement exists, however, where the plaintiff can "demonstrate that (1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer."  Petrosino v. Bell Atl., 385 F.3d at 227.[71]

"An individual may be held liable under §§ 1981 and 1983 only if that individual is

---

[69]     Accord, e.g., D'Cunha v. Genovese/Eckerd Corp., 479 F.3d 193, 195 (2d Cir. 2007) (plaintiff established a prima facie case of age discrimination where he established, inter alia, that he was rejected for a position in favor of someone eight years younger); Chhorn v. Derwinski, 129 F.3d 113 at *1 (2d Cir. 1997) (table), cert. denied, 525 U.S. 906 , 119 S. Ct. 243 (1998); de la Cruz v. N.Y.C. Human Res. Admin. Dep't of Soc. Servs., 82 F.3d 16, 20 (2d Cir. 1996); Penn v. N.Y. Methodist Hosp., 11 Civ. 9137, 2013 WL 5477600 at *13 (S.D.N.Y. Sept. 30, 2013); see also, e.g., Littlejohn v. City of N.Y., 795 F.3d at 313 ("The fact that a plaintiff was replaced by someone outside the protected class will ordinarily suffice for the required inference of discrimination at the initial prima facie stage."); Artope v. Ctr. for Animal Care & Control, Inc., 05 Civ. 9283, 2009 WL 874037 at *9 (S.D.N.Y. Mar. 27, 2009).

[70]     Accord, e.g., Brown v. Coach Stores, Inc., 163 F.3d 706, 710 (2d Cir. 1998) ("We read McDonnell Douglas and Burdine generally to require a plaintiff to allege that she or he applied for a specific position or positions and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion.  This general mandate ensures that, at the very least, the plaintiff employee alleges a particular adverse employment action, an instance of alleged discrimination, by the employer."); Farzan v. Wells Fargo Bank, N.A., 2013 WL 6231615 at *23 ("Absent some formalized application to a specific position, [plaintiff's] claim must fail as a matter of law.").

[71]     Accord, e.g., Fox v. Cty. of Yates, 657 F. App'x 60, 63 (2d Cir. 2016); Saber v. N.Y.S. Dep't of Fin. Servs., 15 Civ. 5944, 2017 WL 985889 at *8 (S.D.N.Y. Mar. 10, 2017); Doran v. N.Y.S. Dep't of Health Office of Medicaid Inspector Gen., 15 Civ. 7217, 2017 WL 836027 at *11 (S.D.N.Y. Mar. 2, 2017); Opoku v. Brega, 15 Civ. 2213, 2016 WL 5720807 at *12 (S.D.N.Y. Sept. 30, 2016).

'personally involved in the alleged deprivation.'" Littlejohn v. City of N.Y., 795 F.3d at 314

(quoting Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107, 127 (2d Cir. 2004)).[72/]

> Personal involvement can be shown by: "evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring."

Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d at 127.[73/] "In addition to fulfilling one

of these requirements, 'a plaintiff must also establish that the supervisor's actions were the proximate

cause of the plaintiff's constitutional deprivation. Finally, as with individual liability, in the § 1983

context, a plaintiff must establish that a supervisor's behavior constituted intentional discrimination

---

[72/] Accord, e.g., Raspardo v. Carlone, 770 F.3d 97, 116 (2d Cir. 2014) ("[L]iability for supervisory government officials cannot be premised on a theory of respondeat superior because § 1983 requires individual, personalized liability on the part of each government defendant. . . . [B]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." (quotations & citations omitted)); Farid v. Ellen, 593 F.3d 233, 249 (2d Cir. 2010); Patterson v. Cty. of Oneida, 375 F.3d at 229 ("In order to make out a claim for individual liability under § 1981, 'a plaintiff must demonstrate some affirmative link to causally connect the actor with the discriminatory action. . . . [P]ersonal liability under section 1981 must be predicated on the actor's personal involvement.'"); Villar v. City of N.Y., 135 F. Supp. 3d at 140-41.

[73/] Accord, e.g., Littlejohn v. City of N.Y., 795 F.3d at 314; Rolon v. Ward, 345 F. App'x 608, 611 (2d Cir. 2009) ("A supervisory official personally participates in challenged conduct not only by direct participation, but by (1) failing to take corrective action; (2) creation of a policy or custom fostering the conduct; (3) grossly negligent supervision, or deliberate indifference to the rights of others."); Patterson v. Cty. of Oneida, 375 F.3d at 229 ("Personal involvement, within the meaning of this concept, includes not only direct participation in the alleged violation but also gross negligence in the supervision of subordinates who committed the wrongful acts and failure to take action upon receiving information that constitutional violations are occurring."); Villar v. City of N.Y., 135 F. Supp. 3d at 141.

on the basis of a protected characteristic.'" Littlejohn v. City of N.Y., 795 F.3d at 314.[74/]

Like § 1981, the NYSHRL and NYCHRL prohibit discrimination in the terms and conditions of employment, see N.Y. Exec. L. § 296(1)(a); N.Y.C. Admin. Code § 8-107(1)(a), and "also require personal involvement" in order to hold an individual defendant personally liable for an act of discrimination, Lewis v. Roosevelt Island Operating Corp., 2017 WL 1169647 at *8 (citing Feingold v. New York, 366 F.3d 138, 157-58 (2d Cir. 2004)).[75/]   Indeed, "'[t]he standard for intentional discrimination under [N.Y. Exec. Law] § 296 [i.e., the NYSHRL] is identical to that for claims of discrimination pursuant to § 1981.'" Toussaint v. NY Dialysis Servs., Inc., 14 Civ. 5069, 2017 WL 456471 at *10 (S.D.N.Y. Feb. 2, 2017).[76/]

---

[74/]   Accord, e.g., Lewis v. Roosevelt Island Operating Corp., 16 Civ. 3071, 2017 WL 1169647 at *8 (S.D.N.Y. Mar. 28, 2017); Cowan v. City of Mount Vernon, 95 F. Supp. 3d 624, 644-45 (S.D.N.Y. 2015).

[75/]   Accord, e.g., Nieblas-Love v. N.Y.C. Hous. Auth., 165 F. Supp. 3d 51, 75-76 (S.D.N.Y. 2016) ("Under Section 1981, the NYSHRL, and the NYCHRL, individual liability exists only where a defendant 'actually participate[d] in the conduct giving rise to a discrimination claim.'"); Villar v. City of N.Y., 135 F. Supp. 3d at 143 ("Actual participation in conduct giving rise to a discrimination claim is required to support liability under both the NYSHRL and NYCHRL."); Jackson v. Battaglia, 63 F. Supp. 3d 214, 222 (N.D.N.Y. 2014) ("[T]he NYSHRL and § 1981 provide for individual liability where the individual possessed 'power to do more than carry out personnel decisions made by others,' or is shown to have 'actually participate[d] in the conduct giving rise to a discrimination claim.'"); Hagan v. City of N.Y., 39 F. Supp. 3d 481, 514 (S.D.N.Y. 2014) ("The SHRL and CHRL similarly provide for individual liability for persons who 'aid, abet, incite, compel, or coerce the doing of any of the acts forbidden [thereunder], or attempt to do so.' N.Y. Exec. L. § 296(6); N.Y.C. Admin. Code § 8-107(6).   This provision reaches conduct by a supervisor or 'a co-worker who "actually participates in the conduct giving rise to a discrimination claim."'" (fn. omitted)); Morgan v. N.Y.S. Atty. Gen.'s Office, 11 Civ. 9389, 2013 WL 491525 at *13 (S.D.N.Y. Feb. 8, 2013) ("Individual employees may be held personally liable under the NYSHRL and NYCHRL if they participate in discriminatory conduct.").

[76/]   Accord, e.g., Wright v. City of Syracuse, 611 F. App'x 8, 10 n.1 (2d Cir. 2015) ("New York courts 'require the same standard of proof for claims brought under the NYSHRL as for those brought under Title VII, and, for present purposes, those brought under sections 1981
(continued...)

However, "courts must analyze NYCHRL claims separately and independently from any federal and state law claims." Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 108-09 (2d Cir. 2013).[77] "NYCHRL claims are to be reviewed more liberally than Title VII claims, and the provisions of the NYCHRL must be construed broadly in favor of plaintiffs alleging discrimination." Johnson v. Andy Frain Servs., Inc., 638 F. App'x at 71; see also Benn v. City of N.Y., 482 F. App'x 637, 639 (2d Cir. 2012) ("While 'City HRL claims have typically been treated as coextensive with state and federal counterparts . . . the New York City Council has rejected such equivalence.'"); Bennett v. Health Mgmt. Sys., Inc., 92 A.D.3d 29, 34, 936 N.Y.S.2d 112, 116 (1st Dep't 2011) ("'[T]he City HRL now 'explicitly requires an independent liberal construction analysis in all circumstances,' an analysis that 'must be targeted to understanding and fulfilling what the statute characterizes as the City HRL's "uniquely broad and remedial" purposes, which go beyond those of counterpart State or federal civil rights laws.'") (quoting Williams v. N.Y.C. Hous. Auth., 61 A.D.3d 62, 66, 872 N.Y.S.2d 27, 31 (1st Dep't 2009)).

Although courts still analyze NYCHRL claims using the McDonnell Douglas framework, see, e.g., Ya-Chen Chen v. City Univ. of N.Y., 805 F.3d 59, 75-76 (2d Cir.

---

[76] (...continued)
and 1983." (citations & quotations omitted)); Pucino v. Verizon Commc'ns, Inc., 618 F.3d 112, 117 n.2 (2d Cir. 2010) ("We review discrimination claims brought under the NYSHRL according to the same standards that we apply to Title VII discrimination claims."); Leopold v. Baccarat, Inc., 174 F.3d 261, 264 n.1 (2d Cir. 1999); Clark v. City of N.Y., No. 13-CV-210, 2014 WL 4804237 at *4 (E.D.N.Y. Sept. 25, 2014); Ford v. Consol. Edison Co. of N.Y., Inc., 03 Civ. 9587, 2006 WL 538116 at *19 (S.D.N.Y. Mar. 3, 2006) ("A claim of discrimination pursuant to New York Executive Law § 296 is subject to the same analysis as a claim of discrimination under federal law."), aff'd, 225 F. App'x 19 (2d Cir. 2007).

[77] Accord, e.g., Chauca v. Abraham, 841 F.3d 86, 91 (2d Cir. 2016); Johnson v. Andy Frain Servs., Inc., 638 F. App'x at 71; Villar v. City of N.Y., 135 F. Supp. 3d at 133.

2015),[78/] the Second Circuit has admonished that in order for an NYCHRL discrimination claim to survive summary judgment,

> the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason. The employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes as a matter of law that 'discrimination play[ed] no role' in its actions.

Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d at 110 n.8. Moreover, "'to make out the third prong of a prima facie case of discrimination under the NYCHRL, a plaintiff must simply show that she was treated differently from others in a way that was more than trivial, insubstantial, or petty.'" Villar v. City of N.Y., 135 F. Supp. 3d at 129. But even under the NYCHRL's more liberal standard, "a plaintiff must show that he has been treated less well at least in part because of" his or her protected status. Bernadotte v. N.Y. Hosp. Med. Ctr. of Queens, 2016 WL 792399 at *11 (quotations omitted); accord, e.g., White v. Andy Frain Servs., Inc., 629 F. App'x at 133 ("[T]hough we must construe NYCHRL claims more liberally than federal and state law claims, NYCHRL similarly only prohibits discrimination in the 'terms, conditions or privileges of employment' when such discrimination is 'because of' a protected characteristic.").

Finally, plaintiffs establish liability against the City for their NYSHRL and NYCHRL claims by showing that the alleged discriminatory conduct was perpetrated by a supervisor.[79/] See, e.g., Swiderski v. Urban Outfitters, Inc., 14 Civ. 6307, 2015 WL 3513088 at *5 (S.D.N.Y. June 4, 2015) (in the context of NYSHRL claims, "[i]n general, a supervisor's conduct is attributable to the

---

[78/] Accord, e.g., Bernadotte v. N.Y. Hosp. Med. Ctr. of Queens, No. 13-CV-965, 2016 WL 792399 at *11 (E.D.N.Y. Feb. 26, 2016).

[79/] Plaintiffs voluntarily dismissed their claims against the City brought under §§ 1981 and 1983. (See page 1 above.)

employer"); see also, e.g., Garcia v. N.Y.C. Health & Hosps. Corp., 15 Civ. 2119, 2016 WL 4097850 at *5 (S.D.N.Y. July 26, 2016) ("An employer is liable under . . . the NYCHRL for the discriminatory actions of its employees, with exceptions not relevant here, only to the extent that the discriminating employee was a 'supervisor.' An employee is a supervisor if 'he or she is empowered by the employer to take tangible employment actions against the victim.'" (citation omitted)); Zakrzewska v. New Sch., 14 N.Y.3d 469, 480, 902 N.Y.S.2d 838, 842-43 (2010) (discussing employer liability under NYCHRL).[80/]

### A.    McCalla

McCalla raises a discrimination claim based on Thomas Connors' failure to promote him to the Supervising Inspector positions given to Philip DiMaggio and Thomas Solanto. (See Dkt. No. 71: Pls. Opp. Br. at 15-18; see also pages 2-8 above.) Defendants do not dispute that McCalla was qualified for and applied for these positions, and that DiMaggio and Solanto are white. (See Dkt. No. 58: Defs. Br. at 11-13; Dkt. No. 78: Defs. Reply Br. at 8-9.) Thus, McCalla has established a prima facie case. (See cases cited on pages 82-83 & n.69 above.)

---

[80/]    The Court notes the abundance of case law concluding that the standard for establishing employer liability for claims based on the conduct of co-workers—i.e., hostile work environment and sexual harassment—is more stringent under the NYSHRL (and, according to some courts, the NYCHRL) than under Title VII. See, e.g., Parra v. City of White Plains, 13 Civ. 5544, 2016 WL 4734666 at *8 n.6 (S.D.N.Y. Sept. 9, 2016); Haight v. NYU Langone Med. Ctr., Inc., 13 Civ. 4993, 2016 WL 29628 at *9 (S.D.N.Y. Jan. 4, 2016); Marchuk v. Faruqi & Faruqi, LLP, 100 F. Supp. 3d 302, 307 (S.D.N.Y. 2015) (Under NYSHRL, "an employer is never strictly liable for the conduct of employees, even if the harassing employee is a Plaintiff's supervisor. An employer is only liable for conduct that it encouraged, condoned, or expressly or impliedly approved." (citation omitted)); Apionishev v. Columbia Univ., 09 Civ. 6471, 2011 WL 1197637 at *7 (S.D.N.Y. Mar. 25, 2011); Heskin v. Insite Advert., Inc., 03 Civ. 2508, 2005 WL 407646 at *23 (S.D.N.Y. Feb. 22, 2005) (Peck, M.J.) (collecting cases). But because plaintiffs have voluntarily dismissed their hostile work environment claims (see page 1 above), such case law is irrelevant to the instant action.

Defendants' justification for selecting DiMaggio and Solanto for promotion relies on Connors' statements regarding DiMaggio's and Solanto's superior qualifications. (See Defs. Br. at 11-12; Defs. Reply Br. at 9.) Further weighing against an inference of discrimination, defendants assert, is the fact that "Connors has promoted several black employees of Caribbean national origin to supervisor and executive positions." (See page 8 above.)

Both parties cite the number of minorities and non-minorities hired by Connors as evidence relevant to his motive for failing to promote McCalla. (See Pls. Opp. Br. at 17; Defs. Reply Br. at 4-5, 9.) Plaintiffs argue (without any supporting evidence) that "Connors hired 5 white employees in 2012 and promoted all of them within a couple of years and the only black man hired with the five white men was not promoted . . . ." (Pls. Opp. Br. at 17; see also Pls. Rule 56.1(b) Counter-Stmt. ¶ 7 (citing "McCalla Aff."); Dkt. No. 69-3: McCalla Aff. (containing no discussion of the number of blacks and whites hired in 2012).) Citing Connors' affidavit, defendants respond that "[o]f the employees Connors has promoted who are currently at DOB, 15 are white, 12 are black, 9 are Hispanic, and 5 are classified as 'other.'" (Defs. Reply Br. at 9; see also Dkt. No. 59-1, Ex. D: Connors Aff. ¶ 4.) Plaintiffs' conclusorily assert that Connors promoted blacks "not due to his preference but because they were the only ones in line for the promotional positions." (See page 8 above; see also Defs. Reply Br. at 5.)

Although courts have discussed a defendants' promotion of members of the plaintiff's protected class in analyzing failure to promote claims, see, e.g., Sealy v. Hertz Corp., 688 F. Supp. 2d 247, 257 (S.D.N.Y. 2009) (defendants' promotion of members of plaintiff's protected class to supervisory positions cut against plaintiff's claim of discriminatory failure to promote); Fowler v. Visiting Nurse Serv. of N.Y., 06 Civ. 4351, 2007 WL 3256129 at *5 (S.D.N.Y. Oct. 31, 2007) (finding "no evidence of a pattern of mistreatment of other African-Americans during the relevant

period" where, <u>inter alia</u>, defendant "promoted many black employees"), such statistics are not dispositive, <u>cf.</u> <u>O'Connor</u> v. <u>Consol. Coin Caterers Corp.</u>, 517 U.S. 308, 312, 116 S. Ct. 1307, 1310 (1996) ("The fact that one person in the protected class has lost out to another person in the protected class is . . . irrelevant, so long as he has lost out <u>because of his</u>" protected status). Under the facts and law recited above, Connors' promotion of whites versus non-whites benefit neither party to any significant degree, and certainly does not provide a basis to grant summary judgment to defendants.

Turning to the relative qualifications of McCalla, Solanto and DiMaggio (<u>see</u> Defs. Br. at 11; Pls. Opp. Br. at 15; Defs. Reply Br. at 8), defendants cite Connors' assertions that DiMaggio and Solanto were promoted because they had "demonstrated the ability to supervise themselves and other inspectors" by "tak[ing] the lead in routing out other inspectors" (<u>see</u> page 6 above); plaintiffs do not genuinely dispute that DiMaggio and Solanto displayed such abilities (<u>see</u> <u>generally</u> Pls. Opp. Br. at 15-18; <u>see also</u> page 6 n.3 above). McCalla, on the other hand, was assessed as "need[ing] leadership mentoring." (<u>See</u> page 3 above; Defs. Reply Br. at 9.) Although McCalla was a ten-year veteran inspector at the time he applied for the Supervising Inspector positions (<u>see</u> page 3 above), defendants argue that "[a]n employee's length of service at DOB does not necessarily make the employee qualified for a supervisor position" (<u>see</u> pages 5-6 above); as a matter of law, "[t]here is . . . no legal requirement that an employer base promotional decisions solely on seniority." <u>Hamilton</u> v. <u>City of N.Y.</u>, 06 Civ. 15405, 2009 WL 2973007 at *14 (S.D.N.Y. Sept. 18, 2009), <u>aff'd in relevant part</u>, 627 F.3d 50 (2d Cir. 2010). DiMaggio, moreover, had more than twenty years of experience as an electrician and foreman prior to joining DOB (<u>see</u> page 6 above; Defs. Br. at 12), and was told by Ferron Pinnock that he interviewed well (<u>see</u> page 6 above). Solanto worked as an electronics and engineering technician for twenty years and owned his own

electrical company for twelve years before joining DOB (see page 7 above).

In response, plaintiffs note that DiMaggio only had been at DOB for two years at the time of his promotion (see pages 3, 6 above); Solanto only had been at DOB for one year at the time of his promotion (see pages 3, 7 above). McCalla trained both DiMaggio and Solanto (see page 5 above), and also would occasionally ("probably once a month") fill in for a day when the supervisor or chief were out (see page 3 above). Solanto recalled that McCalla "performed[ed] most of the functions that are needed" in his position. (See id.) Moreover, defendants do not dispute McCalla's testimony that he "was being sent to find and correct mistakes in Di[M]aggio's work" and that "DiMaggio did not know how to read plans." (See pages 6-7 above.)

Based on such evidence regarding McCalla's and his comparators' relative qualifications, defendants argue that "McCalla is unable, as a matter of law, to demonstrate that his qualifications were 'so superior' to DiMaggio that no reasonable person could have selected DiMaggio" for the Supervising Inspector position. (Defs. Br. at 12-13.) In support of this argument, defendants rely on Second Circuit case law holding that

> When a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served to mask unlawful discrimination. In effect, the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question."

Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001).[81]

---

[81]     Accord, e.g., Sattar v. Johnson, 129 F. Supp. 3d 123, 139-40 (S.D.N.Y. 2015), aff'd, 669 F. App'x 1 (2d Cir. 2016); Concepcion v. City of N.Y., 15 Civ. 2156, 2016 WL 386099 at *14 (S.D.N.Y. Jan. 29, 2016) (Peck, M.J.) (collecting cases), aff'd, No. 16-603, 2017 WL 2859518 (2017); Chapotkat v. Cty. of Rockland, 11 Civ. 6209, 2014 WL 1373531 at *9
(continued...)

The Court agrees with plaintiffs, however, that an employee's failure to meet Byrnie's "no reasonable person" standard necessitates summary judgment only where "[p]laintiffs have no other evidence of discrimination and are relying solely on their" allegedly superior qualifications. (Pls. Opp. Br. at 8-9); see, e.g., Sattar v. U.S. Dep't of Homeland Sec., 669 F. App'x 1, 3 (2d Cir. 2016) ("[H]aving failed to point to any other probative evidence creating a genuine dispute as to any material fact, [plaintiff] is left with the argument that he was more qualified than Smith. For this argument alone to preclude summary judgment, [plaintiff] must show that his credentials were 'so superior' to Smith's 'that no reasonable person, in the exercise of impartial judgment, could have chosen [Smith] over [plaintiff] for the job in question.'" (emphasis added)) (quoting Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d at 103).[82/]

> The Byrnie court . . . began the paragraph immediately following [the "no reasonable person" standard] with the following caveat, which is relevant in this case: "Nevertheless, just because the discrepancy between [plaintiff and the successful applicant's] qualifications does not on its own have the strength to create a material

---

[81/]     (...continued)
(S.D.N.Y. Apr. 4, 2014), aff'd, 605 F. App'x 24 (2d Cir. 2015); see also, e.g., Vill. of Freeport v. Barrella, 814 F.3d 594, 614 (2d Cir. 2016) ("[F]ederal antidiscrimination law 'does not require that the candidate whom a court considers most qualified for a particular position be awarded that position; it requires only that the decision among candidates not be discriminatory.'"); Bringley v. Donahoe, 499 F. App'x 116, 119 (2d Cir. 2012) ("In light of the evidence as a whole, [plaintiff's] contentions that she was more qualified than either candidate are subjective conclusions without evidence that would 'reasonably support[ ] a finding of prohibited discrimination.'"); Milano v. Astrue, 05 Civ. 6527, 2008 WL 4410131 at *32 (S.D.N.Y. Sept. 26, 2008) ("Courts, however, afford employers a great deal of discretion in assessing the credentials and qualifications of applicants and in determining the criteria for positions."), aff'd, 382 F. App'x 4 (2d Cir. 2010), aff'd, 382 F. App'x 4 (2d Cir. 2010).

[82/]     See also, e.g., Lomotey v. Conn. Dep't of Transp., 355 F. App'x 478, 481 (2d Cir. 2009) (Byrnie's "no reasonable person" standard is "required for a credentials-based finding of pretext"); Aurelien v. Henry Schein, Inc., No. 07-CV-2358, 2009 WL 366148 at *9-12 (E.D.N.Y. Feb. 12, 2009) (discussing Byrnie at length and concluding that "relative qualifications must be considered in light of the entire record.").

issue of fact, that does not mean the discrepancy is stripped of all probative value."

Walsh v. N.Y.C. Hous. Auth., 828 F.3d 70, 78 (2d Cir. 2016) (quoting Byrnie v. Town of Cromwell,

Bd. of Educ., 243 F.3d at 103).  Indeed, in Byrnie, the Second Circuit "vacated the district court's

grant of summary judgment in favor of the employer on the plaintiff's disparate treatment claims on

the ground that a reasonable jury could find the employer's reasons for failing to hire the plaintiff

were not credible due to the discrepancy in qualifications and the employer's digressions from its

established hiring procedures when considering the successful candidate's application."  Medeiros

v. Pratt & Whitney Power Sys., Inc., 272 F. App'x 78, 81 (2d Cir. 2008).

In analyzing whether defendants' justification for failing to promote McCalla is

pretextual, the Court considers not only McCalla's qualifications, but all other facts supporting an

inference of discriminatory motive.  (See pages 61, 92 above); see also, e.g., Weinstock v. Columbia

Univ., 224 F.3d 33, 42 (2d Cir. 2000) ("[T]he question [on summary judgment is] . . . whether the

evidence, taken as a whole, supports a sufficient rational inference of discrimination." (emphasis

added)); Howley v. Town of Stratford, 217 F.3d 141, 151 (2d Cir. 2000) ("In determining the

appropriateness of summary judgment, the court should not consider the record solely in piecemeal

fashion, giving credence to innocent explanations for individual strands of evidence, for a jury, in

assessing whether there was impermissible discrimination and whether the defendant's proffered

explanation is a pretext for such discrimination, would be entitled to view the evidence as a

whole."); Jeffrey v. Montefiore Med. Ctr., 11 Civ. 6400, 2013 WL 5434635 at *18 (S.D.N.Y. Sept.

27, 2013); Bind v. City of N.Y., 08 Civ. 11105, 2011 WL 4542897 at *9 (S.D.N.Y. Sept. 30, 2011).

McCalla has adduced several facts further supporting an inference that defendants'

asserted justification for failing to promote him is pretextual.  First, although Connors asserts that

he promoted DiMaggio and Solanto to Supervising Inspector based on their demonstrated skills in

"routing out other inspectors" (see page 6 above), Solanto testified that his duties in fact involved doing "quality assurance checks on the inspectors in the field" (see id.). Unlike routing or supervising, performing "quality assurance checks" on Inspectors' work is a task for which more experience as an Inspector presumably would correlate with more skill, and McCalla's testimony suggests that less-experienced DiMaggio did not possess those skills. (See pages 6-7 above.) Second, Ferron Pinnock's statement that McCalla was not selected partly because he was not "versatile" in computers (see page 6 above) undermines defendants' assertion that McCalla was not selected because he was assessed as "need[ing] leadership mentoring" (see page 3 above). Third, Michael Rogaleski—who supervised McCalla, DiMaggio and Solanto—stated that McCalla "was the most qualified inspector for promotion" and that McCalla would, in fact, get one the two Supervising Inspector positions. (See page 4 above.) Fourth, DOB admittedly has not followed the civil service rules with regard to promotions. (See pages 49-54 above); see also, e.g., Villar v. City of N.Y., 135 F. Supp. 3d 105, 125 (S.D.N.Y. 2015) (citing cases for the proposition that "[d]epartures from procedural regularity can be evidence of pretext.").[83]

Most importantly, plaintiffs have submitted an affidavit by former DOB employee Winston McKenzie stating, inter alia, that Connors "spoke often and openly about . . . want[ing] to

---

[83] As to McCalla, only a weak inference of discrimination arises from the fact that DiMaggio and Solanto did not pass a civil service exam before their promotion. (See Dkt. No. 68: Pls. Resp. To Defs. Rule 56.1 Stmt. ¶ 19; Dkt. No. 67: Pls. Rule 56.1(b) Counter-Stmt. ¶ 11; Dkt. Nos. 69-1, 69-2: McCalla Dep. at 110.) McCalla testified that although he had taken the exam necessary to become a permanent—i.e., civil servant—Inspector, he had not taken a "promotional exam" such that he was on a list of applicants from whom DOB would have been required to hire, had it been complying with the civil service rules. (See McCalla Dep. at 111.) Thus, McCalla cannot say that defendants' departure from the civil service rules in his case had a determinative (negative) effect on their decision-making process; McCalla can only point to the fact that defendants universally failed to follow rules designed to ensure merit-based promotion. (See pages 53-54 above.)

make changes" at DOB because he believed there were "too many black supervisors and too many black people." (See page 7 above.) Although the probative value of these alleged statements is somewhat diminished because they were not specifically directed at McCalla,[84/] the statements nevertheless are entitled to considerable weight because: (1) they were allegedly made by Connors, who made the decision to promote DiMaggio and Solanto over McCalla; (2) one of the alleged statements occurred in 2012, and interviews were conducted for the Supervising Inspector positions in January 2013; (3) the statements were plainly discriminatory; and (4) the statements pertained to Connors' promotion decision-making process. See Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 149-50 (2d Cir. 2010) (considering whether remarks are probative of discriminatory animus by assessing "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)."), cert. denied, 562 U.S. 1279, 131 S. Ct. 1602 (2011).[85/]

When taken together, the reasonable inferences drawn from the above facts could "permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Stern v. Trs. of Columbia Univ., 131 F.3d

---

[84/]   See, e.g., Sicular v. N.Y.C. Dep't of Homeless Servs., 09 Civ. 0981, 2010 WL 423013 at *20 n.27 (S.D.N.Y. Feb. 4, 2010) (Peck, M.J.) ("These few instances of alleged anti-Semitic comments were not directed to [plaintiff], further weakening the probative value."), R. & R. adopted, 09 Civ. 0981, 2010 WL 2179962 (S.D.N.Y. May 28, 2010), aff'd, 455 F. App'x 129 (2d Cir. 2012).

[85/]   Accord, e.g., Martinez v. N.Y.C. Transit Auth., 672 F. App'x 68, 71 (2d Cir. 2016); Preston v. Bristol Hosp., 645 F. App'x 17, 22 (2d Cir. 2016); Wesley-Dickson v. Warwick Valley Cent. Sch. Dist., 586 F. App'x 739, 742 (2d Cir. 2014); Mesias v. Cravath, Swaine & Moore LLP, 106 F. Supp. 3d 431, 438 (S.D.N.Y. 2015).

305, 312 (2d Cir. 1997); see also cases cited on pages 60-63 & n.45 above. The Court therefore

should DENY defendants' motion for summary judgment as to McCalla's § 1981, NYSHRL and

NYCHRL[86] failure to promote claims against Connors and the City.[87]

**B.  Dorsainville**

Like McCalla, Dorsainville raises a discrimination claim based on Thomas Connors'

failure to promote him to the Supervising Inspector positions to which Philip DiMaggio and Thomas

Solanto were promoted.  (See Dkt. No. 71: Pls. Opp. Br. at 18-20; see also pages 4-5 above.)

Defendants do not dispute that Dorsainville was qualified for the Supervising Inspector positions

and that DiMaggio and Solanto are white.  (See Dkt. No. 58: Defs. Br. at 13-15; Dkt. No. 78: Defs.

Reply Br. at 9-10.)

Defendants correctly observe, however, that Dorsainville admittedly did not submit

a formal application for the two Supervising Inspector positions at issue.  (Defs. Br. at 13-14; Defs.

Reply Br. at 9-10; see also pages 4-5 above.)  Plaintiffs do not dispute that fact, but respond that

---

[86]  Because McCalla's § 1981 and NYSHRL failure-to-promote claims survive, his NYCHRL claims also survive under that statute's "broader . . . standards."  See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013) (state and federal civil rights statutes serve "as a floor below which the [NYCHRL] cannot fall" (quotations omitted)); see also Noel v. Interpublic Grp. of Cos., 12 Civ. 2996, 2013 WL 1955879 at *2 n.1 (S.D.N.Y. May 13, 2013).

[87]  Plaintiffs' Rule 56.1 Statements assert that McCalla was given a City vehicle while working as an Inspector assigned to the Bronx, but the vehicle was "taken away" one month after he transferred to Manhattan.  (See Defs. Rule 56.1 Stmt. ¶ 10; Dkt. No. 68: Pls. Resp. to Defs. Rule 56.1 Stmt. ¶ 11; Dkt. No. 67: Pls. Rule 56.1(b) Counter-Stmt. ¶ 2.)  Defendants argue that summary judgment should be granted on any claims arising from these facts because "McCalla admitted that his vehicle was reassigned shortly after he transferred to Manhattan, and that in Manhattan, only Chief and Assistant Chiefs . . . were provided vehicles." (Defs. Br. at 13.)  Plaintiffs' brief provides no response.  (See generally Pls. Opp. Br.)  The Court therefore should GRANT defendants' summary judgment motion on McCalla's vehicle claims as abandoned.  See, e.g., Jessamy v. City of New Rochelle, 292 F. Supp. 2d 498, 515 n.21 (S.D.N.Y. 2003).

Dorsainville "did not apply for the supervisor's position because he was already offered the position." (See Pls. Opp. Br. at 18.) Defendants respond that despite being offered the position, Dorsainville's failure to formally apply means that he cannot establish a prima facie case under Second Circuit case law. (Defs. Br. at 13-14; Defs. Reply Br. at 9-10.)

The Court disagrees with defendants on the peculiar facts of this case. Dorsainville has propounded evidence establishing that he failed to apply for the Supervising Inspector positions because before the positions were posted, he was told by two separate supervisors—Leonid Miller, a DOB Director of Operations, and Michael Rogaleski, the Chief of the Electrical Unit for Manhattan—that he had been selected to fill one of those positions.[88] (See page 4 above.) Dorsainville further asserts that he went on a month-long vacation after his conversations with Miller and Rogaleski, and that the Supervising Inspector positions were posted and filled by the time he returned. (See page 5 above.) Dorsainville testified that he believed Miller's and Rogaleski's statements because "many times Defendants promoted people without their applying for" promotion. (See id.) Other plaintiffs testified that employees often were hand-picked for promotion at DOB (see, e.g., Dkt. Nos. 70, 70-1: Mulzac Dep. at 61, 85-86); indeed, plaintiff Henry testified to personally being hand-picked for a promotion (see Dkt. Nos. 70-2, 70-3, 70-4: Henry Dep. at 49-50).

Defendants are correct that the Second Circuit typically requires plaintiffs to propound evidence of a "specific application" in order to sustain a discriminatory failure to promote claim. See, e.g., Petrosino v. Bell Atl., 385 F.3d 210, 227 (2d Cir. 2004); see also cases cited on page 83 & n.70 above. The exception to this requirement, which the Second Circuit has described

---

[88] For the reasons already discussed in the context of Rogaleski's statement to McCalla, Miller's and Rogaleski's statements to Dorsainville are not hearsay. (See page 4 n.1 above.)

as "narrow," see Petrosino v. Bell Atl., 385 F.3d at 227,[89/] requires the plaintiff to "demonstrate that (1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer," Petrosino v. Bell Atl., 385 F.3d at 227 (emphasis added). Importantly, the Second Circuit's "specific application" requirement is designed to

> "ensure[] that, at the very least, the plaintiff employee alleges a particular adverse employment action, an instance of alleged discrimination, by the employer." Further, the requirement ensures that the fact finder is not left to speculate as to the qualifications of the competing candidates, the damages to be derived from the salary of unknown jobs, the availability of alternative positions, the plaintiff's willingness to serve in them (e.g., in other locales or on other shifts), etc. The requirement also protects employers from the unfair burden of having "to keep track of all employees who have generally expressed an interest in promotion and [to] consider each of them for any opening for which they are qualified but did not specifically apply."

Petrosino v. Bell Atl., 385 F.3d at 227 (citations omitted, quoting Brown v. Coach Stores, Inc., 163 F.3d 706, 710 (2d Cir. 1998)).

In this case, there is no dispute that Dorsainville has alleged a particular instance of failure to promote: his claim is based on a single promotion that he allegedly was promised but did not receive. The fact finder thus need not "speculate" as to any aspects of that promotion because information regarding the competing candidates, salary, and Dorsainville's willingness to serve in that position are well established. Nor did Dorsainville "generally express[] an interest in promotion" or a desire to be considered "for any opening for which [he was] qualified" such that

---

[89/]    Accord, e.g., Fox v. Cty. of Yates, 657 F. App'x 60, 63 (2d Cir. 2016); Rich v. Associated Brands Inc., 559 F. App'x 67, 68 (2d Cir. 2014); Opoku v. Brega, 15 Civ. 2213, 2016 WL 5720807 at *12 (S.D.N.Y. Sept. 30, 2016); Tulino v. City of N.Y., 15 Civ. 7106, 2016 WL 2967847 at *5 (S.D.N.Y. May 19, 2016) ("[T]hat exception is a narrow one."); Billups v. Dent Wizard Int'l Corp., 05 Civ. 9356, 2010 WL 2541361 at *8 (S.D.N.Y. June 14, 2010) ("The exception to the application rule is narrow."); Butts v. N.Y.C. Dep't Of Hous. Pres. & Dev., 00 Civ. 6307, 2007 WL 259937 at *11 (S.D.N.Y. Jan. 29, 2007), aff'd, 307 F. App'x 596 (2d Cir. 2009).

DOB was saddled with an unfair burden. Id. To the contrary, if DOB was burdened by informal applications, that burden was of its own making: DOB's decision makers routinely hand-picked candidates for promotion (see page 97 above) and ignored civil service promotion rules (see pages 49-54 above). The Second Circuit's "specific application" requirement should not provide unscrupulous employers the ability to make discriminatory promotion decisions with impunity by relieving the undesired applicant of the need to apply (e.g., by telling him that he has already been selected for the job) and then posting the position when the undesired applicant is least likely to be looking for said posting (e.g., when he is on vacation).[90]

Finally, many of the facts discussed above in the context of McCalla's application for the same Supervising Inspector positions also apply to Dorsainville—namely, the plaintiff trained DiMaggio and Solanto and had significantly more experience as a DOB Inspector (see page 5 above), DOB's failure to follow the civil service rules,[91] Winston McKenzie's affidavit discussing Connors' alleged discriminatory remarks, and the fact that the plaintiff allegedly was told by Rogaleski that he would get one of the two Supervising Inspector positions (see pages 4-5, 93-95

---

[90]     Notably, the Second Circuit has relaxed the specific application requirement where the facts suggested that "any application for a particular vacancy would have been futile." See Dawson v. N.Y.C. Transit Auth., 624 F. App'x 763, 770 (2d Cir. 2015) (exception to the specific application requirement existed in ADA discrimination case after considering "Plaintiff's prolonged efforts to regain a position he previously held, Defendant's repeated representation that those requests were under consideration, and Defendant's admission that its decision turned on Plaintiff's [disability] (as opposed to an absence of available positions)."). Like the plaintiff in Dawson, Dorsainville's application to the Supervising Inspector positions would have been futile insofar as two different supervisors told him that one of those positions was already his.

[91]     Unlike McCalla, Dorsainville has proffered facts indicating that he "had not only become a civil servant . . . but [he] had also passed the civil service promotional exam" (Dkt. No. 69-5: Dorsainville Aff. ¶ 11), thus enhancing any inference of discrimination drawn from DOB's failure to abide by the civil service rules (see page 94 n.83 above).

above). A fact finder could reasonably infer from these facts that McCalla and Dorsainville had been hand picked for promotion by their direct supervisor, but that Connors intervened and promoted two less experienced white Inspectors for discriminatory reasons.

Thus, the Court should <u>DENY</u> defendants' summary judgment motion as to Dorsainville's § 1981 and NYSHRL failure to promote claim against Connors and the City. Even if on review it were held that Dorsainville did not satisfy the Second Circuit's "specific application" requirement and his § 1981 and NYSHRL claims were dismissed, his identical NYCHRL claim survives summary judgment.

The Second Circuit has repeatedly instructed that "courts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.'" <u>Mihalik</u> v. <u>Credit Agricole Cheuvreux N. Am., Inc.</u>, 715 F.3d 102, 109 (2d Cir. 2013) (citations omitted); <u>see</u> cases cited at page 86 & n.77 above.[92/] "This task is not always uncomplicated, however," as the NYCHRL generally "provides no specific guidance concerning <u>how</u> the NYCHRL should be 'construed liberally' and independently of state and federal law in its particular applications." <u>Chauca</u> v. <u>Abraham</u>, 841 F.3d at 87-88. This task is further complicated by the fact that "courts have yet to establish a test for analyzing failure to promote claims under the NYCHRL." <u>Campbell</u> v. <u>Cellco P'ship</u>, 860 F. Supp. 2d 284, 297 (S.D.N.Y. 2012); <u>accord</u>, <u>e.g.</u>, <u>Tulino</u> v. <u>City of N.Y.</u>, 2016 WL 2967847 at *5. In <u>Campbell</u>, however, the court used

---

[92/]    Accord, <u>e.g.</u>, <u>Eisner</u> v. <u>Cardozo</u>, No. 16-872-CV, 2017 WL 1103437 at *3 (2d Cir. Mar. 24, 2017) (describing obligation to analyze NYCHRL claims separately from state and federal claims as a "clear directive"); <u>Camarda</u> v. <u>Selover</u>, 673 F. App'x 26, 28 (2d Cir. 2016); <u>Chauca</u> v. <u>Abraham</u>, 841 F.3d 86, 87 (2d Cir. 2016); <u>Ya-Chen Chen</u> v. <u>City Univ. of N.Y.</u>, 805 F.3d 59, 75 (2d Cir. 2015).

Title VII standards "as a guide in analyzing plaintiff's failure to promote claims" while "bearing in mind the more liberal standards of the NYCHRL." See Campbell v. Cellco P'ship, 860 F. Supp. 2d at 297. The Court adopts this tack.

Taking account of the facts discussed above (see pages 97, 99-100 above), it cannot be said that "the record establishes as a matter of law that 'discrimination play[ed] no role' in" Connors' and DOB's actions. Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d at 110 n.8. Similarly, a fact finder could reasonably infer that Connors acted at least in part for discriminatory reasons. See, e.g., Moore v. Metro. Transp. Auth., 999 F. Supp. 2d 482, 501 (S.D.N.Y. 2013) ("[S]ummary judgment dismissing a claim under the NYCHRL should be granted only if no jury could find defendant liable under any of the evidentiary routes—McDonnell Douglas, mixed motive, direct evidence, or some combination thereof." (quotations omitted)). Thus, the more liberal standards of the NYCHRL necessitate denying summary judgment. The Court should DENY defendants' motion for summary judgment as to Dorsainville's NYCHRL failure to promote claims against Connors and the City, as well as his § 1981 and NYSHRL claims.[93]

**C.    Mulzac**

Mulzac raises three discrimination claims arising from Thomas Connors' promotion of Zafeirios Chatzis, Joseph Iacopetta and James Glynn to Supervising or Associate Inspector positions. (See Dkt. No. 71: Pls. Opp. Br. at 20-21; see also pages 9-11 above.) Defendants do not

---

[93]    Defendants note that Dorsainville testified to other positions to which he was not promoted for allegedly discriminatory reasons, including an Assistant Chief position awarded to Felix Rivera. (See Defs. Br. at 13; Dkt. No. 69-4: Dorsainville Dep. at 44-47.) Dorsainville also testified to possible retaliation in the form of increased monitoring by IAD. (See Defs. Br. at 15 n.7; Dorsainville Dep. at 86.) Plaintiffs' brief fails to provide any response (see generally Pls. Opp. Br. at 18-20), and the Court therefore should GRANT defendants' summary judgment motion on these claims as abandoned. See, e.g., Jessamy v. City of New Rochelle, 292 F. Supp. 2d 498, 515 n.21 (S.D.N.Y. 2003).

dispute that Mulzac was qualified for the Supervising and Associate Inspector positions, that he applied for those positions, and that Chatzis, Iacopetta and Glynn are white. (See Dkt. No. 58: Defs. Br. at 15-18; Dkt. No. 78: Defs. Reply Br. at 10-11.) Mulzac has established a prima facie case for each of these claims. (See cases cited on pages 82-83 & n.69 above.)

As their justification for promoting Chatzis, Iacopetta and Glynn, defendants cite their qualifications for the positions. (See Defs. Br. at 16.) Chatzis worked as a DOB Inspector for seven years before his promotion and previously worked as a carpenter and foreman for nine years. (See page 9 above.) Iacopetta worked as a DOB Multi-Discipline Inspector for two years before his promotion and previously worked as a construction supervisor for seven years. (See page 10 above.) Glynn worked as a DOB Multi-Discipline Inspector for three years before his promotion and previously worked as a foreman for five years, an electrician for six years, and a building inspector for three years. (See pages 10-11 above.)

As evidence of pretext, plaintiffs note that Mulzac had roughly ten years of experience as a DOB Inspector when he applied for the promotions at issue. (See pages 8-11 above.) Prior to joining DOB, Mulzac worked as a construction manager for two years, a construction superintendent for two years, and an assistant superintendent for three years; he had acquired supervisory skills during his DOB tenure by training new hires and acting as a "field supervisor." (See pages 8-9 above.) He also holds a bachelor's degree in construction management and an associate's degree in architecture. (See page 9 above.) Even though Chatzis, Iacopetta and Glynn lacked the full extent of Mulzac's education and seniority, each had extensive experience in construction-related fields. Any disparities in the candidates' relative qualifications were not so stark as to call into question the legitimacy of the choices made. (See cases cited on page 91 & n.81 above.)

Plaintiffs' other arguments on these claims are easily dismissed. They argue, for example, that "the fact that [Mulzac] had to train some of the new hires who were later promoted over him is evidence of both discrimination and pretext." (Pls. Opp. Br. at 21.) The record contains no facts regarding the names or races of these new hires; nor does the record establish that Mulzac trained Chatzis, Iacopetta or Glynn. (See page 11 n.6 above.) Plaintiffs' assertion that Mulzac "took and passed . . . the civil service . . . promotional examinations" is similarly unsupported by the cited portions of plaintiffs' Rule 56.1 statements. (See Pls. Opp. Br. at 20.)[94] Finally, plaintiffs' assertions that Chatzis and Glynn were unqualified for promotion because they still were probationary employees (see Dkt. No. 68: Pls. Resp. To Defs. Rule 56.1 Stmt. ¶¶ 34, 40; Dkt. No. 67: Pls. Rule 56.1(b) Counter-Stmt. ¶¶ 24, 26) are unavailing, as plaintiffs failed to establish that probationary employees are ineligible for promotion under the civil service rules—indeed, Gina Bitro and plaintiff Henry testified to the opposite (see page 52 above).

On the other hand, defendants' argument that Mulzac has "not satisf[ied] his burden to demonstrate that the individual defendants were personally involved in" selecting Chatzis, Iacopetta or Glynn (see Defs. Br. at 15) also is unavailing. When asked who made the final promotional decision, Mulzac testified that "[a]ll positions, all selections, are made by Thomas Connors." (See page 11 above.) Defendants have not adduced any evidence rebutting this assertion—including in Connors' affidavit, which confirmed his participation in decisions relevant to other plaintiffs' claims. (See generally Dkt. No. 59-1, Ex. D: Connors Aff.)

---

[94]   Mulzac testified that he passed the civil service exam to become a "regular inspector." (See Dkt. Nos. 70, 70-1: Mulzac Dep. at 44.) In the absence of evidence that Mulzac's name was on a list of persons from whom DOB was required to choose for promotion under the civil service rules, any inference of discrimination drawn from DOB's failure to follow the civil service rules in this instance is a weak one. (See page 94 n.83 above.)

Mulzac's unrebutted assertion that Connors made the decisions to promote Chatzis, Iacopetta and Glynn both helps and hurts his case. First, as defendants correctly note (see Defs. Br. at 16 n.8), at least two positions about which Mulzac testified were filled by black applicants of Caribbean national origin.[95/] (See page 11 n.7 above.) If "all selections," including these, were made by Connors, then selection of persons in Mulzac's protected class weakens any inference of discriminatory motive. (See pages 89-90 above.) But Connors' participation also implicates Winston McKenzie's assertions that Connors openly remarked that too many blacks occupied DOB supervisory positions. (See pages 7-8 above.)

Taking all of the above facts into consideration (see cases cited on page 93 above)—particularly McKenzie's affidavit—the Court concludes that "a rational finder of fact [could] infer that the defendant's employment decision[s] w[ere] more likely than not based in whole or in part on discrimination." Stern v. Trs. of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997). The Court should DENY defendants' motion for summary judgment as to Mulzac's § 1981, NYSHRL and NYCHRL failure to promote claims against Connors and the City arising from the promotions of Zafeirios Chatzis, Joseph Iacopetta and James Glynn.[96/]

**D.     Henry**

Henry raises a disparate treatment claim based on the reassignment of his City vehicle after his transfer to Manhattan as a Triage Officer for the ERT Unit; he also raises claims

---

[95/]     This fact also bolsters the credibility of Mulzac's testimony regarding the extent of Connors' participation in the promotion decisions at issue, insofar as Connors' affidavit corroborates Mulzac's testimony that Connors participated in the promotion of the two black employees, Andie Holder and Lindsay Stewart. (See Connors Aff. ¶ 5.)

[96/]     For the reasons already discussed (see page 11 n.7 above), the Court should GRANT defendants' summary judgment motion as to Mulzac's remaining claims.

based on the concomitant loss of his parking permit and gas card. (Dkt. No. 71: Pls. Opp. Br. at 22; see also pages 12-13 above.) Defendants argue that these claims need not proceed to pretext analysis for three reasons. (See Dkt. No. 58: Defs. Br. at 18-19.)

First, defendants argue that "Henry fails to demonstrate that the individual defendants were personally involved in these decisions." (Defs. Br. at 18.) Indeed, plaintiffs have not established that any named defendants personally participated in Henry's loss of a parking permit and gas card (see pages 12-13 above), but the same is not true for reassignment of his City vehicle. Henry testified that defendant Dmitri Dits was personally responsible for that reassignment (see page 12 above) and defendants do not dispute that fact (see generally Dkt. No. 79: Defs. Resp. To Pls. Rule 56.1(b) Counter-Stmt.). In any event, Henry need not establish personal involvement to pursue these claims against the City under the NYSHRL and NYCHRL. (See cases cited on pages 87-88 above.)

Second, defendants argue that Henry fails to establish a prima facie case on these claims because he "cannot demonstrate that he incurred an adverse employment action." (Defs. Br. at 18.) The Court agrees. Henry has failed to demonstrate, as is necessary under § 1981 and the NYSHRL, that the loss of his vehicle, permit and gas card were "'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012); see, e.g., Pierre v. Napolitano, 958 F. Supp. 2d 461, 481 (S.D.N.Y. 2013) ("[T]he Court of Appeals has expressly held that decisions concerning the assignment of vehicles are not adverse employment actions."). However, the NYCHRL standard for establishing an adverse employment action requires the plaintiff to "'simply show that she was treated differently from others in a way that was more than trivial, insubstantial, or petty.'" Villar v. City of N.Y., 135 F. Supp. 3d 105, 129 (S.D.N.Y. 2015); see cases cited on page 87 above. Henry's loss of his vehicle,

parking permit and gas card satisfies that standard, and his related NYCHRL claims survive this argument.

Defendants' third argument—that Henry has not established that he was treated differently than a similarly situated employee outside his protected class (see Defs. Br. at 19)—applies with equal force to Henry's § 1981, NYSHRL and NYCHRL claims. Defendants note that "the three 'comparators' Henry identified who were purportedly assigned City vehicles in the ERT Unit or were granted parking permits—Derek Peeples, Lenox Williams, and Schofield Padmore—were also black and from the Caribbean." (Defs. Br. at 19.) Henry testified that his vehicle was reassigned to Tom Mascialino, who is white (see page 12 above), and that Glen Rella, who is white, had a City vehicle (see Dkt. Nos. 70-2, 70-3, 70-4: Henry Dep. at 94). Nevertheless, Henry failed to propound any facts establishing that these comparators were similarly situated. Although Henry asserts that "all his fellow Assistant Chiefs in the Manhattan Office had vehicles assigned to them," the record indicates that Henry was assigned to work as a "Triage Officer" and was not required to perform "routine/normal field work." (See page 16 above; see also Defs. Br. at 19.) The record contains no information regarding the named comparators' duties. Without such information, there is no "'evidence from which a jury could reasonably conclude that there was indeed disparate treatment of similarly situated employees,'" Villar v. City of N.Y., 135 F. Supp. 3d at 121, and Henry cannot create an inference "that he has been treated less well at least in part because of" his protected status, Bernadotte v. N.Y. Hosp. Med. Ctr. of Queens, No. 13-CV-965, 2016 WL 792399 at *11 (E.D.N.Y. Feb. 26, 2016) (quotations omitted). The Court should GRANT defendants' summary judgment motion as to these claims.

Henry also asserts discrimination claims based on: (1) his testimony that he did not receive a raise after his transfer to Manhattan in October 2012; (2) Dmitri Dits' failure to promote

him to ERT Assistant Chief and selection of Juan Arias for that position; and (3) evidence that white DOB employees earned higher salaries than blacks doing similar work. (See Pls. Opp. Br. at 22; see also pages 13-14 above.) As discussed above, Henry's NYSHRL and NYCHRL claims based on these facts should be dismissed for lack of jurisdiction under the election of remedies doctrine. (See pages 76-77 above.) Henry, moreover, has not propounded any facts establishing that any particular defendant was "personally involved" in the alleged discrepancies in salary between white and black DOB employees (see page 14 above), even under the standards for personal involvement that do not require direct participation (see cases cited on pages 83-85 & n.72 above). The Court should GRANT defendants' summary judgment motion as to Henry's § 1981 claims based on alleged salary discrepancies.

Defendants argue that Henry cannot establish a prima facie case of disparate treatment on his claim that he did not receive a raise after defendant Dits assigned him to Manhattan as a Triage Officer in October 2012. (Defs. Br. at 19.) Defendants correctly note that Henry's comparator on this claim—who Henry testified did receive such a raise after being transferred—is Andie Holder, who is black and from the Caribbean. (Id.; see also page 13 above; Dkt. No. 78: Defs. Reply Br. at 11.) Because Holder is within Henry's protected group, his more favorable treatment cannot easily give rise to an inference of discrimination. See, e.g., Smith v. Planas, 975 F. Supp. 303, 308 (S.D.N.Y. 1997) (plaintiff had not established "circumstances giving rise to an inference of race discrimination" where "[f]ive of the seven individuals identified by Plaintiff as having received higher-paying assignments were . . . members of Plaintiff's protected class."). In any event, Henry did not establish that Holder was transferred under similar circumstances. (See Defs. Br. at 19; see also page 13 above.) The Court should GRANT defendants' motion as to Henry's § 1981 claims against Dits and the City arising from Henry's failure to receive a raise upon

transfer to Manhattan.

Turning to the Assistant Chief position given to Juan Arias, defendants do not dispute that Henry was qualified for and applied for that position. (See Defs. Br. at 20; see generally Defs. Reply Br. at 11-12.) Nor do defendants dispute that Juan Arias falls outside of Henry's protected class. (See id.) Henry has established a prima facie case of failure to promote. (See cases cited on pages 82-83 & n.69 above.)

Defendants' justification for Dits' selection of Arias for the Assistant Chief position is that he was qualified: Arias had experience dealing with emergencies and had been in charge of incidents when working with the BEST Squad. (See page 14 above.) Plaintiffs do not dispute these facts. (See generally Pls. Opp. Br. at 22-23.) Arias, moreover, had six years of experience as a DOB Inspector and Supervising Inspector before his promotion to Associate Chief. (See page 14 above.) Plaintiffs respond that Henry "had a long and distinguished supervisory experience." (Pls. Opp. Br. at 23.) At the time he was passed up for promotion to Assistant Chief, Henry had worked for more than ten years as a DOB Inspector and as a Triage Officer for four years. (See pages 11-13 above.)

Henry testified that during his interview for the Assistant Chief position, Dits asked whether he would be available to respond to emergencies twenty-four hours a day. (See page 13 above.) Henry responded "that he could get up at anytime if the job requires." (See id.) Dits testified to having concerns that Henry would not be able to effectively respond to emergencies due to "his personal life and ability," but he did not clarify. (See id.) The Court agrees with defendants that any inference of discriminatory motive drawn from this testimony would be speculative. (Defs. Br. at 20.) Dits' question concerned Henry's qualifications for the job, which required being on-call at night, and his concern over Henry's "personal life and ability," though vague, cannot reasonably

be construed as indicative of discriminatory animus.

In the absence of additional evidence from which one might draw an inference of discriminatory motive, Henry's failure to promote claim rests on comparison of his and Arias' relative qualifications. But Henry has not shown that his qualifications were "so superior" to Arias' "that 'no reasonable person, in the exercise of impartial judgment, could have chosen [Arias] over [Henry] for the job in question.'" Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001); see cases cited on page 91 & n.81 above. The Court should GRANT defendants' motion on Henry's § 1981 claims against Dits arising from Juan Arias' promotion to Assistant Chief.

Henry also raises disparate treatment claims based on: (1) denial of overtime opportunities by Dits, (2) his failure to be registered for a driving course and failure to receive a certificate of completion for an OSHA course, and (3) Dits' decision to prohibit him from entering the office before 7 a.m. (See Pls. Opp. Br. at 21-23; see also pages 15-16 above.) These claims fail for the same reason that Henry's other disparate treatment claims fail: the record contains insufficient evidence of similarly situated comparators outside of Henry's protected class. (See generally page 106 above; Henry Dep. at 140-47.) When asked if he knew "other white employees who were signed up for the" driving course, Henry responded that "[t]here are many inspectors that signed up for the class that took the class" (Henry Dep. at 143); Henry could not remember the names of coworkers who received a certificate (id. at 145). Although Henry recalled the names of some persons who were allowed to enter the office early, the record contains no evidence establishing that those persons were similarly situated. (See page 16 above; Henry Dep. at 160-64.) Having failed to produce evidence of "'disparate treatment of similarly situated employees'" outside of his protected class, Villar v. City of N.Y., 135 F. Supp. 3d at 121, Henry cannot show "that he has been treated less well at least in part because of" his protected status, Bernadotte v. N.Y. Hosp. Med.

Ctr. of Queens, 2016 WL 792399 at *11 (quotations omitted). The Court should GRANT defendants' summary judgment motion as to Henry's § 1981, NYSHRL and NYCHRL claims against Dits and the City arising from denial of overtime and driving and OSHA courses.[97]

Finally, plaintiffs argue that "[w]hile some complaints of difference in treatment would not each in itself amount to an adverse employment action, when taken together, coupled with Plaintiff's prima facie case may lead a reasonable jury to conclude that . . . discrimination may well likely have been the reason for the" adverse employment actions, and that "the court is required to look at the whole picture." (Pls. Opp. Br. at 23.) The Court is mindful of the Second Circuit's admonitions that "in the context of employment discrimination cases, courts should evaluate the facts holistically rather than 'view individual incidents in isolation' or in a 'piecemeal fashion.'" O'Toole v. Cty. of Orange, 16 Civ. 2059, 2017 WL 2377999 at *5 (S.D.N.Y. May 31, 2017); see cases cited on page 93 above.[98] Even taken together, however, the facts fail to produce an inference of discriminatory animus strong enough to allow any of Henry's claims to proceed to a jury.[99]

---

[97] Henry's claims based on these training courses also fail (to varying degrees under § 1981, NYSHRL and NYCHRL) to the extent plaintiffs have not shown that denial of such courses is "materially adverse" or that any of the individual defendants participated in the relevant acts. (See page 15 above.)

[98] Accord, e.g., Walsh v. N.Y.C. Hous. Auth., 828 F.3d 70, 76 (2d Cir. 2016) ("A plaintiff's evidence at the third step of the McDonnell Douglas analysis must be viewed as a whole rather than in a piecemeal fashion."); Johnson v. J. Walter Thompson U.S.A., LLC, 16 Civ. 1805, 2016 WL 7217847 at *6 (S.D.N.Y. Dec. 13, 2016).

[99] The Court does not address Henry's argument that he "was called a monkey by colleagues and he complained to supervisors who did nothing" (Pls. Opp. Br. at 22) because plaintiffs have voluntarily dismissed their hostile work environment claims (see page 1 above) and because plaintiffs make no effort (see Pls. Opp. Br. at 22) to show a nexus between these comments and any of the claims or defendants discussed herein. See, e.g., Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 149-50 (2d Cir. 2010) (setting out factors for analyzing the probative value of discriminatory remarks); see cases cited on page 95 n.85 above.

**E.     Ukpong**

Ukpong asserts that he often was transferred between units within DOB; that he was "always transferred out before the promotion opportunities in those units were advertised"; that contrary to DOB's standard operating procedure, his salary was not adjusted upward upon lateral transfer between units; and although he never formally applied for promotions, he did so informally "in person by approaching the different unit heads and hoping that they would recognize the kind of work that [he] do[es]." (See pages 17-18 above.)  Ukpong generally asserts that whites were retained within units and given promotional opportunities, and that whites were given raises upon lateral transfers according to DOB standard operating procedures.  (See id.)  Based on these facts, Ukpong raises broad claims of failure to promote and disparate treatment.  (See Dkt. No. 71: Pls. Opp. Br. at 38-39.)

Defendants argue that any failure to promote claim must fail because Ukpong never formally applied for a promotion.  (Dkt. No. 58: Defs. Br. at 20-21; Dkt. No. 78: Defs. Reply Br. at 12.)  Plaintiffs admit that "Ukpong never applied for a promotion," but explain that Ukpong's experiences at DOB "discouraged" him and convinced him that applying would be "futile." (Pls. Opp. Br. at 38-39.)  Defendants correctly observe, however, that this explanation is contradicted by Ukpong's assertions that he applied in person.[100]  (Defs. Br. at 21; Defs. Reply Br. at 12.)

The Court agrees with defendants that Ukpong's admitted failure to identify a specific application is fatal to his failure to promote claims.  See, e.g., Petrosino v. Bell Atl., 385 F.3d 210,

---

[100]     For this reason, the Court does not address plaintiffs' argument that "the jury should be allowed to determine in light of the circumstances facing Ukpong . . . whether a reasonable person would find that application would be futile and whether or not he so found." (Pls. Opp. Br. at 39.)  Even if the premise of this argument had not been defeated by Ukpong's own testimony, plaintiffs have not adduced the sort of evidence of "futility" sufficient to excuse a specific application.  (See case cited on page 99 n.90 above.)

227 (2d Cir. 2004); see cases cited on page 83 & n.70 above. Unlike Dorsainville (see pages 97-99 above), Ukpong has proffered no facts mitigating the concerns addressed by the specific application requirement. To the contrary, Ukpong is a textbook example of why the specific application requirement exists: because he identifies no specific position to which he should have been promoted (see, e.g., Pls. Opp. Br. at 38-39; Dkt. No. 67: Pls. Rule 56.1(b) Counter-Stmt. ¶¶ 219-42), any fact finder would be "left to speculate as to the qualifications of the competing candidates, the damages to be derived from the salary of unknown jobs, the availability of alternative positions, the plaintiff's willingness to serve in them (e.g., in other locales or on other shifts), etc."; and his reliance on informal applications and in-person discussions leave DOB with the "unfair burden of having to keep track of all employees who have generally expressed an interest in promotion and [to] consider each of them for any opening for which they are qualified but did not specifically apply." Petrosino v. Bell Atl., 385 F.3d at 227 (quotations omitted). Even under the NYCHRL's more liberal standards (see cases cited on pages 86-87 above), the record does not contain facts detailed enough to permit an inference that Ukpong lost any particular promotion "at least in part because of" his protected status. Bernadotte v. N.Y. Hosp. Med. Ctr. of Queens, No. 13-CV-965, 2016 WL 792399 at *11 (E.D.N.Y. Feb. 26, 2016) (quotations omitted).

Ukpong's disparate treatment claims similarly fail for lack of specificity. Those claims are loosely based on Ukpong's frequent lateral transfers without upward adjustments to his salary. (See generally Pls. Opp. Br. at 38-39.) Ukpong has failed to identify any similarly situated comparators. (See pages 17-18 above.) He argues, for example, that he was transferred out of the Boiler Unit—where he "knew that promotional opportunities were coming up"—and that David

Warshall, "a white male who just graduated high school," was not transferred.[101/]  (See page 17

above.)  The record, however, contains no evidence suggesting that Warshall was similarly

situated—that is, there is no "evidence from which a jury could reasonably conclude that there was

indeed disparate treatment of similarly situated employees." Villar v. City of N.Y., 135 F. Supp. 3d

105, 121 (S.D.N.Y. 2015) (quotations omitted).  The same is true of Ukpong's claims based on his

failure to receive raises upon lateral transfer: those claims are supported only by his conclusory

assertion that a policy of such raises existed and that the policy "ha[d] been implemented for white

employees." (See Pls. Rule 56.1(b) Counter-Stmt. ¶ 231.)  Without more evidence—as opposed to

speculative or conclusory assertions—no reasonable jury could conclude that Ukpong "has been

treated less well at least in part because of" his protected status.  Bernadotte v. N.Y. Hosp. Med. Ctr.

of Queens, 2016 WL 792399 at *11 (quotations omitted).

The Court should GRANT defendants' summary judgment motion as to all of

Ukpong's claims.[102/]

---

101/  Defendants correctly note (see Dkt. No. 79: Defs. Resp. To Pls. Rule 56.1(b) Counter-Stmt. ¶ 59) that the facts regarding Ukpong's conversation with Santulli, Ukpong's request to remain in the Boiler Unit, his transfer and the subsequent retaining/hiring of white employees do not appear in—or relate to claims presented in—plaintiffs' Second Amended Complaint.  (See Dkt. No. 48: 2d Am. Compl. ¶¶ 71-78.)  "A party generally may not assert a cause of action for the first time in response to a summary judgment motion." Armstrong v. Metro. Transp. Auth., 07 Civ. 3561, 2015 WL 992737 at *11 (S.D.N.Y. Mar. 3, 2015) (quotations omitted).  In any event, these claims fail on the merits for the reasons discussed herein.

102/  The Court does not address Ukpong's testimony regarding alleged discriminatory conduct by Inspector Thomas Spina (see Dkt. No. 67: Pls. Rule 56.1(b) Counter-Stmt. ¶¶ 242-43; Dkt. No. 72-2: Ukpong Aff. ¶¶ 16-17) because plaintiffs have voluntarily dismissed their hostile work environment claims (see page 1 above) and they make no effort to establish a nexus between Spina's conduct and any of the claims discussed herein. See, e.g., Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 149 (2d Cir. 2010).  Indeed, Spina's conduct is not mentioned at all in plaintiffs' brief.  (See Pls. Opp. Br. at 38-39.)

F.    **Whint**

Plaintiffs' Rule 56.1 statements and Whint's deposition transcripts contain facts potentially giving rise to disparate treatment claims—facts concerning Chief Eyal Amos' reassignment of Whint's City vehicle and Amos' reassignment of Whint from performing site safety duties to processing complaints.  (See pages 19-21 above.)  Defendants argue that these claims fail because Amos is a non-party, Amos' actions were not materially adverse, Whint provides no evidence supporting his assertions that his treatment was due to his protected status, and because Whint's claims are undermined by his "extensive disciplinary record at IAD."  (Dkt. No. 58: Defs. Br. at 23-24.)  Plaintiffs fail to provide any argument in support of these potential disparate treatment claims, instead focusing on Whint's failure to promote claims.  (See Dkt. No. 71: Pls. Opp. Br. at 36-37.)  The Court therefore should GRANT defendants' summary judgment motion as to Whint's § 1981, NYSHRL and NYCHRL claims arising from reassignment of his City vehicle and his reassignment from performing site safety duties to processing complaints.  (See case cited on page 8 n.5 above.)[103]/

Whint raises three failure to promote claims based on his applications for promotion to Assistant Chief or Supervising Inspector of the BEST Squad; those positions were awarded to Glen Rella, Michelle Kotsikonas and George Zimmerman.  (See Pls. Opp. Br. at 36-37; see also

---

[103]/    Even if plaintiffs had not abandoned these claims, the Court would find that they fail on the merits because Whint has proffered insufficient evidence to establish an inference that Amos' actions were motivated by discriminatory animus.  (See pages 19-21 above.)  Whint cites no comparator outside his protected class who retained a City vehicle under similar circumstances (see pages 19-20 above); his assertion that white employees were treated differently with respect to IAD complaints is unsupported by documentation or testimony on any specific examples of disparate treatment (see pages 20-21 above).  Whint's other claims regarding Amos' behavior are either insufficiently developed to allow for an inference of discriminatory animus (see, e.g., Dkt. No. 67: Pls. Rule 56.1(b) Counter-Stmt. ¶ 101), or lack any nexus to the discrimination claims discussed herein (see, e.g., id. ¶ 107).

pages 21-23 & n.12 above).[104/]  Whint's claim arising from the alleged promotion of Zimmerman to Supervising Inspector must fail.  (See page 23 n.12 above; Dkt. No. 67: Pls. Rule 56.1(b) Counter-Stmt. ¶ 112.)  Contrary to the "facts" stated in plaintiffs' Rule 56.1 statements, Whint testified at deposition that he could not recall whether Zimmerman or Sirajul Islam got that position; Whint recalled that Islam was better qualified and that his appointment to the Supervising Inspector position would not have been discriminatory.  (See page 23 n.12 above; see also Dkt. No. 78: Defs. Reply Br. at 13 n.2.)  Plaintiffs fail to plug this hole in Whint's testimony, and the Court therefore should GRANT defendants' summary judgment motion as to Whint's claims arising from the alleged promotion of Zimmerman to Supervising Inspector.

Defendants do not dispute that Whint was qualified for the Assistant Chief position

---

[104/]    The record also contains information regarding promotions awarded to Philip Krikorian and Richard Brower.  (See pages 21, 23 above.)  Defendants argue that Whint was not qualified for these promotions and that "[u]nlike Whint, . . . Philip Krikorian and Richard Brower . . . were already serving in Supervisor positions."  (Defs. Br. at 22.)  Plaintiffs' brief makes no mention of these claims, instead focusing almost entirely on the Supervising Inspector position awarded to Michelle Kotsikonas.  (See Pls. Opp. Br. at 36-37.)  However, plaintiffs' brief states: "For details of Mr Whints' [sic] claims and the basis of those claims and his claim of pretext, the Court is respectfully referred to the Counter Statement ¶¶97-116."  (Pls. Opp. Br. at 36.)  The Court declines this invitation and refers plaintiffs to the plethora of case law admonishing that "[j]udges are not like pigs, hunting for truffles buried in the record."  Capitol Records, LLC v. Escape Media Grp., Inc., 12 Civ. 6646, 2015 WL 1402049 at *36 n.17 (S.D.N.Y. Mar. 25, 2015) (quotations omitted).  It is not the Court's job to construct plaintiffs' pretext arguments for them—and, for that matter, Rule 56.1 statements are for facts, not legal arguments or conclusions.  See, e.g., Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, 138 F. Supp. 3d 352, 394 (S.D.N.Y. 2015) ("the Court can . . . disregard legal conclusions or unsubstantiated opinions in a Local Rule 56.1 statement" (citing cases)); see also Dkt. No. 78: Defs. Reply Br. at 2.  As such, the Court deems these claims abandoned.  See, e.g., Jessamy v. City of New Rochelle, 292 F. Supp. 2d 498, 515 n.21 (S.D.N.Y. 2003).  In any event, Whint's claims arising from the promotions of Krikorian and Brower would fail for the same reason as his claims arising from the promotions of Rella and Kotsikonas: Whint's credentials are insufficiently impressive to create a reasonable inference of pretext on their own.  (See pages 117-18 below.)  The Court should GRANT defendants' summary judgment motion as to these claims.

awarded to Rella or the Supervising Inspector position awarded to Kotsikonas; they do not dispute that Whint actually applied for those positions.[105] (See Defs. Br. at 22-23; Defs. Reply Br. at 12-13.) Nor do defendants dispute that Rella and Kotsikonas are white. (See id.) Whint has established a prima facie case as to these two claims. (See cases cited on pages 82-83 & n.69 above.)

As justification for these promotions, defendants argue that Rella and Kotsikonas were better qualified than Whint. (See Defs. Br. at 22-23.) At the time of his promotion to Assistant Chief in late 2015, Rella had more than seven years of experience as a DOB Inspector and more than a year of that experience was as a Supervising Inspector. (See page 22 above.) Whint had no experience as a Supervising Inspector at that time. (See pages 18, 21 above; Defs. Br. at 22.) At the time of her promotion to Supervising Inspector in August 2015, Kotsikonas had two and a half years of experience as a DOB Inspector and four years of experience as a carpenter and journeyman carpenter. (See pages 22-23 above.) Defendants also note that "Whint was recently promoted in 2016 to Supervising Inspector in the Build-it-Back Unit, and was also selected for a Supervisor position in the Affordable Housing Unit." (Defs. Br. at 22; see pages 18-19 above.) They argue that "Whint's selection for two Supervising Inspector positions a few months after[] [Kotsikonas was promoted] further dispels any inference that Whint was subjected to discrimination." (Defs. Br. at 23.)

Plaintiffs argue that these justifications are pretextual in part because Whint was better qualified than Rella and Kotsikonas. (Pls. Opp. Br. at 36-37.) Whint joined DOB as an

---

[105] Defendants argue that summary judgment should be granted as to Whint's claims arising from Rella's promotion because DOB records indicate that Whint declined to interview. (See Defs. Br. at 22.) However, whether Whint interviewed is disputed (see page 21 above) and the Court must resolve such disputes in favor of Whint.

Inspector in 2007, making him more senior than Rella and Kotsikonas by one and six years, respectively. (See pages 18, 22 above.) Whint also testified that Kotsikonas was pre-selected for the Supervising Inspector position—and that Krikorian announced as much—calling into question the legitimacy of the hiring process. (Pls. Opp. Br. at 36-37; see page 22 above.) Plaintiffs also argue that Whint's recent promotion—which occurred after the filing of this lawsuit—is a sham. (Pls. Opp. Br. at 37.)

The Court agrees with defendants that Whint's pre-selection arguments fail to raise an inference of discriminatory animus. (See Defs. Br. at 22-23.) Plaintiffs have proffered no evidence demonstrating that Krikorian played any part in Kotsikonas' promotion, see Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 149 (2d Cir. 2010) (a statement's probative value depends in part on its nexus to the allegedly discriminatory act), and otherwise have failed to show that Kotsikonas' pre-selection was motivated by discriminatory animus, see, e.g., Pathare v. Klein, 06 Civ. 2202, 2008 WL 4210471 at *7 (S.D.N.Y. Sept. 12, 2008) ("Even if a rational inference of pre-selection could be drawn . . . , Plaintiffs offer no evidence to connect that inference to any rational basis for discerning a genuine issue as to pretext for . . . discrimination."), aff'd, 347 F. App'x 646 (2d Cir. 2009); During v. City Univ. of N.Y., 01 Civ. 9584, 2005 WL 2276875 at *7 (S.D.N.Y. Sept. 19, 2005) ("[E]ven if the Court were to credit Plaintiff's allegation that Borden was pre-selected, that fact does not give rise to an inference of discrimination without some evidence that that pre-selection was somehow discriminatory."). Similarly, even assuming a factual basis for Whint's assertions of a "sham" promotion (see page 20 n.10 above), plaintiffs make no attempt to establish a nexus between that promotion and the promotions giving rise to his discrimination claims (see Defs. Reply Br. at 13).

In the absence of other indicators of pretext, Whint must show that his qualifications

were "so superior" to Rella's and Kotsikonas' "that 'no reasonable person, in the exercise of impartial judgment, could have chosen [them] over [Whint] for the job[s] in question.'" Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001); see cases cited on page 91 & n.81 above. Plaintiffs have failed to meet this standard with regard to Rella, who was similar to Whint in seniority and had experience as a Supervising Inspector. (See page 22 above.) Even as to Kotsikonas, plaintiffs have failed to adduce facts sufficient to show that Whint was the only clear choice. In the absence of such a showing, Whint cannot demonstrate "that he has been treated less well at least in part because of" his protected status. Bernadotte v. N.Y. Hosp. Med. Ctr. of Queens, No. 13-CV-965, 2016 WL 792399 at *11 (E.D.N.Y. Feb. 26, 2016) (quotations omitted). The Court should GRANT defendants' summary judgment motion as to Whint's § 1981, NYSHRL and NYCHRL claims arising from the promotions of Glen Rella and Michelle Kotsikonas.

Finally, plaintiffs argue that Whint "applied for the position of Assistant Chief of Excavation but was denied the position which was given to a less qualified white employee who was still in training." (See Pls. Opp. Br. at 36.) As already discussed, however (see page 23 n.12 above), this vague claim is unsupported by even the most basic facts—for example, the name of the candidate selected—necessary to corroborate Whint's conclusory testimony, let alone establish an inference of discriminatory intent. The Court should GRANT defendants' summary judgment motion on this claim.

## G. Patel

Patel raises eight failure to promote claims based on his applications for promotion to various supervisory positions that were awarded to Zafeirios Chatzis (twice), James Picone, James Glynn (twice), Joseph Iacopetta, Craig Hughes, and Carlos Saavedra. (See Dkt. No. 71: Pls. Opp. Br. at 34-36; see pages 24-29 & n.14 above.) Defendants do not dispute that Patel was qualified for

and applied for these positions, and that those who were awarded the positions fall outside of Patel's protected class. (See Dkt. No. 58: Defs. Br. at 24-25; Dkt. No. 78: Defs. Reply Br. at 13-14.) Patel has established a prima facie case as to these claims. (See cases cited on pages 82-83 & n.69 above.)

Defendants argue that all of the chosen candidates "were well-qualified for promotion." (Defs. Br. at 24.) Defendants also note that for most of these promotions, Patel has not adduced evidence of the personal involvement of any named defendant. (Id.) Plaintiffs' response only discusses the positions given to James Glynn (in 2013), Craig Hughes and Joseph Iacopetta.[106/] (See Pls. Opp. Br. at 34-36.)

With respect to Glynn's 2013 promotion to Supervising Inspector of the Manhattan Construction Unit, plaintiffs argue that Glynn was less qualified because, at the time of his promotion, he had been with DOB for less than two years and had not passed any civil service exams. (See Pls. Opp. Br. at 34; see also page 25 above.) At that point, Patel had seven years of experience as a DOB Inspector. Patel testified that Donald O'Connors, who conducted Patel's interview for the Supervising Inspector position, told Patel that he (O'Connors) had proposed Patel's name for the position, but that Thomas Connors chose Glynn instead. (Pls. Opp. Br. at 34; see also page 25 above.) Plaintiffs note that Winston McKenzie's affidavit, discussed above (see pages 7-8), describes discriminatory statements allegedly made by Connors in 2012 (Pls. Opp. Br. at 35).

---

[106/]    For the reasons already discussed (see page 115 n.104), the Court declines plaintiffs' invitation to "[s]ee generally Plaintiff's Counter Statement ¶¶ 117-139 for various promotional opportunities that Patel was denied" (Pls. Opp. Br. at 34). The Court deems abandoned Patel's claims arising from the promotions of Chatzis, Picone, Glynn (in 2015), and Saavedra. Even if these claims were not abandoned, the Court would find that they lack merit because, as compared to any of these applicants (see pages 24-25, 28 above), Patel's credentials were insufficiently impressive to create a reasonable inference of pretext on their own. In addition, Patel's claims arising from Chatzis' 2011 promotion to Supervisor in the Construction Enforcement Unit are time barred. (See page 29 n.14 above.) The Court should GRANT defendants' summary judgment motion as to these claims.

Because O'Connors conducted Patel's interview, the Court finds that he was involved in the promotion decision-making process and that his statement to Patel is not hearsay. (See cases cited on page 4 n.1 above.) When combined with the fact that Patel had five more years of seniority than Glynn, O'Connors' statement that Patel was better qualified calls defendants' justification into question. Furthermore, defendants do not dispute that Connors made the ultimate decision to promote Glynn over Patel, providing a nexus to the discriminatory statements described in McKenzie's affidavit. (See page 25 above.) Finally, although Patel has not established that he passed a promotional civil service exam, a weak inference of pretext nevertheless can be drawn from the DOB's failure to follow the civil service rules. (See page 94 n.83 above.) Taken together (see cases cited on page 93 above), these facts—particularly McKenzie's affidavit—could lead "a rational finder of fact to infer that" defendants' decision to promote Glynn over Patel was "more likely than not based in whole or in part on discrimination." (See cases cited on pages 60-63, 95 & n.45 above.) The Court should DENY defendants' summary judgment motion as to Patel's § 1981, NYSHRL and NYCHRL failure to promote claims against Connors and the City arising from the 2013 promotion of James Glynn to Supervising Inspector of the Manhattan Construction Unit.

With respect to Hughes' promotion to a Supervisor position in 2014, Patel testified that the position was cancelled by Dits after interviews were conducted. (Pls. Opp. Br. at 34; see also pages 26-27 above.) According to Patel, Derek Peeples—who conducted Patel's interview for the Supervisor position (see page 26 above)—told Patel that "I [Peeples] recommended your name, but, unfortunately, the interview was cancelled by Dmitri Dits" (see page 27 n.13 above). The position was posted a second time, but it was awarded to Hughes before Patel found out about the

re-posting.[107]  (See page 27 above.)  Defendants reply that Patel's assertion that Dits canceled the position because Patel was the "'only qualified person in that interview'" is based upon "sheer speculation."  (Defs. Br. at 25.)

The Court agrees with defendants (see page 27 n.13 above), and adds that the re-posting does not create an inference of discriminatory animus.  Patel has adduced no facts regarding the circumstances of the re-posting, except that it happened without his knowledge after he was recommended for the position the first time it was posted.  A jury perhaps could conclude, based on such evidence, that defendants' justification for hiring Hughes was pretextual, but there is no evidence suggesting that the justification is a pretext for discrimination.  See, e.g., St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 519, 113 S. Ct. 2742, 2754 (1993) ("It is not enough . . . to dis-believe the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.").[108]  The same holds true even when considering the disparity in Hughes' and Patel's qualifications.  Patel asserts that he trained Hughes, but he does not say when.  (See page 27 above.) Patel joined DOB in 2006 and Hughes joined in 2008.  (See pages 24, 27 above.)  By the time they applied for the Supervisor position in late 2014, both had years of experience as Inspectors; Hughes had plenty of time to outshine his former tutor.  (See page 26 above.)  Patel has failed to create an inference "that he has been treated less well at least in part because of" his protected status. Bernadotte v. N.Y. Hosp. Med. Ctr. of Queens, No. 13-CV-965, 2016 WL 792399 at *11 (E.D.N.Y. Feb. 26, 2016) (quotations omitted).  The Court should GRANT defendants' summary judgment

---

[107]  Notably, defendants do not argue that Patel fails to meet the specific application requirement based on these facts.  (See generally Defs. Br. at 24-25; Defs. Reply Br. at 13-14; see also cases cited on page 83 & n.70 above.)

[108]  The missing link here might have been the statement by "Val" regarding alleged discriminatory comments by Dits, but that statement is hearsay.  (See page 27 n.13 above.)

motion as to Patel's § 1981, NYSHRL and NYCHRL failure to promote claims against Dits and the City arising from Hughes' promotion.

With regard to Iacopetta, plaintiffs argue only that Patel was better qualified for the Associate Inspector position. (See Pls. Opp. Br. at 35.) Iacopetta joined DOB in 2012 (see page 26 above), making Patel six years his senior at the time of their application for the Associate Inspector position in July 2014 (see pages 24, 26 above). However, prior to joining DOB, Iacopetta worked as an engineering technician for two years and a construction supervisor for seven years. (See page 26 above.) Plaintiffs have failed to establish that Patel's qualifications were "so superior to [Iacopetta's] that 'no reasonable person, in the exercise of impartial judgment, could have chosen [Iacopetta] over [Patel] for the job[s] in question.'" Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001); see cases cited on page 91 & n.81 above. As such, Patel again fails to demonstrate "that he has been treated less well at least in part because of" his protected status. Bernadotte v. N.Y. Hosp. Med. Ctr. of Queens, 2016 WL 792399 at *11 (quotations omitted). The Court should GRANT defendants' summary judgment motion as to Patel's § 1981, NYSHRL and NYCHRL failure to promote claims arising from Iacopetta's promotion.

### H.    Cantave

Cantave raises a discrimination claim based on his September 2012 "demotion" from OEM to BEST Squad following an email from the Director of OEM's watch command, Mark Clampet, to Dmitri Dits expressing dissatisfaction with Cantave's job performance. (Dkt. No. 71: Pls. Opp. Br. at 25; see also pages 30-31 above.) As discussed above, Cantave raised the issue of his September 2012 "demotion" in his complaint to the NYSDHR, and his NYSHRL and NYCHRL claims based on that demotion therefore should be dismissed for lack of jurisdiction under the election of remedies doctrine. (See pages 77-78 above.)

Defendants argue that Cantave has failed to establish the third and fourth elements of a prima facie case for his remaining "demotion" claim brought under § 1981. First, defendants argue that no "demotion," and therefore no adverse action, occurred because Cantave retained his salary and civil service title upon being reassigned from OEM to BEST Squad. (Dkt. No. 58: Defs. Br. at 25; see page 31 above.) Plaintiffs do not directly respond to this argument (see generally Pls. Opp. Br. at 23-26), but Cantave did testify that his "duties did, in fact, change in that he . . . was performing the duties of an Inspector rather than the duties of an Assistant Chief Inspector" (see page 31 above). Nevertheless, "[a]n adverse employment action is one which is more disruptive than . . . an alteration of job responsibilities." Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012); see also, e.g., Henry v. N.Y.C. Health & Hosp. Corp., 18 F. Supp. 3d 396, 406 (S.D.N.Y. 2014) ("The receipt of undesirable assignments, without more, amounts to nothing more than a 'mere inconvenience,' not a 'materially adverse change in the terms and conditions of employment.'"); Smalls v. Allstate Ins. Co., 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) ("'[R]eceiving unfavorable schedules or work assignments . . . do[es] not rise to the level of [an] adverse employment action[] . . . because [it does] not have a material impact on the terms and conditions of Plaintiff's employment.'").

Defendants additionally note that "Cantave . . . fails to present any evidence that this reassignment was the result of discriminatory animus." (Defs. Br. at 25.) The Court agrees. The record evidence suggests that Cantave's reassignment was precipitated by his poor performance at OEM and a resulting complaint. (See pages 30-31 above.) Plaintiffs dispute (without supporting evidence) that Cantave was performing poorly at OEM. (See Pls. Opp. Br. at 25; see also page 31 n.16 above.) Even if defendants' justification for Cantave's reassignment were false, Cantave has adduced no evidence establishing that the real reason for his reassignment was discrimination. See,

e.g., St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 519, 113 S. Ct. 2742, 2754 (1993) ("It is not enough . . . to dis-believe the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.").  The Court should GRANT defendants' summary judgment motion as to Cantave's § 1981 discrimination claim arising from his reassignment from OEM to the BEST Squad in September 2012.

Cantave next asserts that he was: (1) prevented from performing overtime by Dmitri Dits, and that overtime was offered to his subordinates; (2) required to pay for his own OSHA training courses but two white employees were not; and (3) "kept . . . out of the loop about many things in the Unit" by Dits and Gina Bitro.  (See pages 31-32 above; see also Pls. Opp. Br. at 25.) Cantave's NYSHRL and NYCHRL claims based on these facts should be dismissed for lack of jurisdiction under the election of remedies doctrine.  (See pages 77-78 above.)

With respect to Cantave's remaining § 1981 claim based on denial of overtime, defendants argue that Cantave "fails to proffer any evidence that he was treated differently than similarly situated Assistant Chiefs because of his race or national origin" (Defs. Br. at 27), and that, in any event, undisputed evidence establishes that DOB had instituted a freeze on overtime for non-inspector employees—i.e., the "subordinates" that Cantave supervised as an Assistant Chief (id.; see also page 32 above).  As to Cantave's claim based on being kept "out of the loop," defendants argue that such treatment does not establish an adverse employment action under § 1981.  (Defs. Br. at 26.)  Cantave's brief fails to respond to these arguments, and indeed makes no mention of Cantave's overtime and "kept out of the loop" claims.  (See generally Pls. Opp. Br. at 23-26.)  Instead, plaintiffs once again "respectfully refer[]" the Court to "Plaintiffs' Counter Statement ¶¶ 140-194" for "a detailed statement of Cnatave's [sic] claims and the basis for his making them."  (Pls. Opp.

Br. at 23.) These claims thus are abandoned[109/] (see page 115 n.104 above), and the Court therefore should GRANT defendants' summary judgment motion as to Cantave's § 1981 discrimination claims arising from his denial of overtime and being "kept out of the loop."

With regard to Cantave's claim that he was required to pay for his own OSHA training courses, defendants argue that Cantave has not suffered an adverse action; that Cantave has not adduced any evidence of a discriminatory motive; that Cantave has not adduced evidence of any similarly situated comparators; and that DOB had a legitimate justification for declining to pay because Cantave was out on leave when the training was offered. (Defs. Br. at 27.) Arguing past defendants, plaintiffs respond that requiring Cantave to pay for his own classes was discriminatory even though "the money involved was not much," and that the real question involves "[p]aying for it for white employees and not paying for it for" Cantave. (Pls. Opp. Br. at 25.) Assuming arguendo that requiring Cantave to pay for his own OSHA classes constituted an adverse action under § 1981, Cantave has provided no evidence establishing that he and his white comparators were similarly situated. (See pages 32-33 above.) Even if Cantave could establish a prima facie case, he has not provided any information calling into question the legitimacy of defendants' justification—i.e., that DOB does not pay for employees taking courses while out on leave. (See pages 32-33 & n.18 above.) The Court should GRANT defendants' summary judgment motion as to Cantave's § 1981 discrimination claim regarding payment for OSHA courses.

Cantave raises seven failure to promote claims based on his applications for promotion to various supervisory positions that were awarded to Bernard Ross, Gary Grandstaff, Daniel Cornwell, Joseph Bruno, Richard Schwerdt, Michael Maffei and Philip Krikorian. (See

---

[109/]  Even if the claims were not abandoned, the Court would find defendants' arguments persuasive and dispositive.

pages 33-39 above.)  Defendants do not dispute that Cantave was qualified for and applied for these positions,[110] or that the persons appointed to these positions are white.  (Defs. Br. at 27-28.) Cantave has established a prima facie case as to these claims.  (See cases cited on pages 82-83 & n.69 above.)

Defendants argue that the chosen candidates were qualified for promotion and that Cantave fails to show that any named defendants were personally involved in these promotions, except for Robert D'Allessio's participation in Krikorian's promotion.  (Defs. Br. at 28.)  Cantave, moreover, did not appear for his interview for Administrative Chief Inspector of the Build-it-Back Unit, to which Maffei was promoted.  (Id.; see also page 37 & n.21 above.)  With respect to the Deputy Borough Commissioner position awarded to Bruno, defendants note that Cantave was assessed as "Not Qualified" because he was not licensed as a Professional Engineer or Registered Architect as required for that position.  (Defs. Br. at 28; see also page 35-36 above.)

Plaintiffs' response focuses on D'Allessio's promotion of Krikorian to Chief of the BEST Squad (see Pls. Opp. Br. at 23-24), arguing that "Cantave had more experience tha[n] Krikorian, had been an Assistant Chief for six years and Krikorian was just put in the Acting position for a few months before being promoted to the Chief's position."  (Pls. Opp. Br. at 23.) Plaintiffs also argue that "D'Allessio, a white man and Timothy Hogan, also a white man choose [sic] Philip Kikorian [sic] over Cantave, by first making him an acting chief so that they can eventually promote him to become the chief.  They made this decision even though Contave [sic] had been an assistant chief for six years and has more academic qualifications than him." (Pls. Opp.

---

[110]  Cantave admitted that the posting for the Major Project Director position awarded to Bernard Ross was "no longer there" when he went to apply for it, thus implying that he never applied. (See page 33 above.)

Br. at 24.) Defendants reply that "Cantave . . . neglects to mention that Krikorian had already worked at the BEST Squad for twenty years at the time of his promotion." (Defs. Reply Br. at 15.)

Contrary to plaintiffs' assertion that D'Allessio "would not offer a reason" why he selected Krikorian over Cantave (Pls. Opp. Br. at 23), D'Allessio testified that Krikorian had "twenty years in high-rise construction, concrete construction, and he had twenty years in the BEST Squad from the inception of the unit until the time that I interviewed him, and I felt that those two things combined were what I needed for the position." (See page 39 above.) Although D'Allessio confirmed Cantave's assertion that Krikorian was selected to serve as Acting Chief before being promoted to Chief, D'Allessio explained that he needed to temporarily fill the Chief position with "someone responsible that [he] could deal with on a daily basis," and that Krikorian fit that bill. (See page 39 above.) Cantave has proffered no evidence that these explanations are false, let alone a pretext for discriminatory animus.

In the absence of evidence of pretext, Cantave must show that his credentials were "so superior to the credentials of [Krikorian] that 'no reasonable person, in the exercise of impartial judgment, could have chosen [Krikorian] over [Cantave] for" the Chief of BEST Squad job. Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001); see cases cited on page 91 & n.81 above. Given Krikorian's decades-long experience at DOB, and at the BEST Squad specifically, Cantave cannot meet this standard. As such, Cantave fails to demonstrate "that he has been treated less well at least in part because of" his protected status. Bernadotte v. N.Y. Hosp. Med. Ctr. of Queens, No. 13-CV-965, 2016 WL 792399 at *11 (E.D.N.Y. Feb. 26, 2016) (quotations omitted). The Court should GRANT defendants' summary judgment motion as to Cantave's § 1981, NYSHRL and NYCHRL failure to promote claims against Robert D'Allessio and the City arising from Krikorian's promotion to Chief of the BEST Squad.

Turning to the other six failure to promote claims mentioned above, plaintiffs employ a bold, dual-pronged approach by (yet again) making a boilerplate reference to their Rule 56.1 statements and inviting the Court to construct their pretext arguments for them (see Pls. Opp. Br. at 23-24), and then conclusorily asserting that "Mr. Cantave's qualifications, educational experience as well as his work history and supervisory history demonstrate that a reasonable jury may infer that the decision[s] not to promote him into these positions were discriminatory" (Pls. Opp. Br. at 24).[111] The Court (yet again) declines the first invitation (see page 115 n.104) and adds that a thorough review of the relative qualifications of Cantave and the candidates chosen for the at-issue promotions (see pages 33-38 above) reveals that Cantave's credentials were not "so superior to the credentials of the person[s] selected for the[se] job[s] that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate[s] selected over [Cantave] for the job[s] in question.'" Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001); see cases cited on page 91 & n.81 above.[112] The Court should GRANT defendants' summary judgment

---

[111] The Court already has rejected plaintiffs' arguments (see Pls. Opp. Br. at 26) that an inference of discriminatory animus may be drawn from Dmitri Dits' testimony regarding Cantave's ability to work overtime in the Night Supervisor ERT position awarded to Schwerdt. (See page 37 n.20 above.) The Court also already has rejected as untimely Cantave's claims arising from the Assistant Chief of Construction position awarded to Thomas Mascialino (see page 39 n.23 above), to which plaintiffs dedicate a significant portion of their brief (see Pls. Opp. Br. at 24-25; see also Defs. Reply Br. at 15 n.3).

[112] The Court also is persuaded by defendants' arguments that Cantave declined to interview for the position awarded to Maffei (see page 37 n.21 above), and that Cantave was unqualified for the Deputy Borough Commissioner position awarded to Bruno (see pages 35-36 above). Cantave's testimony that two white individuals who "were also serving in deputy borough commissioner positions and assistant commissioner positions" (see page 36 above) did not have professional licenses is insufficient to create an inference of discriminatory animus because Cantave has not demonstrated that those persons were similarly situated (Defs. Br. at 28; see also page 36 above). It is unknown, for example, whether DOB increased the necessary qualifications for those positions before Cantave applied. See, e.g., Milano v.
(continued...)

motion as to Cantave's § 1981, NYSHRL and NYCHRL failure to promote claims arising from the promotions of Bernard Ross, Gary Grandstaff, Daniel Cornwell, Joseph Bruno, Richard Schwerdt and Michael Maffei.

### I. Minault

Minault raises four failure to promote claims based on his applications for promotion to various supervisory positions that were awarded to Ronald Mener, Mr. Powell, Mr. Rodriguez, and Juan Arias. (See pages 40-43 above.) Except for Minault's claims pertaining to the promotion of Ronald Mener, defendants argue that all of Minault's failure to promote claims are time-barred (see Dkt. No. 58: Defs. Br. at 29-30; Dkt. No. 78: Defs. Reply Br. at 16-17); defendants make no alternative arguments on the merits (see id.). As discussed above, the Court agrees with defendants that Minault's claim arising from his application to the Chief of the Scaffolding Unit position is time-barred. (See page 41 n.24 above.) But because Minault benefits from American Pipe tolling, his remaining failure to promote claims are not time barred. (See pages 68-73 above.)

Defendants do not dispute that Minault applied for and was qualified for the positions awarded to Powell, Rodriguez and Arias, and that Powell, Rodriguez and Arias are not members of Minault's protected class. (See Defs. Br. at 29-30; Defs. Reply Br. at 16-17.) Minault has established a prima facie case as to these claims. (See cases cited on pages 82-83 & n.69 above.) Because defendants rely entirely on their statute of limitations argument and fail to present any alternative basis for summary judgment, the Court should DENY defendants' summary judgment motion as to Minault's § 1981, NYSHRL and NYCHRL claims arising from the promotions of

---

(...continued)
Astrue, 05 Civ. 6527, 2008 WL 4410131 at *32 (S.D.N.Y. Sept. 26, 2008) ("Courts . . . afford employers a great deal of discretion . . . in determining the criteria for positions."), aff'd, 382 F. App'x 4 (2d Cir. 2010), aff'd, 382 F. App'x 4 (2d Cir. 2010).

Powell, Rodriguez and Arias.

Turning to Minault's claim arising from Mener's selection for promotion to Executive Officer for Borough Enforcement Inspections, defendants rely on Mener's allegedly superior qualifications. (See Defs. Br. at 30.) Plaintiffs respond (see Pls. Opp. Br. at 33) that Joseph Ventour recommended Minault for the Executive Officer position, but Dmitri Dits told Minault "that there was no point for him applying for the position . . . and that the position was not going to be available" (see pages 40-41 above). The Court agrees with defendants, however, that "Minault fails to provide any evidence that Dits was in any way motivated by discriminatory animus" when he made these comments. (See Defs. Br. at 30.) Because plaintiffs proffer no additional facts as to Mener's promotion giving rise to an inference of discriminatory animus (see generally Pls. Opp. Br. at 32-34), Minault must demonstrate pretext by winning a battle of qualifications (see cases cited on pages 91-93 & n.81 above). At the time of his promotion, Mener had been working as a Supervisor for roughly two years; he had roughly thirteen total years of DOB experience—five more years than Minault. (See pages 40-41 above.) Plaintiffs note that Minault holds a college degree and worked as professor at multiple colleges and as a project engineer for two construction companies prior to joining DOB. (Pls. Opp. Br. at 32.) Based on these facts,[113] the Court finds that Minault's credentials were not "so superior to the credentials of [Mener] that 'no reasonable person, in the exercise of impartial judgment, could have chosen [Mener] over [Cantave] for the job in question.'" Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001); see also cases cited on page 91 & n.81 above. As such, Minault has not established a reasonable inference

---

[113] Plaintiffs' brief asserts that Minault "was already doing for many months the responsibilities of the" Executive Officer position (Pls. Opp. Br. at 33), but as defendants note (see Defs. Reply Br. at 17), this assertion is wholly unsupported by the parties' Rule 56.1 statements or any record citations.

"that he has been treated less well at least in part <u>because of</u>" his protected status.  <u>Bernadotte</u> v. <u>N.Y. Hosp. Med. Ctr. of Queens</u>, No. 13-CV-965, 2016 WL 792399 at *11 (E.D.N.Y. Feb. 26, 2016).  The Court should <u>GRANT</u> defendants' summary judgment motion as to Minault's § 1981, NYSHRL and NYCHRL failure to promote claims arising from promotion of Ronald Mener to Executive Officer for Borough Enforcement Inspections.[114]/

### J.    <u>Morilla</u>

Morilla raises a failure to promote claim arising from Gary Grandstaff's promotion to Assistant Chief of the Excavation Unit.  (Dkt. No. 71: Pls. Opp. Br. at 26-27; <u>see also</u> pages 44-46 above.)   In 2012, Morilla "was practically performing the duties of the Assistant Chief of Excavation."  (<u>See</u> page 44 above.)  After the Assistant Chief position was vacated by Eyal Amos, Morilla spoke to Bernard Ross, Robert D'Allessio and Director Santulli about the position and all three said that the position was closed.  (<u>See</u> pages 44-45 above.)  D'Allessio transferred Morilla out of the unit in 2012, and "the position of Assistant Chief of Excavation Unit which defendants claimed was closed was offered to Gary Grandstaff."  (<u>See</u> page 46 above.)  Morilla testified regarding an April 25, 2013 letter that she sent to HR expressing concern over the fact that the Assistant Chief position was posted "for a couple days only," and that someone in HR "refused to talk to" her about it.  (<u>See</u> <u>id.</u>)

In her NYSDHR complaint, Morilla discussed Ross' statement that the Assistant Chief position was closed (<u>see</u> page 79 above); Morilla's NYSHRL and NYCHRL claims arising

---

[114]/    As discussed above, Minault's claims of alleged harassment by Michael Maffei are time barred.  (<u>See</u> page 41 n.24.)  Plaintiffs make no attempt to establish a nexus between Maffei's harassment and Minault's failure to promote claims; indeed, plaintiffs' brief does not address the harassment at all.  (<u>See generally</u> Pls. Opp. Br. at 33.)  Similarly, the Court has already rejected the arguments in plaintiffs' brief (<u>see</u> Pls. Opp. Br. at 32-33) regarding Minault's claims of disparate treatment with respect to salaries (<u>see</u> page 43 n.25 above).

from Grandstaff's selection for that position should be dismissed for lack of jurisdiction under the election of remedies doctrine (see pages 78-79 above). Defendants argue that Morilla's remaining § 1981 claims against D'Allessio are untimely. (Dkt. No. 58: Defs. Br. at 30-31.) As discussed above, the Court disagrees that Morilla's race-based (as opposed to sex-based[115/]) § 1981 claim is barred because Morilla benefits from American Pipe tolling. (See pages 68-73 & n.55 above.)

Defendants do not dispute that Morilla was qualified for the Assistant Chief position, that she satisfies (or can be excused from) the specific application requirement, and that Gary Grandstaff is white. (See generally Defs. Br. at 30-32; Dkt. No. 78: Defs. Reply Br. at 17-19.) Morilla has established a prima facie case. (See cases cited on pages 82-83 & n.69 above.) Because defendants rely entirely on their statute of limitations argument and fail to present any alternative basis on which to grant summary judgment, the Court should DENY defendants' summary judgment motion as to Morilla's § 1981 failure to promote claim against Robert D'Allessio arising from Gary Grandstaff's promotion to Assistant Chief of the Excavation Unit.[116/]

Morilla raises a failure to promote claim arising from Gary Grandstaff's subsequent

---

[115/]  Morilla's sex-based discrimination claims arising from Grandstaff's promotion to Assistant Chief are time-barred because they do not benefit from American Pipe tolling. (See page 71 n.55 above.) Moreover, "[s]ection 1981 does not prohibit discrimination on the basis of gender." Villar v. City of N.Y., 135 F. Supp. 3d 105, 142 n.17 (S.D.N.Y. 2015). Finally, Morilla's NYSHRL and NYCHRL claims based on D'Allessio's sex-based comments are barred by the election of remedies doctrine. (See pages 78-79 above.)

[116/]  Even if defendants had presented alternative arguments on the merits of this claim, given the facts recounted in detail above—e.g., Morilla's involuntary transfer out of the Excavation Unit, the statements from three separate supervisors that the Assistant Chief position was closed, Morilla's letter to HR complaining that the position was posted for only a few days before being filled by Grandstaff, and the fact that Morilla had eight years more of DOB experience than Grandstaff (see pages 34, 43 above)—the Court would conclude that Morilla should not only be excused from her failure to apply to the Assistant Chief position, but also that she adduced evidence of pretext sufficient to survive summary judgment.

promotion to Chief of the Excavation Unit. (Pls. Opp. Br. at 27; see also page 47 above.) Defendants argue that Morilla cannot establish a prima facie case on this claim because she neither applied nor interviewed for the position. (See Defs. Br. at 31.) Plaintiffs apparently assume this argument refers to the Assistant Chief position (see Pls. Opp. Br. at 27 ("The allegation that Plaintiff did not apply for the position that Gary Grandstaff was promoted to has no relevance . . . . Plaintiff . . . was told that the position was closed.")), and therefore provide no substantive response. The Court agrees with defendants that Morilla fails to meet the specific application requirement for this claim without any mitigating circumstances. (See, e.g., pages 98-99 & n.90 above.) The Court should GRANT defendants' summary judgment motion as to Morilla's § 1981, NYSHRL and NYCHRL failure to promote claims arising from Gary Grandstaff's promotion to Chief of the Excavation Unit.

Morilla raises a failure to promote claim arising from her application in 2015 to the Assistant Chief of the Excavation Unit position awarded to Richard Brower. (Pls. Opp. Br. at 27-28; see also page 48 above.) Defendants do not dispute that Morilla was qualified for and applied for the Assistant Chief position, or that Richard Brower is a white male. (See generally Defs. Br. at 31; Defs. Reply Br. at 18.) Morilla has established a prima facie case. (See cases cited on pages 82-83 & n.69 above.)

As their legitimate justification, defendants assert that "Brower had already gained supervisory experience at the time of his selection, and had worked as a Project Manager in the private sector for nearly thirty years prior to joining DOB." (Defs. Br. at 31; see also page 23 above.) Defendants also note that there is no evidence that any of the named defendants were involved in this promotion. (Defs. Br. at 31; see also Defs. Reply Br. at 18 n.4.) As evidence that defendants' justification is a pretext for discrimination, plaintiffs note that Morilla trained Brower

and that she already was a supervisor when he was hired by DOB.  (Pls. Opp. Br. at 27.)[117]

       Brower was appointed Assistant Chief of the Excavation Unit in 2015—roughly three years after Gary Grandstaff's selection for that position.  (See page 48 above.)  Plaintiffs make no effort to establish a nexus between these two failure to promote claims (see generally Pls. Opp. Br. at 27-28); nor is there any evidence that the same decision makers were involved (see Defs. Reply Br. at 18 n.4).  In the absence of any indicators of pretext, Morilla relies solely on her superior qualifications.  (See cases cited on pages 91-93 & n.81 above.)  Brower joined DOB in 2008, giving him seven years of DOB experience at the time of his promotion to Assistant Chief.  (See page 23 above.)  Although Morilla may have trained Brower at some point, seven years is more than enough time for Brower to have surpassed his former tutor in relevant experience and qualifications, especially given that Brower had been working as a Supervisor in the Excavation Unit for four years at the time of his promotion.  (See pages 23, 48 above.)  Based on these facts, the Court finds that Morilla's credentials were not "so superior to the credentials of [Brower] that 'no reasonable person, in the exercise of impartial judgment, could have chosen [Brower] over [Morilla] for the job in question.'"  Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001); see also cases cited on page 91 & n.81 above.  As such, Morilla cannot establish a reasonable inference "that [s]he has been treated less well at least in part because of" her protected status.  Bernadotte v. N.Y. Hosp. Med. Ctr. of Queens, 2016 WL 792399 at *11.  The Court should GRANT defendants' summary judgment motion as to Morilla's § 1981, NYSHRL and NYCHRL failure to promote claims arising from Brower's promotion to Assistant Chief of the Excavation Unit.

---

[117]    Plaintiffs' additional assertion that "Morilla had . . . passed the civil service . . . promotional examination" (see Pls. Opp. Br. at 28) is unsupported by the parties' Rule 56.1 statements (see generally Dkt. No. 57: Defs. Rule 56.1 Stmt. ¶¶ 177-97; Dkt. No. 68: Pls. Resp. To Defs. Rule 56.1 Stmt. ¶¶ 177-97; Dkt. No. 67: Pls. Rule 56.1(b) Counter-Stmt. ¶¶ 27-69).

Finally, Morilla raises a claim under the Family and Medical Leave Act ("FMLA") arising from her application to Assistant Chief Plan Examiner.  (Pls. Opp. Br. at 28-29; see also pages 47-48 above.)[118/]  Specifically, Morilla testified that she had a conversation with Elizabeth Skowronek—the head of the relevant unit—during which, upon learning that Morilla had applied or was applying to the Assistant Chief Position, Skowronek allegedly told Morilla, "I think you should take care of your health first."  (See page 48 above.)  Morilla asserts that this statement referred to her treatment for breast cancer, for which she intermittently had taken FMLA leave.  (See Pls. Opp. Br. at 29; see also page 48 above.)  Defendants argue that "Morilla's belief that she was not selected for the [Assistant Chief] position based on Skowronek's purported comment is completely unsupported by any evidence." (Defs. Br. at 32.)  Plaintiffs' brief does not respond to this argument, instead focusing on Skowronek's "discouragement" of Morilla's application to the Assistant Chief position.  (See Pls. Opp. Br. at 28-29.)

It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA.  29 U.S.C. § 2615(a)(1).  "The regulations promulgated pursuant to the FMLA explain that "'[i]nterfering with" the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.'"  Potenza v. City of N.Y., 365 F.3d 165, 167 (2d Cir. 2004) (quoting 29 C.F.R. § 825.220(b)).  "Discouragement" relates to "discouraging an employee from using [FMLA] leave."  29 C.F.R. § 825.220(b).  "[C]ourts in the Second Circuit

---

118/     Although plaintiffs' Second Amended Complaint also pleaded an ADA claim arising from Morilla's application to the Assistant Plan Examiner position (see Dkt. No. 48: 2d Am. Compl. ¶¶ 136-39), plaintiffs' response brief makes no mention of that claim (see generally Pls. Opp. Br. at 26-29).  The Court therefore deems the claim abandoned.  (See page 8 n.5 above.)

require a Plaintiff who asserts a FMLA interference claim on a 'discouragement theory' to offer evidence that she tried to assert her FMLA rights and was thereafter discouraged from taking FMLA leave, unless the employer's purported acts of discouragement would have dissuaded a similarly situated employee of ordinary resolve from attempting to exercise his or her FMLA rights." Reilly v. Revlon, Inc., 620 F. Supp. 2d 524, 535 (S.D.N.Y. 2009).[119]

No reasonable jury could interpret Skowronek's statement that Morilla should "take care of [her] health" as an attempt to discourage Morilla from exercising her rights under the FMLA.[120] To the extent plaintiffs attempt to present a novel "discouragement" claim relating to Morilla's application to the Assistant Chief position, that theory is unsupported by plaintiffs' cited cases (see Pls. Opp. Br. at 28-29) and in any event fails because Morilla did apply for that position. See Roberts v. Health Ass'n, 308 F. App'x 568, 570 (2d Cir. 2009) ("Although [plaintiff] can likely show that [defendant] interfered with her FMLA rights, because there is no evidence that the

---

[119] Accord, e.g., Stuart v. T-Mobile USA, Inc., 14 Civ. 4252, 2015 WL 4760184 at *4 (S.D.N.Y. Aug. 12, 2015); Rinaldi v. Quality King Distribs., Inc., 29 F. Supp. 3d 218, 229 (E.D.N.Y. 2014) ("A plaintiff proceeding on a discouragement theory must offer evidence that she tried to assert her FMLA rights but was discouraged from doing so in such a way that would have dissuaded a similarly situated employee of ordinary resolve from attempting to exercise his or her FMLA rights." (quotations omitted)).

[120] To the extent Morilla might have had a compelling "retaliation" claim based on Skowronek's comment and Morilla's subsequent failure to secure the Assistant Chief position, see, e.g., 29 C.F.R. § 825.220(c) ("employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as . . . promotions"); Rinaldi v. Quality King Distribs., Inc., 29 F. Supp. 3d at 229 ("Interfering with, restraining or denying an employee's rights under the FMLA is unlawful. Employers, moreover, are prohibited from discriminating against an employee 'for having exercised or attempted to exercise FMLA rights.' In the Second Circuit, these two prohibitions equate to separate and distinct claims for interference and retaliation under the FMLA." (citations omitted) (quoting 29 C.F.R. § 825.220(c))), the Court again declines to construct plaintiffs' arguments for them (see page 115 n.104 above).

violation was prejudicial, the District Court did not err in dismissing her claim.").[121/]  To the extent

plaintiffs attempt to present a generic "interference" claim based on Morilla's application for the

Assistant Chief position, they fail to even mention, let alone apply, the Second Circuit's five-element

test for such claims.  See, e.g., Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 424 (2d Cir.

2016).[122/]  The Court should GRANT defendants' summary judgment motion as to Morilla's FMLA

claims arising from her application to Assistant Chief Plan Examiner.[123/]

---

[121/]    Accord, e.g., Hill v. City of N.Y., 136 F. Supp. 3d 304, 342 (E.D.N.Y. 2015) ("A plaintiff
must show that 'she suffered some injury by reason of the interference with her FMLA
rights.'"); Forrester v. Prison Health Servs., No. 12-CV-363, 2015 WL 1469737 at *29
(E.D.N.Y. Mar. 30, 2015), aff'd, 651 F. App'x 27 (2d Cir. 2016).

[122/]    Accord, e.g., Douyon v. N.Y.C. Dep't of Educ., 665 F. App'x 54, 57 (2d Cir. 2016); Hill v.
City of N.Y., 136 F. Supp. 3d at 342.

[123/]    The Court agrees with defendants (see Defs. Br. at 31 n.11) that the threadbare facts in the
record regarding Morilla's application to the Assistant Chief of ERT position do not support
a failure to promote claim.  The facts establish only that Morilla interviewed for that position
and that Thomas Mascialino conducted the interview.  (Pls. Rule 56.1(b) Counter-Stmt. ¶ 52;
Dkt. Nos. 74, 74-1, 74-2: Morilla Dep. at 117, 119.)  Because Morilla could not recall the
name of the person selected for the position (Morilla Dep. at 119), her assertions that the
person was less qualified (see Pls. Rule 56.1(b) Counter-Stmt. ¶ 52; Morilla Dep. at 119-20)
are conclusory and fail to create an inference of discriminatory animus.  The Court further
agrees with defendants that Morilla's claims arising from her application to Construction
Chief for the ERT are barred by the statute of limitations.  (See page 49 n.31 above.)  The
Court should GRANT defendants' summary judgment motion as to these claims.  Finally,
plaintiffs' Rule 56.1 statements contain facts pertaining to incidents unrelated to the claims
discussed above.  (See, e.g., Pls. Rule 56.1(b) Counter-Stmt. ¶¶ 41 ("Nicoli Bestly . . .
constantly mocked Morilla's accent and would often make fun of her as she spoke on the
phone with contractors and engineers."), 64 (Morilla "was often followed and monitored by
people from the department of Investigations . . . when she was working in the Excavation
and Forensic Units."), 65 ("Daniel Cornwell used to mock [Morilla's] accent all the time in
the presence of other employees.").)  Because plaintiffs have dismissed their hostile work
environment claims (see page 1 above) and have made no attempt to establish a nexus
between these incidents and the claims addressed above, the Court does not discuss them
herein—except to note that Morilla's NYSHRL and NYCHRL claims based on some of these
facts are barred by the election of remedies doctrine (see pages 78-79 above).

**V.      DEFENDANTS SHOULD BE GRANTED SUMMARY JUDGMENT ON CANTAVE'S AND MORILLA'S CONSTRUCTIVE DISCHARGE CLAIMS**

"'[A]n employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily.'  Case law generally focuses on two parts of this standard: the employer's intentional conduct and the intolerable level of the work conditions."  Petrosino v. Bell Atl., 385 F.3d 210, 229 (2d Cir. 2004) (citation omitted).[124/]  The second part of a constructive discharge claim requires the plaintiff to prove that an objectively reasonable person in the plaintiff's position would find her "work conditions so intolerable as to compel resignation."  Petrosino v. Bell Atl., 385 F.3d at 230.[125/]  This standard "is a demanding one," Miller v. Praxair, Inc., 408 F. App'x 408, 410 (2d Cir. 2010), cert. denied, 564 U.S. 1038, 131 S. Ct. 3067 (2011), because "[c]onstructive discharge cases 'present[] a "worse case" harassment scenario, harassment ratcheted up to the breaking point,'" Copantitla v. Fiskardo Estiatorio, Inc., 788 F. Supp. 2d at 301 (quoting Pa. State Police v. Suders, 542 U.S. 129, 147-48, 124 S. Ct. 2342, 2355 (2004)).  The Second Circuit therefore has held that the constructive discharge "standard is higher than the standard for establishing a hostile work environment."  Fincher v. Depository Tr. & Clearing Corp., 604 F.3d 712, 725 (2d Cir. 2010).[126/]

---

[124/]     Accord, e.g., Serricchio v. Wachovia Sec. LLC, 658 F.3d 169, 185 (2d Cir. 2011); Creacy v. BCBG Max Azria Grp., LLC, 14 Civ. 10008, 2017 WL 1216580 at *11 (S.D.N.Y. Mar. 31, 2017); Pryor v. Jaffe & Asher, LLP, 992 F. Supp. 2d 252, 257 (S.D.N.Y. 2014); Copantitla v. Fiskardo Estiatorio, Inc., 788 F. Supp. 2d 253, 295 (S.D.N.Y. 2011).

[125/]     Accord, e.g., Serricchio v. Wachovia Sec. LLC, 658 F.3d at 185; Creacy v. BCBG Max Azria Grp., LLC, 2017 WL 1216580 at *11; Pryor v. Jaffe & Asher, LLP, 992 F. Supp. 2d at 257; Copantitla v. Fiskardo Estiatorio, Inc., 788 F. Supp. 2d at 295.

[126/]     Accord, e.g., Kaye v. Storm King Sch., 11 Civ. 3369, 2015 WL 5460107 at *13 (S.D.N.Y. June 8, 2015); Pryor v. Jaffe & Asher, LLP, 992 F. Supp. 2d at 257 (constructive discharge claims arise out of "particularly pronounced hostile work environments."); E.E.O.C. v.
(continued...)

Plaintiffs voluntarily dismissed their hostile work environment claims (see page 1 above), making the basis for meeting the even higher standard for constructive discharge inherently suspect. See, e.g., Chenette v. Kenneth Cole Prods., Inc., 345 F. App'x 615, 620 (2d Cir. 2009) ("Having failed on her hostile work environment claim, 'she can neither survive summary judgment on her constructive discharge claim, which requires evidence of even more severe conditions.'"); Day v. N.Y.C. Dep't of Consumer Affairs, 10 Civ. 4888, 2016 WL 1070843 at *8 (S.D.N.Y. Mar. 15, 2016) ("[T]he existence of a hostile work environment is a 'necessary predicate' to a constructive discharge case.").

In Petrosino, moreover, the Second Circuit held that "[a]n employee who anticipates little chance of promotion in a particular job may well decide to seek employment elsewhere, but the employee can hardly demonstrate that the job she in fact holds was rendered so intolerable that she was compelled to quit." Petrosino v. Bell Atl., 385 F.3d at 231; see also, e.g., Stetson v. NYNEX Serv. Co., 995 F.2d 355, 361 (2d Cir. 1993) (no claim for constructive discharge when employee was dissatisfied with his assignments, compensation and criticisms of his work, but his rank and salary were never reduced and his working conditions were not so difficult or intolerable); Brescia v. Leff, No. 3:04CV1680, 2006 WL 3231433 at *5 (D. Conn. Nov. 7, 2006) ("The failure to win a promotion in a close application process is not sufficiently intolerable to give rise to constructive discharge."); Loucar v. Boston Mkt. Corp., 294 F. Supp. 2d 472, 482 (S.D.N.Y. 2003)

---

[126]/ (...continued)
Bloomberg L.P., 967 F. Supp. 2d 816, 875 (S.D.N.Y. 2013); Roman-Malone v. City of N.Y., 11 Civ. 8560, 2013 WL 3835117 at *9 (S.D.N.Y. July 25, 2013); Mandel v. Champion Int'l Corp., 361 F. Supp. 2d 320, 327 (S.D.N.Y. 2005) ("The standard for constructive discharge is even higher than that required to prevail on a hostile environment claim, which itself requires that the plaintiff show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.").

("A denial of promotion does not constitute an 'intolerable work atmosphere' amounting to a constructive discharge.").

Plaintiffs argue that "Cantave and Morilla have had the same title/position for approximately six years each . . . .  When each was convinced that there was no way their careers would advance . . . they resigned to look for opportunities for better employment."  (Dkt. No. 71: Pls. Opp. Br. at 29; see also pages 40, 49 above.)  Such feelings of stagnation do not meet the "demanding" standard for establishing a constructive discharge claim.  See, e.g., Petrosino v. Bell Atl., 385 F.3d at 231 ("An employee who anticipates little chance of promotion in a particular job may well decide to seek employment elsewhere, but the employee can hardly demonstrate that the job she in fact holds was rendered so intolerable that she was compelled to quit."); see also cases cited on page 139 above.  Indeed, the fact that plaintiffs endured at DOB "for approximately six years" shows that the conditions were not "so intolerable as to compel resignation," Petrosino v. Bell Atl., 385 F.3d at 230, and did not "present[] a 'worse case' harassment scenario, harassment ratcheted up to the breaking point," Pa. State Police v. Suders, 542 U.S. 129, 147-48, 124 S. Ct. 2342, 2355 (2004); cf. Petrosino v. Bell Atl., 385 F.3d at 230 ("[W]e conclude that a reasonable jury could find that throughout her employment . . . , [plaintiff] experienced a work environment that employees and supervisors made deliberately hostile to women.  Nevertheless, she endured this environment for eight years, and she does not suggest that this conduct compelled her resignation.").[127]

---

[127]  Plaintiffs are correct (see Pls. Opp. Br. at 29-30) that a claim of constructive discharge based on discriminatory failures to promote survived summary judgment in Aurelien v. Henry Schein, Inc., 07 Civ. 2358, 2009 WL 366148 at *17 (E.D.N.Y. Feb. 12, 2009).  But in Aurelien, the plaintiffs' four failure to promote claims also survived summary judgment.  See id. at *16-17.  Here, unlike Aurelien, Cantave's failure to promote and other discrimination claims fail (see pages 122-29 above), and all but one of Morilla's failure to promote claims fail (see pages 131-37 above).  The incident giving rise to Morilla's successful failure to
(continued...)

The Court should <u>GRANT</u> defendants' summary judgment motion as to Cantave's and Morilla's § 1981, NYSHRL and NYCHRL constructive discharge claims.[128]

## VI. DEFENDANTS SHOULD BE GRANTED SUMMARY JUDGMENT ON SOME OF PLAINTIFFS' RETALIATION CLAIMS

Although § 1981 does not contain an explicit anti-retaliation provision, such claims are evaluated using substantially the same framework as Title VII claims.  <u>See</u>, <u>e.g.</u>, <u>Fincher</u> v. <u>Depository Tr. & Clearing Corp.</u>, 604 F.3d 712, 720 (2d Cir. 2010); <u>accord</u>, <u>e.g.</u>, <u>Littlejohn</u> v. <u>City of N.Y.</u>, 795 F.3d 297, 315 (2d Cir. 2015) ("Retaliation claims under . . . § 1981 are . . . analyzed pursuant to Title VII principles and the <u>McDonnell Douglas</u> burden-shifting evidentiary framework." (fn. omitted)); <u>Hicks</u> v. <u>Baines</u>, 593 F.3d 159, 164 (2d Cir. 2010).  Under Title VII, it is unlawful for an employer to "retaliate" by discriminating against an employee because the employee engaged in a protected activity by "oppos[ing] any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).

To establish a prima facie case of retaliation under § 1981, "a plaintiff must show that 1) the employee engaged in [a] protected activity; 2) the employer was aware of that activity; 3) the employee suffered an adverse employment action; and 4) there was a causal connection between the

---

[127] (...continued)
promote claim was not the straw that broke the camel's back: she continued to work at DOB for four years after that claim accrued.

[128] "The Court is mindful that NYCHRL claims must be analyzed separately and independently from federal and state discrimination claims.  Nonetheless, New York state courts have articulated an NYCHRL constructive discharge standard that is identical to the Title VII standard."  <u>E.E.O.C.</u> v. <u>Bloomberg L.P.</u>, 29 F. Supp. 3d 334, 338-39 (S.D.N.Y. 2014) (citations & quotations omitted, collecting cases).

protected activity and the adverse employment action." <u>Blanco</u> v. <u>Brogan</u>, 620 F. Supp. 2d 546, 553 (S.D.N.Y. 2009); <u>accord</u>, <u>e.g.</u>, <u>Littlejohn</u> v. <u>City of N.Y.</u>, 795 F.3d at 316; <u>Kwan</u> v. <u>Andalex Grp. LLC</u>, 737 F.3d 834, 844 (2d Cir. 2013); <u>Kessler</u> v. <u>Westchester Cty. Dep't of Soc. Servs.</u>, 461 F.3d 199, 205-06 (2d Cir. 2006); <u>Treglia</u> v. <u>Town of Manlius</u>, 313 F.3d 713, 719 (2d Cir. 2002); <u>Weixel</u> v. <u>Bd. of Educ.</u>, 287 F.3d 138, 148-49 (2d Cir. 2002).[129/] Defendants do not dispute that plaintiffs satisfy the first two elements of their retaliation claims. (<u>See generally</u> Dkt. No. 58: Defs. Br.; Dkt. No. 78: Defs. Reply. Br.)

As to the third element, "Title VII's 'antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.'" <u>Villar</u> v. <u>City of N.Y.</u>, 135 F. Supp. 3d 105, 135 (S.D.N.Y. 2015) (quoting <u>Burlington N. & Santa Fe Ry. Co.</u> v. <u>White</u>, 548 U.S. 53, 64, 126 S. Ct. 2405, 2412-13 (2006)).[130/] Rather, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Burlington N. & Santa Fe Ry. Co.</u> v. <u>White</u>,

---

[129/] See also, <u>e.g.</u>, <u>Lovejoy-Wilson</u> v. <u>NOCO Motor Fuel, Inc.</u>, 263 F.3d 208, 223 (2d Cir. 2001); <u>Gordon</u> v. <u>N.Y.C. Bd. of Educ.</u>, 232 F.3d 111, 116 (2d Cir. 2000); <u>Saber</u> v. <u>N.Y.S. Dep't of Fin. Servs.</u>, 15 Civ. 5944, 2017 WL 985889 at *12 (S.D.N.Y. Mar. 10, 2017); <u>Villar</u> v. <u>City of N.Y.</u>, 135 F. Supp. 3d 105, 135 (S.D.N.Y. 2015); <u>Chinnery</u> v. <u>N.Y.S. Office of Children & Family Servs.</u>, 10 Civ. 0882, 2014 WL 1651950 at *11 (S.D.N.Y. Apr. 25, 2014), <u>R. & R. adopted</u>, 2015 WL 1029601 (S.D.N.Y. Mar. 10, 2015); <u>Munck</u> v. <u>New Haven Sav. Bank</u>, 251 F. Supp. 2d 1078, 1085 (D. Conn. 2003).

[130/] Accord, <u>e.g.</u>, <u>Kessler</u> v. <u>Westchester Cty. Dep't of Soc. Servs.</u>, 461 F.3d at 207-09 (explicating the Supreme Court's <u>Burlington</u> v. <u>White</u> decision); <u>Vega</u> v. <u>Hempstead Union Free Sch. Dist.</u>, 801 F.3d 72, 90 (2d Cir. 2015) (Title VII's definition of an adverse action for retaliation claims "covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII").

548 U.S. at 68, 126 S. Ct. at 2415 (quotations omitted).[131] Even under Burlington, however, "trivial harms—i.e., those petty slights or minor annoyances that often take place at work and that all employees experience—are not materially adverse." Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d at 25 (quotations omitted); see also Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 568 (2d Cir. 2011) ("As the Court reminded us in Burlington, Title VII does not set forth a general civility code for the American workplace." (quotations omitted)). The failure to promote an otherwise qualified individual certainly constitutes an adverse employment action for the purposes of establishing a prima facie case of retaliation. Hinton v. City Coll. of N.Y., 05 Civ. 8951, 2008 WL 591802 at *25 (S.D.N.Y. Feb. 29, 2008); accord, e.g., Rouse v. City of N.Y., 08 Civ. 7419, 2009 WL 1532054 at *12 (S.D.N.Y. June 2, 2009).

The fourth element of a prima facie case of retaliation—causation—can be established either directly through evidence of retaliatory animus or indirectly by demonstrating that the adverse employment action followed quickly on the heels of the protected activity or through other evidence such as disparate treatment of fellow employees. See, e.g., Littlejohn v. City of N.Y., 795 F.3d at 319; Kercado-Clymer v. City of Amsterdam, 370 F. App'x 238, 242-43 (2d Cir. 2010); Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d at 224; DeCintio v. Westchester Cty. Med. Ctr., 821 F.2d 111, 115 (2d Cir.), cert. denied, 484 U.S. 965, 108 S. Ct. 455 (1987).[132] Section 1981

---

[131] See also Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 25 (2d Cir. 2014) ("[C]ontext matters, as some actions may take on more or less significance depending on the context, and [a]lleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct." (quotations & citations omitted)).

[132] Accord, e.g., Saber v. N.Y.S. Dep't of Fin. Servs., 15 Civ. 5944, 2017 WL 985889 at *13 (S.D.N.Y. Mar. 10, 2017); McCall v. Genpak, LLC, 13 Civ. 1947, 2015 WL 5730352 at *20 (S.D.N.Y. Sept. 30, 2015).

"retaliation claims must be proved according to traditional principles of but-for causation . . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013); accord, e.g., Kwan v. Andalex Grp. LLC, 737 F.3d at 846 n.5.[133/]

Like Title VII and § 1981, "[t]he NYSHRL . . . prohibits an employer from 'discharg[ing] or otherwise discriminat[ing] against any person because he or she has opposed any practices forbidden under [§ 296].'"  Cowan v. City of Mount Vernon, 95 F. Supp. 3d 624, 651 (S.D.N.Y. 2015) (quoting N.Y. Exec. Law § 296(3-a)(c)).  "'[R]etaliation claims under the [NYSHRL] are generally governed by the same standards as federal claims under Title VII.'"  Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d at 25 n.8; accord, e.g., Hicks v. Baines, 593 F.3d at 164; Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 609 (2d Cir. 2006); Cowan v. City of Mount Vernon, 95 F. Supp. 3d at 651.[134/]

"Section 8-107(7) of the NYCHRL prohibits employers from 'retaliat[ing] or discriminat[ing] in any manner against any person because such person has . . . opposed any practice forbidden under this chapter.'"  Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 112 (2d Cir. 2013) (quoting N.Y.C. Admin. Code § 8-107(7)).  "[T]o prevail on a retaliation claim

---

[133/]    See also, e.g., Kwan v. Andalex Grp. LLC, 737 F.3d at 845-46 ("[T]he but-for causation standard does not alter the plaintiff's ability to demonstrate causation at the prima facie stage on summary judgment or at trial indirectly through temporal proximity. . . .  '[B]ut-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive.").

[134/]    But see Armstrong v. Metro. Transp. Auth., 07 Civ. 3561, 2015 WL 992737 at *10 (S.D.N.Y. Mar. 3, 2015) ("It remains unclear whether [Nassar's] 'but-for' standard applies to NYSHRL claims or whether a plaintiff need only demonstrate that a retaliatory motive was a substantial or motivating factor behind the adverse action." (quotations omitted)).

under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d at 112 (citation omitted).[135/] "Consistent with the liberal standards of the NYCHRL, 'the retaliation inquiry under the [City law] is broader than its federal counterpart.'" Farzan v. Wells Fargo Bank, N.A., 2013 WL 6231615 at *27 (quoting Fincher v. Depository Tr. & Clearing Corp., 604 F.3d at 723). But this "'broader standard [for retaliation] does not absolve [plaintiffs] from putting forth evidence tending to show a causal connection between [their] action[s] opposing [defendants'] alleged discrimination and the alleged adverse actions.'" Dudley v. N.Y.C. Hous. Auth., 12 Civ. 2771, 2014 WL 5003799 at *25 (S.D.N.Y. Sept. 30, 2014).

## A. Henry

Plaintiffs' three-sentence defense of Henry's retaliation claims states:

> Henry complained to the Human Resources and the [DOB] EEO of discrimination. His car was taken from him, he was forbidden from being in the office early while whites were permitted to do so, and he was denied two promotional positions he applied for. The denials of those promotions happened closely in time to the time of complaining of discrimination.

(Dkt. No. 71: Pls. Opp. Br. at 32.) Despite relying entirely on a conclusory assertion of temporal proximity to sustain Henry's retaliation claim, almost all of the discriminatory acts committed against Henry discussed in plaintiffs' Rule 56.1 filings—such as Dits allegedly prohibiting Henry from entering the office early—are devoid of dates, making it impossible to establish a time line.

---

[135/] Accord, e.g., Villar v. City of N.Y., 135 F. Supp. 3d at 139; Farzan v. Wells Fargo Bank, N.A., 12 Civ. 1217, 2013 WL 6231615 at *27 (S.D.N.Y. Dec. 2, 2013) ("[T]he framework for assessing retaliation claims under the NYCHRL generally echoes the approach under federal and state law, although applying a 'slightly different standard.'"), aff'd, 619 F. App'x 15 (2d Cir. 2015).

(See generally Dkt. No. 68: Pls. Resp. To Defs. Rule 56.1 Stmt. ¶¶ 42-71; Dkt. No. 67: Pls. Rule 56.1(b) Counter-Stmt. ¶¶ 70-96; see also Dkt. No. 78: Defs. Reply Br. at 11-12.) Nor do plaintiffs specify which of Henry's numerous (mostly undated) complaints gave rise to the retaliation. (See, e.g., Pls. Rule 56.1(b) Counter-Stmt. ¶¶ 75, 78, 79, 87, 90, 92, 93.)

Only two of Henry's complaints have an ascertainable date. The first is Henry's March 8, 2013 complaint filed with the NYSDHR. (See page 14-15 above.) However, the only alleged discriminatory acts that possibly occurred after March 8, 2013 were: (1) denial of overtime by Dmitri Dits, which occurred between 2013 and 2015; (2) defendants' failure to register Henry for a defensive driving course in 2014; and (3) defendants' (undated) failure to provide Henry with a certification of completion for his OSHA courses. (See generally pages 11-16 above.) None of these acts, however, are the discriminatory acts that plaintiffs argue constituted retaliation. (See Pls. Opp. Br. at 32.)

Henry's second complaint with an ascertainable date—the April 30, 2014 email which prompted a response memorandum by Bernadette Nespole (see page 16 above)—occurred after all the alleged discriminatory acts with an ascertainable date. (See generally pages 11-16 above.) Any retaliation claims based on that email therefore fail. See, e.g., Slattery v. Swiss Reins. Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").

Henry has failed to proffer "evidence tending to show a causal connection between [his] action[s] opposing [defendants'] alleged discrimination and the alleged adverse actions." Dudley v. N.Y.C. Hous. Auth., 12 Civ. 2771, 2014 WL 5003799 at *25 (S.D.N.Y. Sept. 30, 2014) (quotations omitted). The Court therefore should GRANT defendants' summary judgment motion

as to Henry's § 1981, NYSHRL and NYCHRL retaliation claims.

**B.** **Cantave**

Plaintiffs argue that "[a]fter filing his internal EEO complaint as well as the external one, Yvon Cantave was denied further promotional opportunities." (Dkt. No. 71: Pls. Opp. Br. at 31.)[136/] Cantave filed his internal EEO complaint in July 2012[137/] (see page 33 above) and a complaint with the NYSDHR on January 15, 2013 (see id.). Defendants correctly note, however, that "the promotion decisions Cantave is challenging occurred several months and years after he filed these complaints." (Dkt. No. 78: Defs. Reply Br. at 16.) The first position to which Cantave alleges he should have been promoted (the Major Project Director position that Cantave testified was "no longer there" when he attempted to apply for it) was posted in September 2013, nine months after his NYSDHR complaint. (See page 33 above.) Cantave interviewed for the next position to which he argues he should have been promoted (the Chief of Excavation position given to Gary Grandstaff) on January 9, 2014—a year after his NYSDHR complaint.

Although the Second Circuit "has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to

---

[136/] Cantave also testified that he was reassigned from OEM to the BEST Squad in retaliation for the internal EEO complaint he filed against Dits in July 2012. (Defs. & Pls. Rule 56.1 Stmts. ¶ 135; Pls. Rule 56.1(b) Counter-Stmt. ¶ 164; Dkt. Nos. 73-1, 73-2, 73-3: Cantave Dep. at 102-03.) Defendants' brief argues that "[t]o the extent Cantave believes he was reassigned because of a July 2012 internal EEO complaint made against Dits, the subsequent September 21, 2012 complaint from OEM is an intervening event that breaks any causal connection." (Dkt. No. 58: Defs. Br. at 25.) The retaliation section of plaintiffs' brief fails to mention Cantave's reassignment/demotion as a basis for his retaliation claim, let alone present any response to defendants' argument. This claim is abandoned. (See page 8 n.5 above.)

[137/] Cantave's NYSHRL and NYCHRL retaliation claims emanating from his July 2012 complaint to DOB's EEO are barred by the election of remedies doctrine. (See pages 77-78 above.)

establish causation," <u>Gorzynski</u> v. <u>JetBlue Airways Corp.</u>, 596 F.3d 93, 110 (2d Cir. 2010), even plaintiffs' cited cases do not go beyond a five-month gap between the complaint and alleged retaliatory action (<u>see</u> Pls. Opp. Br. at 30-31).  <u>See also</u>, <u>e.g.</u>, <u>McCall</u> v. <u>Genpak, LLC</u>, 13 Civ. 1947, 2015 WL 5730352 at *22 (S.D.N.Y. Sept. 30, 2015) (citing cases); <u>Rouse</u> v. <u>City of N.Y.</u>, 08 Civ. 7419, 2009 WL 1532054 at *12 (S.D.N.Y. June 2, 2009) ("[T]he ten month period . . . stretches the bounds of the time frame that courts have allowed to support an inference of causation based on temporal proximity.").  The Court concludes that, under the circumstances of this case, an inference of retaliatory motive cannot reasonably be drawn based on temporal proximity alone.  <u>See</u>, <u>e.g.</u>, <u>Brown</u> v. <u>City of N.Y.</u>, 622 F. App'x 19, 20 (2d Cir. 2015) ("The time lapses between [plaintiff's] protected activities and the alleged retaliatory acts—ranging from two months to several years—were simply too attenuated to establish that the alleged adverse employment actions were the product of a retaliatory motive <u>absent other supporting factual allegations</u>." (emphasis added)).[138]

Cantave therefore has failed to proffer "evidence tending to show a causal connection between [his] action[s] opposing [defendants'] alleged discrimination and the alleged adverse actions."  <u>Dudley</u> v. <u>N.Y.C. Hous. Auth.</u>, 12 Civ. 2771, 2014 WL 5003799 at *25 (S.D.N.Y. Sept. 30, 2014) (quotations omitted).  The Court should <u>GRANT</u> defendants' summary judgment motion as to Cantave's § 1981, NYSHRL and NYCHRL retaliation claims.

---

[138] Plaintiffs' Rule 56.1 filings contain additional facts that are potentially relevant to this analysis (<u>see</u>, <u>e.g.</u>, Pls. Rule 56.1(b) Counter-Stmt. ¶¶ 167, 169, 189, 191), which defendants specifically addressed in their briefing (<u>see</u> Defs. Br. at 25-26).  Plaintiffs did not respond to defendants' argument, however, instead focusing entirely on the temporal proximity between Cantave's complaints and his failure to promote claims.  (<u>See</u> Pls. Opp. Br. at 31.) Again, the Court declines to make plaintiffs' arguments for them.

### C.     __Morilla__

Plaintiffs argue that Morilla "was moved immediately from the Unit after complaining of race and sex discrimination and Gary Grandstaff was later promoted." (Dkt. No. 71: Pls. Opp. Br. at 31.)  The Court assumes this argument refers to Morilla's complaints about race and sex discrimination to Robert D'Allessio after being told that the Assistant Chief of the Excavation Unit position was closed.  (See pages 44-45 above.)  Viewed in the light most favorable to Morilla, the evidence establishes that D'Allessio transferred her out of the Excavation Unit against her will "shortly after" that conversation.  (See page 45 above.)  As noted above (see page 132 above), defendants argue these claims are untimely (Dkt. No. 58: Defs. Br. at 30-31), and the Court disagrees because Morilla benefits from American Pipe tolling (see pages 68-73 & n.55 above).

Defendants do not dispute that Morilla engaged in a protected activity; that D'Allessio was aware of that activity; that Morilla's transfer from the Excavation Unit to the Forensics Unit constituted an adverse employment action; or that there was a causal connection between her complaint and her transfer.  (See generally Dkt. No. 58: Defs. Br. at 30-32; Dkt. No. 78: Defs. Reply Br. at 17-19.)  Morilla has established a prima facie case.[139]  See, e.g., Blanco v. Brogan, 620 F.

---

[139]    The Court is skeptical, however, that Morilla would have been able to establish a prima facie case in the absence of defendants' failure to provide any argument on the merits of this claim.  Whether Morilla's transfer to the Forensics Unit was materially adverse is uncertain at best.  See, e.g., Galabya v. N.Y.C. Bd. of Educ., 202 F.3d 636, 641 (2d Cir. 2000) ("'Obviously a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action.'" (quoting Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 274 (7th Cir. 1996))).  Judging by the standard of whether the transfer was likely to deter a reasonable person from engaging in protected activity—i.e., complaining about discrimination—the answer would seem to be "no," given that by plaintiffs' own account, Morilla's "complaints of discrimination . . . continued." (Pls. Opp. Br. at 31.)  Nor is plaintiffs' assertion that Morilla was transferred "shortly after" her conversation with D'Allessio particularly helpful in establishing an inference of retaliatory animus on the basis of temporal proximity.  (See page 45 above.)

Supp. 2d 546, 553 (S.D.N.Y. 2009); see also cases cited on pages 141-42 & n.129 above. Because defendants rely entirely on their statute of limitations argument and fail to present any alternative argument for summary judgment, the Court should <u>DENY</u> defendants' summary judgment motion as to Morilla's § 1981, NYSHRL and NYCHRL retaliation claims against Robert D'Allessio and the City arising from Morilla's transfer from the Excavation Unit to the Forensics Unit.[140]/

Plaintiffs also argue that "Richard Brower was also later promoted and [Morilla] applied for the position." (Pls. Opp. Br. at 31.) Again, plaintiffs fail to specify which complaint triggered defendants' allegedly retaliatory decision to promote Richard Brower over Morilla (see id.); only two of her complaints have an ascertainable date. Morilla's complaint to D'Allessio occurred in 2012 (see pages 44-45 above); her NYSDHR complaint was filed on February 26, 2013 (see page 47 above). Richard Brower was promoted to Assistant Chief of the Excavation Unit on October 25, 2015 (see page 48 above)—years after these complaints. Once again, the Court concludes that a reasonable inference of retaliatory animus cannot be drawn from temporal proximity alone under these circumstances. (See cases cited on pages 147-48 above.) Morilla has failed to proffer "evidence tending to show a causal connection between [her] action[s] opposing [defendants'] alleged discrimination and" Brower's promotion. <u>Dudley</u> v. <u>N.Y.C. Hous. Auth.</u>, 12 Civ. 2771, 2014 WL 5003799 at *25 (S.D.N.Y. Sept. 30, 2014) (quotations omitted). The Court

---

[140]/      Unlike Morilla's discrimination claim arising from Gary Grandstaff's promotion to Assistant Chief, it cannot be said that her retaliation claim "aris[es] out of the same events" discussed in her NYSDHR complaint. See, e.g., Coppedge v. N.Y.C. Sales Inc., 10 Civ. 6349, 2011 WL 4343268 at *2 (S.D.N.Y. Sept. 8, 2011) (quotations omitted); see also cases cited on page 75 above. Although that complaint alleged that when an Assistant Chief position opened up in 2011, Bernard Ross told her that the position was closed (see page 79 above), those facts cannot reasonably be said to encompass Morilla's claim that she was transferred to the Forensics Unit in retaliation for complaining to Robert D'Allessio that the Assistant Chief position was closed.

therefore should <u>GRANT</u> defendants' summary judgment motion as to Morilla's § 1981, NYSHRL and NYCHRL retaliation claims arising from Richard Brower's promotion to Assistant Chief of the Excavation Unit.

## **<u>CONCLUSION</u>**

For the reasons set forth above, the Court should rule as follows with respect to each plaintiff:

**Gary McCalla**

1. The Court should <u>DENY</u> defendants' summary judgment motion as to McCalla's § 1981, NYSHRL and NYCHRL failure to promote claims against Thomas Connors and the City arising from promotion of Philip DiMaggio and Thomas Solanto to Supervising Inspector. (<u>See</u> pages 88-96 above.)

2. The Court should <u>GRANT</u> defendants' summary judgment motion as to all of McCalla's remaining claims. (<u>See</u> page 96 n.87 above.)

**Rinville Dorsainville**

1. The Court should <u>DENY</u> defendants' summary judgment motion as to Dorsainville's § 1981, NYSHRL and NYCHRL failure to promote claims against Thomas Connors and the City arising from promotion of Philip DiMaggio and Thomas Solanto to Supervising Inspector. (<u>See</u> pages 96-101 above.)

2. The Court should <u>GRANT</u> defendants' summary judgment motion as to all of Dorsainville's remaining claims. (<u>See</u> page 101 n.93 above.)

**Dean Mulzac**

1. The Court should <u>DENY</u> defendants' summary judgment motion as to Mulzac's § 1981, NYSHRL and NYCHRL failure to promote claims against Thomas Connors

and the City arising from the promotions of Zafeirios Chatzis, Joseph Iacopetta and James Glynn. (See pages 101-04 above.)

2.    The Court should GRANT defendants' summary judgment motion as to all of Mulzac's remaining claims. (See page 11 n.7; page 104 n.69 above.)

**Delvin Henry**

1.    Pursuant to the election of remedies doctrine (see pages 76-77 above), the Court should DISMISS Henry's NYSHRL and NYCHRL claims arising out of:

A.    alleged salary disparities between whites and blacks at DOB;

B.    DOB's promotion of Juan Arias to Assistant Chief of the Emergency Response Unit;

C.    Dmitri Dits' failure to give Henry a raise on or before March 8, 2013;

D.    Dennis Zambotti's alleged denial of overtime pay to Henry while Henry was assigned to the Queens Construction Unit.

2.    The Court should GRANT defendants' summary judgment motion as to all of Henry's remaining claims. (See pages 104-10 & n.99; pages 145-47 above.)

**Asuquo Ukpong**

The Court should GRANT defendants' summary judgment motion as to all of Ukpong's claims. (See pages 111-13 & nn.101-02 above.)

**Richard Whint**

The Court should GRANT defendants' summary judgment motion as to all of Whint's claims. (See pages 114-18 & n.104 above.)

**Satish Patel**

1.    The Court should DENY defendants' summary judgment motion as to Patel's § 1981,

NYSHRL and NYCHRL failure to promote claims against Thomas Connors and the City arising from the 2013 promotion of James Glynn to Supervising Inspector. (See pages 119-20 above.)

2.    The Court should <u>GRANT</u> defendants' summary judgment motion as to all of Patel's remaining claims.  (See pages 118-22 & n.106 above.)

## Yvon Cantave

1.    Pursuant to the election of remedies doctrine (see pages 77-78 above), the Court should <u>DISMISS</u> Cantave's NYSHRL and NYCHRL claims arising out of:

   A.    Cantave's transfer from OEM to the BEST Squad;

   B.    Tom Mascialino's promotion to Chief of the ERT;

   C.    denial of overtime by Dmitri Dits;

   D.    Gina Bitro and Dmitri Dits holding important meetings without Cantave;

   E.    Gina Bitro's refusal to approve payment for OSHA training courses;

   F.    Cantave's July 2012 complaint to DOB's EEO.

2.    The Court should <u>GRANT</u> defendants' summary judgment motion as to all of Cantave's remaining claims.  (See page 39 n.23; pages 122-29 & n.111; pages 138-41; pages 147-48 & n.136 above.)

## Reginald Minault

1.    The Court should <u>DENY</u> defendants' summary judgment motion as to Minault's claims arising from the promotions of Mr. Powell, Mr. Rodriguez and Juan Arias. (See pages 129-30 above.)

2.    The Court should <u>GRANT</u> defendants' summary judgment motion as to all of Minault's remaining claims.  (See page 41 n.24; page 43 n.25; pages 130-31 & n.114

above.)

**Niurka Morilla**

1.    Pursuant to the election of remedies doctrine (see pages 78-79 above), the Court should <u>DISMISS</u> Morilla's NYSHRL and NYCHRL claims arising out of:

    A.    Morilla's conversation with Bernard Ross in which Ross told her that the position of Assistant Chief of Excavation was closed;

    B.    Morilla's conversation with Robert D'Allessio in which D'Allessio made sex-based comments;

    C.    coworkers mocking Morilla's Spanish accent;

    D.    Bernard Ross and Robert D'Allessio leaving Morilla "out of the loop" by not copying her on important emails.

2.    The Court should <u>DENY</u> defendants' summary judgment motion as to Morilla's § 1981 failure to promote claims against Robert D'Allessio arising from the promotion of Gary Grandstaff to Assistant Chief of the Excavation Unit.  (See pages 131-32 above.)

3.    The Court should <u>DENY</u> defendants' summary judgment motion as to Morilla's § 1981, NYSHRL and NYCHRL retaliation claims against Robert D'Allessio and the City arising from Morilla's transfer from the Excavation Unit to the Forensics Unit. (See pages 149-50 above.)

4.    The Court should <u>GRANT</u> defendants' summary judgment motion as to all of Morilla's remaining claims.  (See page 49 n.31; pages 131-37 & nn.115, 118, 120, 123; pages 138-41; pages 150-51 above.)

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Lewis A. Kaplan, 500 Pearl Street, Room 2240, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Kaplan (with a courtesy copy to my chambers).  Failure to file objections will result in a waiver of those objections for purposes of appeal.  Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Ingram v. Herrick, 475 F. App'x 793, 793 (2d Cir. 2012); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:      New York, New York
            August 14, 2017

_____
**Andrew J. Peck**
United States Magistrate Judge

Copies ECF to:      All Counsel
                    Judge Kaplan